Daniel P. Dalton, Michigan SBN P44056
*Pending admission pro hac vice*
DALTON & TOMICH, PLC
The Chrysler House
719 Griswold, Suite 270
Detroit, MI 48226
Tel:  (313) 859-6000
Fax: (313) 859-8888
Email: ddalton@daltontomich.com
*Lead Counsel for Plaintiff*

Andrew W. Zepeda, California SBN 106509
Elizabeth Tran, California SBN 331255
LURIE, ZEPEDA, SCHMALZ, HOGAN & MARIN
1875 Century Park East, Suite 2100
Los Angeles, CA  90067
Tel:  (310) 274-8700
Fax:  (310) 274-2798
Email:  azepeda@lurie-zepeda.com
          etran@lurie-zepeda.com

LURIE, ZEPEDA, SCHMALZ, HOGAN & MARTIN
1875 Century Park East, Suite 2100
Los Angeles, California 90067-2574

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALL PEOPLES CHURCH, a California Non-Profit Corporation<br><br>Plaintiff,<br><br>vs.<br><br>CITY OF SAN DIEGO, CALIFORNIA, a California Municipal Corporation,<br><br>Defendant. | Case No.: **'24 CV 0562 TWR MSB**<br><br>Hon. _____<br><br>**VERIFIED COMPLAINT AND PETITION FOR WRIT OF MANDATE**<br><br>**DEMAND FOR JURY TRIAL**<br><br>Date:<br>Time:<br>Dept: |

**Nature of the Case**

1.      This case is about how the City of San Diego ("City") has imposed its land use regulations in a manner that has substantially burdened the religious exercise of All Peoples Church ("Church") in violation of federal and state law through its denial of its Project to build a new House of Worship.

2.      This suit, which seeks damages as well as equitable relief, challenges the manner in which the City has implemented and imposed its land use regulations to deny the Church's Project and prohibit the Church's religious land use and its rights guaranteed by RLUIPA, the United States Constitution, and California law.

**Jurisdiction, Venue, and Request for Speedy Decision**

3.      This Court has original subject matter jurisdiction over this case under:

a.      42 U.S.C. § 2000cc-2(f) and 28 U.S.C. § 1331, as this action arises under the United States Constitution and laws of the United States;

b.      28 U.S.C. § 1343(a)(3), as this case is brought to redress deprivations under color of state law, of rights, privileges and immunities secured by the United States Constitution;

c.      28 U.S.C. § 1343(a)(4), as this case seeks to recover equitable relief under acts of Congress, specifically 42 USC § 1983 and 42 U.S.C. § 2000cc, which provide causes of actions for the protection of civil and constitutional rights and injunctive remedies;

d.      28 U.S.C. § 2201(a), as this case seeks declaratory relief under 28 U.S.C. § 2202;

e.      42 U.S.C. § 1988, to secure reasonable attorney fees as part of the case; and

f.      supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over the state law claims which are part of the same case or controversy.

LURIE, ZEPEDA, SCHMALZ, HOGAN & MARTIN
1875 Century Park East, Suite 2100
Los Angeles, California 90067-2574

4.     Venue is proper in this district under 28 U.S.C. § 1391(b)(1) because the City is situated in this district and under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rising to the claims occurred in this district.

5.     The Church respectfully requests a speedy decision and advancement on this Court's calendar under Fed. R. Civ. P. 57 and 28 U.S.C. § 2201.

### Parties and Property at Issue

6.     The Church has been organized as a religious nonprofit corporation in California since January 17, 2008.

7.     The Church started as a small group of people gathering in a living room.

8.     The Church has since grown to become an established non-denominational Christian church with a weekly attendance of about 800 people.

9.     Due to the Church's growth, it has outgrown various facilities and is in desperate need of a building large enough to accommodate its congregation, ministries, and the Church's anticipated future growth. The Church currently meets in a leased facility that substantially limits and burdens the Church's religious exercise as the leased facility cannot accommodate the Church's growing congregation or the ministries the Church believes it is called by God to perform. Further, the lease expires on June 30, 2024 and the Church must vacate the premises on December 31, 2024.

10.     The Church believes it is called by God to own and build a permanent home large enough to accommodate its growing congregation, its anticipated growth, and its various ministries. Towards that end, the Church searched for years for the right property.

11.     In 2017, the Church, through a California limited liability company titled Light on a Hill, LLC, purchased a 5.99-acre parcel of undeveloped property ("the Property") west of College Avenue, north of Interstate 8 ("I-8"), and south of Del Cerro Boulevard in the City and began its six (6)n year journey of site plan approval. The Property, located within the City, which is under the jurisdiction of this Court, is pictured below:

LURIE, ZEPEDA, SCHMALZ, HOGAN & MARTIN
1875 Century Park East, Suite 2100
Los Angeles, California 90067-2574



12.     The decades long vacant Property lies within the RS-1-7 (Residential-Single Unit) zone and the Navajo Community Plan area. (***Exhibit A***, *Report to the Planning Commission, dated September 21, 2023, at pages 1-2.*)

13.     The Property abuts a single-family residential development to the east, gas station to the north, a synagogue (Temple Emanu-El) and residential development to the west and the I-8 freeway to the south. *Id.*

**The Church's Religious Exercise**

14.     The religious mission of the Church is based on the gospel of Luke, Chapter 4 versus 18-19. In this passage of scripture, Jesus returns to his hometown in Nazareth and was asked to read from the scroll of the prophet Isaiah. Unrolling it, he found the place where it is written:

> The Spirit of the Lord is on me,
> because he has anointed me
> to proclaim good news to the poor.
> He has sent me to proclaim freedom for the prisoners
> and recovery of sight for the blind,
> to set the oppressed free,
> to proclaim the year of the Lord's favor.

15.     In accordance with Luke 4:18-19, the Church focuses on the practices of spirit empowered ministry, proclaiming the good news of the love of Jesus, serving the

poor, healing of physical, emotional, and racial pain, and blessing the other churches in our region as well as the City as a whole. The Church sums up its focus in its vision statement: "Get Rocked, Get Real and Give It Away," which means to Get rocked by God's love, Get real in community, and Give God's love away to the world around us.

16.   The Church believes that its purpose and mission compel their building of the Project pursuant to what the Church discerns to be its religious duty.

17.   In furtherance of the Church's sincerely held religious beliefs, the Church intends to build a place of religious assembly and worship at the Property.

18.   Specifically, the Church intends to build one structure that includes a 900-seat church sanctuary, staff offices, Sunday School classrooms and a multi-purpose room. The multi-purpose room is intended to serve as a multi-functional space, such as the youth room, fellowship hall and a basketball court. The basketball court is specifically designed to be smaller than "regulation size" as it will be without bleachers for spectators. It is anticipated that church staff will use the basketball court Monday through Thursday, 9:00 a.m. through 6:00 p.m., which is the hours that Pastors will be present. In the evenings and weekends this room will be used to host church youth recreational activities and other church activities that have been historically hosted at the church facility.

19.   The Church does not currently have access to a building large enough to accommodate its congregation and those the Church seeks to reach with the Gospel of Jesus Christ.

20.   Due to its growing congregation, the Church has been forced to conduct multiple worship services in a single day in an effort to accommodate all who wish to come.

21.   But even multiple worship services are not always enough to accommodate everyone, and the separate services have the effect of dividing the congregation and impeding the members' ability to seek unity and build relationships.

LURIE, ZEPEDA, SCHMALZ, HOGAN & MARTIN
1875 Century Park East, Suite 2100
Los Angeles, California 90067-2574

22.    The Church is unable to offer more than three services due to staff and logistical limitations, as well as the desire to follow the biblical mandate of gathering as much of the congregation together as possible for worship and fellowship.

23.    The Church's inability to host larger gatherings has a substantially burdened the Church's ability to host weddings, funerals, and other ministry events.

### The Proposed Project

24.    The Project involved the construction of a church/sanctuary building designed in a contemporary Spanish Colonial Revival-style theme as shown below:



25.    As noted in the copy of the Report to the Planning Commission (Ex. A), City staff told the Church it needed the following to gain approval of the Project:

- A Land Use Plan Amendment per San Diego Municipal Code Section ("SDMC") 122.0105(b) to amend the Navajo Community Plan;

- A Planned Development Permit ("PDP") pursuant to SDMC Section 126.0602(a)(2) to allow for the church use on the Project cite;

- A Site Development Permit ("SDP") in accordance with SDMC Section 126.0502(a)(2) to allow the development on a site with Environmentally Sensitive Lands ("ESL"); and

- A Tentative Map pursuant to SDMC Section 125.0430 for a one-lot Parcel Map to consolidate the ownership interest and for the vacation of a sewer, drainage, and slope easements. *See Exhibit A at page 6.*

LURIE, ZEPEDA, SCHMALZ, HOGAN & MARTIN
1875 Century Park East, Suite 2100
Los Angeles, California 90067-2574

LURIE, ZEPEDA, SCHMALZ, HOGAN & MARTIN
1875 Century Park East, Suite 2100
Los Angeles, California 90067-2574

26.     According to City staff, the Navajo Community Plan needed to be amended because it does not currently provide a separate land use designation for churches or places of religious assembly and does not permit churches or places of religious assembly uses as part of the Other Community Facilities map. *Id. at page 7.*

27.     The proposed amendment to the Navajo Community Plan would have allowed the site to retain its single-family residential zoning designation, as requested by City staff, and the change would identify and designate the Property for church use on the Other Community Facilities map. *Id.*

**City Staff Approve the Project**

28.     After years of various time-consuming and costly reviews, including environmental impact and traffics studies prepared pursuant to the California Environmental Quality Act ("CEQA"), the Project was found to have no transportation impacts. *Id.*

29.     Specifically, the Environmental Impact Report ("EIR") prepared for the Project and the associated Transportation Analysis, both of which were prepared under the City's direction and guidance, determined that the Church would result in a less than significant transportation impact. *Id. at pages 7 and 8.*

30.     The EIR also determined the Project would not result in land use-noise compatibility issues, or the exposure of people to current or future transportation noise levels that exceed City standards. *Id. at page 9.*

31.     In addition, the EIR found the Project to be consistent with the Navajo Community Plan and did not identify inconsistencies with any applicable City land use policies. *Id. at pages 10 and 11.*

32.     Ultimately, the EIR adopted by the City concluded that the Project would not have any significant and unmitigated environmental impacts under CEQA. *Id. at page 11.*

33.     City staff therefore recommended the City Council certify the EIR and approve all permits necessary for the Project. *Id.*

**Project Opposition Forms**

34.     Leadership of the Church met with the Del Cerro Action Council and the Navajo Community Planners, the latter of which is the recognized community planning group for the Navajo Community Plan area, in May 2019, to discuss the proposed Project and solicit input from these groups regarding the initial application.

35.     In May 2019, both the Del Cerro Action Council and the Navajo Community Planners reacted favorably to the Project, and both voted to instruct the Church to proceed through the planning process for approval of the Project.

36.     Thereafter, individuals opposed to the Project formed an ad hoc opposition group called "Save Del Cerro." The members of the "Save Del Cerro" group forced the Del Cerro Action Council to disband, then maneuvered to replace members of the Navajo Community Planners with members of the "Save Del Cerro" group in an effort to ensure the Navajo Community Planners would offer a negative recommendation of the Project to City staff.

37.     Once taking control of the Navajo Community Planners, the members of the "Save Del Cerro" disseminated false information, targeted the Church for discriminatory treatment, filed a meritless lawsuit against the Church's planner, harassed and intimidated anyone favoring the Project, trolled the Church and its leaders on social media and opposed the Project every step of the way.

38.     The "Save Del Cerro" opposition has been largely based on falsehoods concerning, or opposition to, the religious beliefs and values of the Church. The group publicly opposed the Project by falsely and maliciously characterizing the Church as "religious nuts," a "cult," "anti-gay," a "mega church," "kool aid drinkers," "bigots," "antisemites," and "false prophets."

39.     On August 21, 2023, the Navajo Community Planners voted 7-0 to recommend denial of the Project based primarily on opposition fomented and raised by "Save Del Cerro" during a lengthy public meeting on the Project.

LURIE, ZEPEDA, SCHMALZ, HOGAN & MARTIN
1875 Century Park East, Suite 2100
Los Angeles, California 90067-2574

40.    Some members of the Navajo Community Planners publicly expressed their support for incorrect and damaging statements made by "Save Del Cerro" at the August 21, 2023, meeting.

### The City Planning Commission Unanimously Approves the Plan

41.    On September 21, 2023, City staff issued a report to the City's Planning Commission that recommended approval of the Project and certification of the EIR. *See Ex. A*.

42.    On September 28, 2023, the City's Planning Commission voted 6-0-1 to recommend approval of the Project, subject to certain conditions, a number of which the Church subsequently incorporated into the Project. (***Exhibit B***, *Planning Commission Meeting Minutes*.)

43.    The video of the September 28, 2023 Planning Commission meeting can be seen on the City's webpage at https://sandiego.granicus.com/player/clip/8764   A request has been made for a transcript of this hearing, and once it is received, will be provided to the Court.

44.    Commissioner Kenneth Malbrough said that the Project "is probably the best use of [the] property." *See, Planning Commission video at 2:46:10 mark.*

45.    Commissioner Dennis Otsuji remarked that "if nothing is approved for this site it will just sit barren." *See, Planning Commission video at 2:48:45 mark.*

46.    Commissioner William Hofman noted that the Church had addressed the traffic, access, and compatibility issues "very well" and that approving the Project would result in "a lot safer [traffic] situation." *See, Planning Commission video at 2:54:10 mark.*

### The City Council Hearing

47.    The Project went before the City Council for approval on January 9, 2024.

48.    The video of the City Council's January 9, 2024 can be seen on the City's webpage at: https://sandiego.granicus.com/player/clip/8818 (beginning at the 2:08 mark). A request has been made for a transcript of this hearing, and once it is received, will be provided to the Court.

LURIE, ZEPEDA, SCHMALZ, HOGAN & MARTIN
1875 Century Park East, Suite 2100
Los Angeles, California 90067-2574

LURIE, ZEPEDA, SCHMALZ, HOGAN & MARTIN
1875 Century Park East, Suite 2100
Los Angeles, California 90067-2574

49.    At the City Council meeting, Martha Blake, the City's Project Manager, introduced and summarized the Church's application to the City Council. *See, City Council video at 2:09:00 mark.*

50.    Ms. Blake informed the City Council of the need to amend the Navajo Community Plan to provide for church and religious assembly uses within the Navajo Community Plan area. *See, City Council video at 2:12:00 mark.*

51.    Ms. Blake informed the City Council that the EIR and its associated Transportation Analysis determined that the Project would not result in a significant VMT impact. *See, City Council video at 2:16:00 mark.*

52.    Assistant City Attorney Leslie Fitzgerald specifically instructed the City Council that their decision concerning the Project was subject to the Religious Land Use & Institutionalized Persons Act, 42 U.S.C. § 2000cc et seq. ("RLUIPA"). *See, City Council video at 2:17:00 mark.*

53.    At the City Council meeting, civil engineering, and traffic experts both explained the infrastructure improvements the Church would make and detailed exactly why the Project would not cause any transportation impacts. *See, City Council video at around the 2:30 mark.*

54.    In fact, Justin Rasas with LOS Engineering, Inc., carefully explained to the City Council how the traffic analysis conducted for the Project was based on site-specific forecasted trips, which are higher than the number of trips if calculated using the City's Trip Generation Manual, ultimately resulting in a "worst-case", conservative analysis for purposes of CEQA. *See City Council video at around the 2:33 mark.*

55.    Marcela Escobar-Eck with the Atlantis Group provided an overview of the EIR and reiterated that the analysis determined the Project would not result in any significant and unmitigated impacts. *See, City Council video at around the 2:37 mark.*

56.    Ms. Escobar-Eck provided the City Council with nine examples of other places of worship which were allowed to locate in RS-1-7 zoning and near residential

developments in the Navajo Community Plan area and other community areas. *See, City Council video at around the 2:38 mark.*

57.    Of the thirteen places of religious assembly in the Navajo Community Plan area, eleven are on residentially zoned land, and nine of the eleven share the same RS-1-7 designation as the Property. *Id.*

58.    Ms. Escobar-Eck explained to the City Council how the Church is similarly situated to nearly every other church or religious assembly that has been permitted in the Navajo Community Plan area. *See, City Council video at around the 2:38 mark.*

59.    Ms. Escobar-Eck has more than 35 years of experience in the land use and development field with various government agencies.    She previously served as the Director for the Development Services Department at the City. She served as Chief Deputy Director in Development Services overseeing Project Management, and as Redevelopment Project Director for the Naval Training Center in the City's Planning Department.

## Councilmember Raul Campillo Opposes the Project

60.    City Councilmember Raul Campillo is the elected Council member of District 7, the district in which the Property is located. He is by training an attorney, with no land use, traffic, transportation, weather or engineering background or experience.

61.    Councilmember Campillo, who now lives approximately one-half mile from the Project site, did not disclose his planned and current property ownership at the hearing.

62.    Councilmember Campillo, who is currently running for re-election to council member for the District where this project is located, began meeting with the "Save Del Cerro" on January 28, 2021, three years prior to the hearing date, to discuss the Project. See, ***Exhibit C***

63.    As part of his efforts to oppose the Project, Councilmember Campillo or his staff prepared, well in advance of the City Council hearing, a lengthy power point with numerous factual and legal errors that was presented during Council comment on the item

and did not share or disclose the slides to representatives of the Church prior to the January 9, 2024, hearing.

64.    The City has not provided a copy of the statement and any background materials used to prepare the statement in response to a Public Records Request.

65.    Councilmember Campillo's opposition was rooted in erroneous traffic and transportation claims, including:

    a. A subjective, speculative false and unsupported claim that the Church improperly undercounted vehicle traffic with the inclusion of a basketball court in the Project. *See, City Council video near the 4:45:36 mark; City Council video near the 4:46:31 mark.*

    b. A subjective, speculative false and unsupported claim that the Project was located on a blind curve, which he believed to be a "concealed trap," which could result in an unexamined traffic safety hazard. *See, City Council video near the 4:54:45 mark.*

    c. A subjective, speculative false and unsupported claim that the Project is subject to an already existing "microclimate," that results in a slick and wet road. *See, City Council video near the 4:56:29 mark.*

    d. A subjective, speculative false and unsupported claim that the Project will result in an unsafe, "merge effect with cross-cutting maneuver," on College Avenue. *See, City Council video near the 4:57:03 mark.*

    e. A subjective, speculative false and unsupported claim that the EIR and experts reports of the City of San Diego, its consultants and the Church were faulty and false. *See, City Council video near the 4:58:46 mark.*

66.    It is unclear how an additional traffic study sought by Councilmember would have demonstrated that it considered a less restrictive means.

67.    Councilmember Campillo's comments were premised on the mistaken and misguided belief that the Church's proposed multi-use basketball court – which was

LURIE, ZEPEDA, SCHMALZ, HOGAN & MARTIN
1875 Century Park East, Suite 2100
Los Angeles, California 00067-2574

LURIE, ZEPEDA, SCHMALZ, HOGAN & MARTIN
1875 Century Park East, Suite 2100
Los Angeles, California 90067-2574

designed to be smaller than "regulation size," and without bleachers for spectators, and open for use Monday through Thursday, 9:00 a.m. through 6:00 p.m. - would be made available to the community at large, rendering the transportation analysis flawed. *See, City Council video at 4:45:36 mark.*

68.     Councilmember Campillo's other comments were premised on the mistaken and misguided claim that City staff and the Church experts failed to consider the geometry of College Avenue in the design of the Project, rendering the safety analysis flawed. *See, City Council video near the 4:58:46 mark.*

### City Staff Rebut the Inaccurate Arguments of Campillo

69.     City staff responded to Councilmember Campillo's comments by assuring the City Council that the applicant would be required to use the Project subject to the parameters of the development application, which did not include outside use of the basketball court, and the scope of the ultimate Project entitlements.  *See, City Council video at around the 5:05:07 mark.*

70.     Staff explained that the transportation analysis properly considered the safety impact of the Project as a whole and that the site-specific analysis was done simply to ensure that the CEQA review is accurate. *See, City Council video at around the 5:05:33 mark.*

71.     Staff transportation analyst explained that the VMT sought by the Councilmember Campillo is a measurement of the number of vehicles times the length of the trips and that safety impacts are examined by City Staff for lower trip volumes. Thus, a request for VMT does not result in greater safety impact. *See, City Council video at around the 5:05:56 mark.*

72.     Staff transportation analyst explained that the safety is the number one issue considered by engineers and the number one issue of all engineers on projects brought before council. *See, City Council video at around the 5:06:10 mark.*

73.     Staff transportation analyst explained that they looked at and were very concerned about the difference in grade on College Avenue, breaking the median and

having something with adequate site distance, pedestrians, and bicyclist, and had the Church look at site distance. *See, City Council video at around the 5:06:12 mark.*

74.     Staff the concluded that it reviewed the information provided to the City from the Church, that the EIR was complete and recommended approval. *See, City Council video at around the 5:10:18 mark.*

75.     The Church's transportation engineer, Mr. Justin Rasas of LOS Engineering, whose report was reviewed and approved by City Staff, addressed the City Council to correct Councilmember Campillo's efforts to misapply the applicable trip generation rate and improperly cherry-pick certain data points out of a complex report in an effort to undermine the expert analysis.

76.     Mr. Rasas properly noted that pursuant to the San Diego Transportation guide, the City provides that "Houses of Worship," include the basketball court as an "ancillary use," for purposes of traffic calculation and therefore, the traffic calculation was correct. *See, City Council video at around the 5:11:08 mark;* City of San Diego Transportation Guide, page C-4.

77.     Mr. Rasas comments to the City Council in response to Councilmember Campillo's statements is consistent with the City policy of calculating trip generation based on the primary use of a property, and not separating out the individual uses within a project. See, *Science Village Project, Table 2-1: Project Trip Generations, page 10 footnote, ** ("The project includes Specialty Retail amenities that are treated as non-trip generating space. These amenities include a 5,748 SF coffee shop, a 2,097 SF market, and 16,411 SF of common rooms (conference rooms and lounges, etc.) consistent with the current University Community Plan. These uses will be non-freestanding and oriented towards the interior of the project.")*

78.     City staff also clarified that, contrary to Councilmember Campillo's suggestion, City staff had reviewed the Project's potential safety impacts and that the City's consultant had "very rigorously addressed" any potential concerns. *See, City Council video at around the 5:06:12 mark.*

LURIE, ZEPEDA, SCHMALZ, HOGAN & MARTIN
1875 Century Park East, Suite 2100
Los Angeles, California 90067-2574

79.     City staff reiterated to the City Council that the EIR accurately analyzed all potential impacts associated with the Project and that no significant environmental impacts would occur with the development. *See, City Council video at around the 5:10:25 mark.*

### The Church Offers to Eliminate the Basketball Court

80.     Thereafter, representatives of the Church informed the City Council that the Church was willing to impose additional conditions on the use of the multi-use basketball court. *See, City Council video at the 5:12:50 mark.*

81.     In fact, an offer was made by the Church to remove the multi-use basketball court. *See, City Council video at the 5:30:04 mark.*

### The City Council Denies the Project

82.     After the Church offered to remove the basketball court from the project, the City Council took an eleven (11) minute recess, leaving the dais and entered into its private chambers to confer with staff and the City Attorney's office. *See, City Council video at the 5:31:05 -5:42:57 mark.*

83.     Staff then returned with two recommendations to satisfy the concerns regarding traffic. *See, City Council video at the 5:43:20 mark.*

84.     Councilmember Campillo refused the Church's offer based on his personal belief that the projects were "wrong," and that he could use an "independent judgment" based on his subjective belief of the use of the property.  He then used his clout as the elected Council member for District 7 to persuade five other Council members to reject the Project, despite the proposed modifications. *See, City Council video at the 5:46:39 mark.*

85.     The Council President, who later voted in favor of the Project, expressed their disagreement with Councilmember Campillo's efforts to question, for the very first time, the expert technical analysis and judgment of the City's professional staff. *See, City Council video at the 5:50:31 mark and the 5:50:31 mark.*

LURIE, ZEPEDA, SCHMALZ, HOGAN & MARTIN
1875 Century Park East, Suite 2100
Los Angeles, California 90067-2574

86.     The San Diego City Council ultimately voted 6-2 to deny the Project, despite the recommendations of City's staff and the Planning Commission. *See, City Council video at around the 5:52:22 mark.*

### FIRST CLAIM TO RELIEF
**Violation of the Religious Land Use and Institutionalized Persons Act**
**Substantial Burdens Provision 42 U.S.C. § 2000cc(b)(1)**

87.     Plaintiff incorporates the allegations in the preceding paragraphs by reference.

88.     Congress defined "religious exercise" to broadly include, "[a]ny exercise of religion, whether or not compelled by, or central to, a system of religious belief," and specifies that the "use, building, or conversion of real property for the purpose of religious exercise shall be considered to be religious exercise of the person or entity that uses or intends to use the property for that purpose."  42 U.S.C. 2000cc-5(7).

89.     Congress further directed that RLUIPA should be "construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution."  42 U.S.C. 2000cc-3(g).

90.     Congress provided in Section 2(a)(1) of RLUIPA statutory protections for "religious exercise" as follows: ""No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution . . . is in furtherance of a compelling government interest [and] is the least restrictive means of furthering that compelling government interest." U.S.C. 2000cc(a)(1)

91.     By applying its land development code to the Project, the City has made an "individualized assessment" of the Church's religious land use within the meaning of 42 U.S.C. § 2000cc(a)(2)(C).

LURIE, ZEPEDA, SCHMALZ, HOGAN & MARTIN
1875 Century Park East, Suite 2100
Los Angeles, California 90067-2574

LURIE, ZEPEDA, SCHMALZ, HOGAN & MARTIN
1875 Century Park East, Suite 2100
Los Angeles, California 90067-2574

92.     As explained above, the Church's sincere religious beliefs compel it to obey the biblical command to gather together for corporate worship and welcome all guests who wish to come so that the Gospel can be spread, and needs can be met.

93.     The Church's current facilities are insufficient to accommodate the Church's existing congregation and those being led to the Church. This limitation persists despite the Church's efforts to accommodate the increased attendance with multiple service times.

94.     The Church worked diligently and in good faith with City staff and members of the community for six (6) years, modified it plans on several occasions and addressed the various concerns that were raised regarding possible transportation impacts and offered to make changes to its facility to alleviate any potential impacts alleged by the public and City Council.

95.     By offering to remove the basketball court at the City Council hearing, the Church again made a good faith effort to comply with the City's concerns regarding traffic and transportation.

96.     The City Council denied the Project by disregarding the recommendations, findings, and reports of the City's professional staff and outside experts and the findings of the City's Planning Commission.

97.     By denying the Project, the Church's intended religious land use, the City has placed a substantial burden on the Church's religious exercise. Indeed, the City Council's denial was not supported by the evidence in the public record; did not provide the Church with an adequate opportunity to respond or take steps to address the City Council's concerns; and will force the Church to turn people away in violation of the Church's sincere religious beliefs as described herein. The burden placed on the Church by the City Council's denial is significantly great and is much more than a simple inconvenience.

98.     Councilmember Campillo's and the City's generalized and speculative concerns about traffic and parking are not compelling. Councilmember Campillo's and

the City present no evidence that any traffic or transportation concerns actually existed, nor that such concerns could not be mitigated in such a way as to allow the Church's use at the subject property.

99.    The City's zoning and land use approval process has already caused the Church significant delay, uncertainty, and expense, and the City Council's denial forces the Church to start all over and suffer additional delay, uncertainty, and expense that will be required to restart its search for a new property.

100.    The City's actions have to a significantly great extent lessened the prospect of the Church being able to construct a new House of Worship in the City.

101.    Under the totality of the circumstances, the City has imposed a substantial burden on the Church's religious exercise

102.    The City was required to show a compelling interest in imposing the burden on religious exercise in the particular case at hand, not a compelling interest in general.

103.    The City Council's complete denial of the Project is not the least restrictive means of achieving any compelling government interest that could be asserted by the City.

104.    The City Council's actions have chilled the Church's efforts to build a church in the City because it would take years, extensive efforts, and expenses to go through another land use approval process—all the while fearing that the City Council would yet again disregard the recommendations of staff and the Planning Commission.

105.    As a direct result of the City's violations of RLUIPA's substantial burden provision, the Church is suffering irreparable harm for which there is no adequate remedy at law.

106.    Furthermore, as a direct result of the City's violations of RLUIPA's substantial burden provision, as alleged above, the Church is entitled to recover damages, costs, and attorney fees.

107.    The Church therefore respectfully requests the relief identified below.

LURIE, ZEPEDA, SCHMALZ, HOGAN & MARTIN
1875 Century Park East, Suite 2100
Los Angeles, California 90067-2574

LURIE, ZEPEDA, SCHMALZ, HOGAN & MARTIN
1875 Century Park East, Suite 2100
Los Angeles, California 90067-2574

## SECOND CLAIM TO RELIEF
### Violation of the Religious Land Use and Institutionalized Persons Act Nondiscrimination Provision 42 U.S.C. § 2000cc(b)(1)

108.   Plaintiff incorporates the allegations in the preceding paragraphs by reference.

109.   RLUIPA's Nondiscrimination Provision states, "[n]o government shall impose or implement a land use regulation against any assembly or institution on the basis of religion or religious discrimination." 42 U.S.C. § 2000cc(b)(2).

110.   The City has imposed its land use regulations against the Church in a manner that is less favorable than the City has treated other religious assemblies in the Navajo Community Plan area.

111.   The City has imposed land use regulations against the Church on the basis of religious discrimination fomented by the opposition referenced above.

112.   As a direct result of the City's violations of 42 USC § 2000cc(b), as alleged above, the Church is suffering irreparable harm for which there is no adequate remedy at law.

113.   Furthermore, as a direct result of the City's violations of 42 USC § 2000cc(b), as alleged above, the Church is entitled to recover damages, costs, and attorney fees.

114.   The Church therefore respectfully requests the relief identified below.

## THIRD CLAIM TO RELIEF
### Violation of the Right to Free Exercise of Religion Guaranteed by the First Amendment to the United States Constitution (42 USC § 1983)

115.   Plaintiff incorporates the allegations in the preceding paragraphs by reference.

116.   As stated above, the Church seeks to build a place of religious assembly at the Property in furtherance of its sincerely held religious beliefs.

117.   The City has prohibited the Church from proceeding with its religious exercise.

118.   The City has applied its land use regulations in this case through a process involving individualized assessments of the Church and its Property.

119.   The City's enforcement of its land use regulations in this case is not neutral or of general applicability.

120.   The City's land use regulations allow the City to grant discretionary exceptions and approvals that the City has denied the Church in this case.

121.   The City has imposed its land use regulations in a manner that treats the Church's religious land use less favorably than comparable secular activities.

122.   The City's actions in this matter are not narrowly tailored to any compelling government interest.

123.   The City's actions in this case are not rationally related to any legitimate government interest.

124.   As a direct result of the City's violations of the U.S. Constitution, as alleged above, the Church is suffering irreparable harm for which there is no adequate remedy at law.

125.   Furthermore, as a direct result of the City's violations of the U.S. Constitution, as alleged above, the Church is entitled to recover damages, costs, and attorney fees.

126.   The Church therefore respectfully requests the relief identified below.

## **FOURTH CLAIM OF RELIEF**
**Violation of the Right to Free Speech and Assembly Guaranteed by the First Amendment to the United States Constitution (42 USC § 1983)**

127.   Plaintiff incorporates the allegations in the preceding paragraphs by reference.

128.   The First Amendment to the U.S. Constitution prohibits government decision makers from "abridging the freedom of speech . . . or the right of the people to peaceably assemble."  U.S. CONST. amend. I.

129.   The First Amendment generally prevents government from proscribing speech, or even expressive conduct, because of disapproval of the ideas expressed. Content-based regulations are presumptively invalid. *Reed v. Town of Gilbert, AZ., 135 S. Ct. 2218, 2227 (2015).*

130.   The First Amendment protects the right to "expressive association," or "the right to associate for the purpose of speaking." *Rumsfeld v. Forum for Academic and Inst. Rights, Inc.,* 547 U.S. 47, 68 (2006).

131.   In circumstances in which religious and non-religious assembly uses are operationally similar (from the perspective of the proper purposes and objectives of government zoning authority), the Land Development Code treats differently religious and non-religious assemblies on the basis of religious speech.

132.   The Land Development Code, as implemented and applied by the City of San Diego, differentiates religious assemblies and secular assemblies by means of analysis of the content of the speech of those who would use the property for assembling, and assigns discriminatory burdens to those users whose speech is religious.

133.   Defendant's discriminatory treatment of religious land uses, including that of Plaintiff, constitutes a content-based and viewpoint-based restriction on speech.

134.   The content and viewpoint-based restrictions of Defendant's Land Development Code that are placed upon Plaintiff are not supported by a compelling governmental interest and are not narrowly tailored to accomplish a compelling governmental interest.

135.   The regulation of religious land uses in the Land Development Code is not a legitimate time, place, or manner regulation, as it does not serve a significant government interest, and does not leave open ample alternative channels for communication.

136.   The Land Development Code, to the extent it requires Plaintiff and all other group worship facilities to obtain special dispensation from the City to use land for religious assembly, as well as affords Defendant unfettered discretion to decide whether to allow religious speech and does not contain in that process the procedural safeguards

LURIE, ZEPEDA, SCHMALZ, HOGAN & MARTIN
1875 Century Park East, Suite 2100
Los Angeles, California 90067-2574

necessary for a speech-related permit scheme, constitutes a prior restraint on Plaintiff's speech in violation of the First Amendment to the United States Constitution.

137. By discriminating against religious land uses, Defendant has violated and continues to violate Plaintiff's right to the Freedom of Speech under the First Amendment.

138. In addition, the Land Development Code, to the extent it imposes discriminatory burdens on those who seek to assemble in the City for religious exercise and speech, violates Plaintiff's right to assemble and associate for the purpose of engaging in activities protected by the First Amendment.

139. The City of San Diego Land Development Code is a land use regulation or system of land use regulations under which the City makes, or has in place, formal or informal procedures or practices that permit it to make individualized assessments of the proposed uses for property in its jurisdiction.

140. As a direct result of the City's violations of Plaintiff's rights under the First Amendment to the United States Constitution, as alleged above, Plaintiff has suffered and is entitled to recover damages, equitable relief, costs, and attorney fees.

## FIFTH CLAIM OF RELIEF
### Violation of the California Constitution

141. Plaintiff incorporates the allegations in the preceding paragraphs by reference.

### Free Exercise of Religion:  Article 1, Section 4

142. The California Constitution provides (in relevant part) that "[f]ree exercise and enjoyment of religion without discrimination or preference are guaranteed. The liberty of conscience does not excuse acts that are licentious or inconsistent with the peace and safety of the state." Cal. Const. Art.1, Sec.5.

143. California Courts have determined that a law could not be applied in a manner that substantially burdens religious belief or practice unless the state showed that the law represented the least restrictive means of achieving a compelling governmental

LURIE, ZEPEDA, SCHMALZ, HOGAN & MARTIN
1875 Century Park East, Suite 2100
Los Angeles, California 90067-2574

interest, or in other words, was narrowly tailored. *Catholic Charities of Sacramento, Inc. v. Superior Court,* 32 Cal. 4th 527, 562 (2004).

144.   The City has unlawfully deprived and continues to deprive the Church, and its members, of their right to freedom of religion, as secured by Article 1, Section 4 of the California Constitution, by discriminating against the Church and by substantially burdening their ability to freely exercise their religious faith.

145.   Defendant, City of San Diego, has deprived and continue to deprive Plaintiff, and its members, of their right to freedom of religion, as secured by Article 1, Section 4 of the California Constitution, by discriminating against Plaintiff's religious character and by substantially burdening their ability to freely exercise their religious faith.

### Freedom of Association:  Articles 1, Section 3

146.   Defendant, City of San Diego, has deprived and continue to deprive Plaintiff, and its members, of their right to freely assemble for the purposes of religious education, as secured by Articles 1, Section 3 of the California Constitution, by prohibiting association for religious worship in a location where nonreligious groups would be permitted to associate for secular assembly.

### Equal Protection:  Article 1, Section 7

147.   Defendant, City of San Diego, has deprived and continue to deprive Plaintiff, and its members, of their right to equal protection of the laws, as secured by Article 1, Section 7 of the California Constitution, by discriminating in their application of the laws, land use regulations and plans of the State of California and those of the City based on religion.

### <u>SIXTH CLAIM TO RELIEF</u>
### Petition for Writ of Mandate (California Code of Civil Procedure § 1094.5)

148.   Plaintiff incorporates the allegations in the preceding paragraphs by reference.

149.   The City was required by law to, and did, hold a public hearing on the Project. Furthermore, the City Council was required by law to, and did, take evidence at

LURIE, ZEPEDA, SCHMALZ, HOGAN & MARTIN
1875 Century Park East, Suite 2100
Los Angeles, California 90067-2574

the hearing, and it had discretion in determining the facts underlying its decision as to whether to approve the Project.

150.   The City Council's decision to deny the Project constituted an abuse of discretion and resulted in findings not supported by the evidence.

151.   The City Council's decision to deny the Project violated RLUIPA and the constitutional provisions alleged above.

152.   The Church performed all duties and conditions precedent to filing its application.

153.   The Church protested the City's actions in the administrative record and offered reasons for its protest in the administrative record.

154.   The Church has fully exhausted any and all administrative remedies available to it by submitting to the City Council's hearing.

155.   The Church is a real-party-in-interest, is beneficially interested, and has a clear, present, and substantial right to performance because it owns the Property at issue and had its Project rejected.

156.   The Church has no plain, speedy, and adequate remedy in the ordinary course of California law, other than the requested writ of mandate, in that no California legal remedy would invalidate the City Council's denial.

157.   The Church therefore respectfully requests the relief identified below.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, the Church respectfully requests a judgment against Defendant City of San Diego and that this Honorable Court:

A.   Adjudge, decree, and declare the rights and other legal relations of the parties to the subject matter in controversy in order that such declaration shall have the force and effect of final judgment and that the Court retains jurisdiction of this matter for the purpose of enforcing the Court's Order.

B.   Pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 57, declare that the Church may proceed with its Project as proposed and direct the City to issue all necessary permits and approvals.

LURIE, ZEPEDA, SCHMALZ, HOGAN & MARTIN
1875 Century Park East, Suite 2100
Los Angeles, California 90067-2574

C.     Pursuant to 28 U.S.C. § 2202, Fed. R. Civ. P. 64, 42 U.S.C. § 1983 and 42 U.S.C. § 2000cc preliminarily and permanently enjoin the City from enforcing its land use regulations to prevent the Church from completing its Project as proposed and as the City's Planning Commission recommended for approval.

D.     Pursuant to 28 U.S.C. § 2202, Fed. R. Civ. P. 65, 42 U.S.C. § 1983 and 42 U.S.C. § 1988 and 42 U.S.C. § 2000cc-2(a), award the Church all necessary and appropriate relief including compensatory and nominal damages.

E.     Declare that the City has violated the Church's rights under the aforementioned provisions of RLUIPA, the First Amendment of the United States Constitution, and the California Constitution.

F.     Declare that the City Council's decision to deny the Church's application is void as an abuse of discretion and not supported by the administrative record.

G.     Pursuant to 42 USC § 1988, 42 USC § 2000cc-2(d), Fed. R. Civ. Pro. 54(d), California Government Code §800 and other applicable law, award the Church its reasonable attorney fees, costs; and

H.     Grant such other and further relief as the Court deems equitable, just, and proper.

## Demand for Jury

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, All Peoples Church hereby demands a trial jury in the action of all issues so triable.

Dated:  March 25, 2024                    DALTON & TOMICH

                                          By: *s/ Daniel Dalton*_____
                                              DANIEL P. DALTON
                                              Lead Attorney for Plaintiff All Peoples Church

Dated:  March 25, 2024                    LURIE, ZEPEDA, SCHMALZ, HOGAN & MARTIN

                                          By: *s/ Andrew W. Zepeda*_____
                                               ANDREW W. ZEPEDA
                                               ELIZABETH TRAN
                                               Attorneys for Plaintiff All Peoples Church

**Verification**

Pursuant to 28 U.S.C. § 1746 I, Robert Herber, hereby declare under penalty of perjury that the factual allegations contained in the complaint and petition for mandate are true, and that I have personal knowledge of the same and can attest to the same at trial.

Dated:  March 25, 2024

By: *s/ Robert Herber*
Pastor Robert Herber

LURIE, ZEPEDA, SCHMALZ, HOGAN & MARTIN
1875 Century Park East, Suite 2100
Los Angeles, California 90067-2574