'24 CV 0562 TWR MSB



THE CITY OF SAN DIEGO

# Report to the Planning Commission

DATE ISSUED:         September 21, 2023                          REPORT NO. PC-23-039

HEARING DATE:        SEPTEMBER 28, 2023

SUBJECT:             ALL PEOPLES CHURCH, Process Five Decision

PROJECT NUMBER:      636444

OWNER/APPLICANT:     LIGHT ON A HILL, LLC

<u>SUMMARY</u>

Issue: Should the Planning Commission recommend to City Council approval of an amendment to the General Plan and the Navajo Community Plan to add a designation of "church" on a 5.99-acre site designated "Residential", and a Site Development Permit, Planned Development Permit, Tentative Map, a revestment of access rights and Easement Vacations (including a vacation of slope, sewer, drainage and utility easements and related site work) for development of a new 900-seat church and parking structure west of College Avenue, North of Interstate 8, and south of Del Cerro Boulevard within the Navajo Community Plan area?

<u>Staff Recommendation(s):</u>

1.    Recommend the City Council certify Environmental Impact Report (EIR) No. 636444/SCH No. 2021100394 and adopt the Mitigation, Monitoring, and Reporting Program (MMRP); and
2.    Recommend the City Council approve the General Plan/Community Plan Amendment No. 2292367; and
3.    Recommend the City Council approve Site Development Permit No. 2292338 and Planned Development Permit No. 2292339; and
4.    Recommend the City Council approve Tentative Map No. 2490918 including the revestment of access rights; and
5.     Recommend the City Council approve Easement Vacation No. 2292340, including the vacation of slope, sewer, drainage and utility easements.

<u>Community Planning Group Recommendation:</u>  On August 21, 2023, the Navajo Community Planners, Inc., the recognized community planning group (CPG) for the Navajo Community

**Ex. A, p. 001**

Plan area voted 7-0 to recommend denial of the project as proposed.

Environmental Review: Environmental Impact Report (EIR), Project PTS 636444/SCH 2021100394, has been prepared for the project in accordance with State of California Environmental Quality Act (CEQA) Guidelines. A Mitigation, Monitoring and Reporting Program has been prepared and will be implemented which will reduce, to below a level of significance, any potential impacts identified in the environmental review process.

Fiscal Impact Statement:  No fiscal impact. All costs associated with the processing of the application are recovered through a fee paid for by the Applicant.

Housing Impact Statement:  This project does not propose housing, nor does it propose to change the underlying zone, but with this proposed development, no housing would be built on residentially zoned land that may be able to accommodate a maximum of 52 dwelling units based on the underlying RS-1-7 Zone and the size of the property.

## **BACKGROUND**

Location:
The 5.99-acre project site is a vacant property located immediately north of Interstate 8 on the east side of College Avenue, within the Navajo Community Plan area. (Attachments 1 & 2)

Community Plan Land Use Designation:
The site is designated as Very Low/Low-Density Residential use at a density range between zero to nine dwelling units per acre (du/ac) in the Navajo Community. (Attachment 3)

Zoning:
The site is within the RS-1-7 (Residential-Single Unit) Zone, and the Montgomery Field Airport Land Use Compatibility Overlay Zone, Airport Influence Area (Review Area 2), and the Parking Impact Overlay Zone (Campus). (Attachment 4)

Prior Approval:
The site was previously approved for a 52-unit residential subdivision by the San Diego City Council in 1979 (PRD 20-115). Thereafter, several extensions of time (EOT) were approved with a final EOT approval in 1984, which expired in 1986. There is an active approval for 24 single-family homes that was approved by City Council on December 12, 2017; an EOT for that approval was also granted. It was ultimately decided by the property owner that the best use of the site was not for residential use but instead for institutional/commercial use due to its proximity to the freeway.

Existing Use:
The site remains an undeveloped property located within a fully urbanized area.

Adjacent Uses:
It abuts single-family residential development to the east, gas station to the north, single-family residential development and Temple Emanu-EL west of College Avenue, and City-owned open space and Interstate-8 to the south/southeast. San Diego State University is located south of Interstate-8,

approximately a half-mile from the project site.

Transit:
The development project site is within a Transit Priority Area. The project site is within 500 feet of a transit stop at College Avenue and Del Cerro Boulevard which is served by MTS Routes 14 and 115.

Environmentally Sensitive Lands:
The site contains Environmentally Sensitive Lands (ESL) in the form of biological resources.

Topography:
The project site is an elongated and irregularly shaped lot. Topography on site generally slopes down toward the southwest with approximate elevations ranging from 450 mean sea level at the northerly limits of the site to 356 mean sea level at the southwest corner. There are slopes up to approximately 25 feet high along the northwesterly property boundary ascending to College Avenue.  According to the geotechnical investigation report, the site was previously partially graded to its current configuration in the late 1950's to early 1960's in relation to the construction of the residential development to the east, College Avenue to the west and Interstate 8 and associated College Avenue off ramp to the south and southwest. The report further states that fill of 20 to 30 feet deep appear to have been placed in the southwesterly portion of the site associated with the residential development to the southeast, based on historic photos and topographic maps.  A slope analysis of the project site confirmed the site does not contain steep hillsides as defined in San Diego Municipal Code Section 113.0103.

Community Plan Amendment Initiation:
The proposed CPA was initiated by the Planning Commission at their July 19, 2018, meeting. Issues identified during the CPA initiation process addressed site design relative to the natural environment of the site; the appropriateness of the land use for the site; and access to the site. (Attachment 5)

## DISCUSSION

Project Description:

The project consists of the construction and operation of a 54,476-square-foot church/sanctuary building and a 71,010-square-foot, two-level parking garage and surface parking areas on a 5.99-acre vacant site. The proposed project would include a 900-seat sanctuary space with accessory uses (i.e., Sunday school classrooms, offices, and a multi-purpose room/gym), and various site improvements, such as circulation, landscaping, and utility connections which are described below. Of the 900 seats, 587 seats would be fixed in place and 3,690-square-foot would accommodate the remaining non-fixed seats. Congregation gatherings would primarily occur on Sundays; small group activities may occur during the weekdays or on Saturdays. No primary educational school spaces are proposed as part of the project.

The project site is designated and zoned for residential use. The surrounding project area is composed of residential neighborhoods interspersed with commercial, educational, and religious facilities, as well as undeveloped hillsides and open space. The project site generally sits below the

residential lots to the east and does not have access to neighborhood streets. The site is separated from the neighborhood to the west by College Avenue, a major street. The project is proposed on an infill site located between College Avenue and a residential neighborhood to the east. The project would include a private driveway/ secondary entrance to the site along College Avenue, with the addition of a traffic signal at the location of the primary entrance/private driveway.

The site plan illustrating the layout of the project is included as Attachment 15, Development Plans. As shown in the site plan, the church/sanctuary building would be situated in the southern portion of the property with the parking garage and main surface parking lot located at grade northerly of the building. An entry plaza would be constructed between the church/sanctuary building and the parking structure. In addition to arrival and departure activities, outdoor activities in the entry plaza would be shielded from nearby residential properties by the church/sanctuary building and the parking structure. Access to the site would be via two private driveway entrances including a new signalized three-way intersection and a new secondary private, gated driveway at the northern edge of the project site for right-in/right-out movements along College Avenue.

Architectural Design

The church/sanctuary building is designed in a contemporary Spanish Colonial Revival-style theme featuring arched entrances and windows along its painted concrete tilt-up facades, with accents of wood fascia and terra-cotta-colored tile roofing materials. The glazing for each window would be tinted bronze in color. Exterior building elevations and building articulations are shown in Site Development Plans. The building would feature two levels with front and rear vestibules located on the first floor.

Regarding the architectural design, most of the church/sanctuary building and its parapet wall around the flat roof areas would comply with the 30-foot height limit established in the SDMC. To create visual interest, three pitched roof towers would extend from 45 to 48 feet above grade and the cross would extend an additional 8 feet above the 45-foot roof tower on the western elevation to 53 feet above grade. These features are illustrated in the elevations in the development plans and require approval of building height deviations as described above. As shown in the cross-sections, the building rooflines and cross would remain below the grade of the adjacent residential lots along Marne Avenue and the west end of Glenmont Street. The setback deviations are proposed due to the elongated, irregular shape of the lot relative to its frontage with College Avenue.

The two-level parking structure would be recessed into the terrain such that the top deck would be below the grade of College Avenue. The lower and upper parking levels of the structure would be connected through an internal vehicle ramp. The primary surface parking lot would be constructed north of the parking structure at grade with College Avenue and connected to the upper level of the parking structure via internal roads. Smaller surface parking areas would be provided south and east of the parking structure and church/sanctuary building as shown on the project site plan. The parking structure would contain 203 parking spaces, while surface parking areas would hold 153 spaces, for a total of 356 parking spaces. Parking would be provided for standard vehicles, accessible vehicles, clean air vehicles, carpool vehicles, electric vehicles, motorcycles, and bicycles. The number of parking spaces for vehicles would exceed the City's minimum parking requirements

of 319 parking spaces by 37 parking spaces. Refuse/recycling areas would be provided in the surface parking area east of the church/sanctuary building.

The design of the parking structure would be consistent with the architectural style of the church/sanctuary building by featuring painted concrete walls with arched entries (as shown in the development plans). The upper deck of the parking structure would feature planters with landscaping that would meet or exceed the requirements in the City's Land Development Code.

Landscape and Grading

The proposed landscape plan (features the use of native/naturalized and/or drought-tolerant plant material, whenever possible. No invasive or potentially invasive species would be used. In general, the landscape improvements along College Avenue would create a 14- to 16-foot-wide parkway featuring a 12-foot-wide shared sidewalk and street side canopy, shade-producing street trees and ground covers from the property line north to the private driveway. North of the private driveway, a 10- to 12-foot-wide parkway would be installed, consisting of street side canopy, shade-producing street trees and a 5-foot-wide sidewalk. Entry monumentation and landscape treatments would be installed on site at the southeast corner, near the driveway entrance.

Plant material would be used throughout the site to help define spaces, encourage circulation paths, highlight entry points, provide visual relief, and screen retaining walls and off-site properties. On-site landscaping would include canopy shade trees and raised box plantings on the upper deck of the parking structure, shade-producing trees in the parking areas, accent planting zones featuring palms and focal point species, and ground cover, shrubs and trees used for slope plantings. A minimum 5-foot-wide landscape buffer containing spreading ground covers, taller screening shrubs and canopy trees, ranging in height from 25 to 40 feet, would be installed between the proposed surface parking areas and residential properties to the east.

The manufactured slope that would wrap around the south-facing slope below the existing neighborhood would feature extensive landscape treatments including spreading ground covers, large shrubs and canopy trees, up to 25 feet in height. The retaining walls along the southern project border would be landscaped with trees and vining species to soften and conceal their visibility. In addition, plant material would be placed within the stormwater biofiltration basins that would be constructed as part of the project (refer to Section 3.2.6 of the EIR) to provide stormwater management by collecting and treating runoff prior to its release off-site. A portion of the existing eucalyptus woodland and Diegan coastal sage scrub located in the southeast corner of the site would be retained in place.

Approximately 93 percent of the project site would be graded to accommodate the development of the project. Approximately 16,500 cubic yards of cut and 39,000 cubic yards of fill (including 22,500 cubic yards of import) would be required to implement the grading plan. The maximum depth of excavation would be 25.5 feet, as measured vertically, and the maximum depth of fill would be 28 feet. To implement the site plan and avoid the need to obtain an encroachment permit for grading into the Caltrans right-of-way, retaining walls are proposed along the southern and southwestern limits of grading. The walls would exceed the 6-foot height limit allowed by the LDC and would require approval of a deviation. Landscape screening and vining species would be installed above and

below the retaining walls to soften their appearance as shown in Figure 3-6 of the EIR.

Required Approvals:

Due to process consolidation, all actions are processed concurrently as a Process Five approval. Development of the proposed project requires the following approvals:

1.  A Land Use Plan Amendment per San Diego Municipal Code Section (SDMC) section 122.0105(b) to amend the Navajo Community Plan.

2.  A Planned Development Permit (PDP) is required pursuant to SDMC section 126.0602(a)(2) to allow for the church use on the project site as the project complies with the proposed land use plan designation but is not permitted in the underlying base residential zone (RS-1-7). The PDP would also allow deviations listed below from the development regulations of the zone. There are four proposed deviations from the RS-1-7 development regulations that would be allowed by the approval of the PDP.

3.  A Site Development Permit (SDP) in accordance with SDMC section 126.0502(a)(2) to allow the development of a site with Environmentally Sensitive Lands (ESL). Mitigation would be required to offset the project's direct impacts to sensitive habitat outside the City of San Diego's Multi-Habitat Planning Area (MHPA) and would comply with the City's Multiple Species Conservation Program (MSCP), as enforced by compliance with the ESL Regulations of the City's Land Development Code (LDC), which is part of the SDMC. Therefore, the project would result in less-than-significant land use impacts with mitigation incorporated.

4.  A Tentative Map pursuant to SDMC section 125.0430 for a one-lot Parcel Map to consolidate the ownership interest and for the requested vacation of sewer, drainage and slope easements within the proposed subdivision boundaries.

Proposed Deviations:

To implement the project, several deviations from the RS-1-7 zone related to building height, retaining wall height, side yard setback, and bicycle parking are proposed as shown below, *Proposed Development Deviations*. The deviations pertain to increased building height to construct a structure that conveys an institutional use and creates architectural interest; increased retaining wall height to create a building pad and avoid grading in the California Department of Transportation (Caltrans) right-of-way; reduced side yard setback adjacent to Caltrans right-of-way to accommodate the irregular lot configuration relative to College Avenue; and to correlate the required number of long-term bike parking spaces to the number of staff, instead of the congregation who are short-term bicycle users on the site. The proposed deviations related to the project design features would result in less-than-significant aesthetic impacts as discussed in Section 5.5, *Visual Effects and Neighborhood Character*, of the EIR.

Ex. A, p. 006

**PROPOSED DEVELOPMENT DEVIATIONS**

| Development Regulations | Required | Proposed |
|---|---|---|
| Maximum Building Height Limits [San Diego Municipal Code (SDMC) §131.0431(b)] | 30 feet above grade | 53 feet above grade (limited to architectural projections only) |
| Maximum Wall Height Limits [SDMC §142.0340(d)(1)] | 6 feet above grade | 20 feet above grade |
| Minimum Building Side Yard Setbacks [SDMC §131.0431(b)] | 84 feet, 2 inches | 14 feet |
| Long-Term Bicycle Parking | 16 spaces | 3 spaces |

Community Plan Amendment:

Approval of the Community Plan Amendment would allow the religious assembly use within the residential designation to be consistent with the Navajo Community Plan. The plan amendment would amend the Other Community Facilities map (Figure 24) of the community plan to designate this site to allow a religious institution consistent with the land use designation for other religious institutions in the community. Since the community plan land use map does not provide a separate land use designation for churches or places of religious assembly, City staff in the preliminary review for the proposed development, recommended amending the Other Community Facilities map (Figure 24) of the community plan. As recommended by staff in the preliminary review, this site would retain the single-family zone and the single-family residential land use designation on the community plan's land use map and the proposed community plan amendment would identify and designate the site for church use on the Other Community Facilities map figure.

Airport Land Use Compatibility

The project site is in the Airport Land Use Compatibility Overlay Zone (ALUCOZ) - Airport Influence Area for Montgomery Field. Review Area 2 of the Airport Influence Area consists of locations within the airspace protection and/or overflight notification areas. The Airport Land Use Commission staff determined that Airport Land Use Commission consistency determination would be unnecessary because of the site is in Review Area 2 and its location topographically below surrounding land uses and the building's low stature relative to airspace restrictions. Project implementation would not increase the potential for a safety hazard related to airports for people residing or working in areas surrounding the project site. The project would not interfere with the operations of the airport.

Transportation/Vehicle Miles Traveled Analysis

The City's *Transportation Study Manual* (TSM) dated September 29, 2022, states that transportation analysis for CEQA shall be conducted using the Vehicle Miles Traveled (VMT) metric.  The TSM lists eight screening criteria for assessing whether a detailed VMT analysis is required. The project is forecasted to generate approximately 280 weekday Average Daily Trips (ADT), which satisfies the City's screening criteria for a small project of less than 300 ADT. Therefore, the project was screened out from conducting a full VMT analysis and is presumed to have a less than significant transportation impact in Section 7.1.12 of the EIR. The transportation analysis contained in EIR Section 7.1.12 and the associated Appendix K implemented the TSM methodology, accurately

applied the TSM's VMT screening criteria and properly assessed the project's VMT impacts in accordance with CEQA. As stated in EIR Appendix K, the TSM methodology for analyzing a regional facility is to use a SANDAG travel demand model for the VMT analysis. However, VMT analysis is typically focused on weekday trips consistent with the guidance in the State of California Office of Planning and Research December 2018 *Technical Advisory on Evaluating Transportation Impacts in CEQA*.  Therefore, weekday project traffic is used for the VMT analysis.

General Plan Analysis

The General Plan Urban Design Element addresses urban form and design through policies aimed at respecting the natural environment and preserving open space systems as follows:

- *Policy UD-A.3.* Design development adjacent to natural features in a sensitive manner to highlight and complement the natural environment in areas designated for development.
- *Policy UD-A.5.* Design buildings that contribute to a positive neighborhood character and relate to neighborhood and community context.
- *Policy UD-A.10.* Design or retrofit streets to improve walkability, bicycling, and transit integration; to strengthen connectivity; and to enhance community identity.
- *Policy UD-A.11.* Encourage the use of underground or above-ground parking structures, rather than surface parking lots, to reduce land area devoted to parking.
- *Policy UD-B.4.* Create street frontages with architectural and landscape interest for both pedestrians and neighboring residents.

The proposed project is consistent with policies including, but not limited to the ones listed above in the Urban Design Element. Specifically, the project design would be sensitive to the adjacent natural areas off-site using setbacks and landscaped slopes that blend with the offsite terrain. The building and parking structure's architecture and site plan layout would be compatible with but distinctive from the neighborhood character and community while minimizing the visibility of its features. Extensive landscape materials would be used to define spaces, encourage circulation paths, highlight entry points, provide visual relief, shade parking areas, screen retaining walls and off-site properties. The improvements to College Avenue would also enhance the streetscape while providing screening to the site improvements, among other policy-related expectations of the General Plan.

The General Plan Public Facilities, Services, and Safety Element is directed at providing adequate public facilities and services through policies that address public financing strategies, public and developer financing responsibilities, prioritization, and the provision of specific facilities and services that must accompany growth.  Relevant policies include the following:

- *Policy PF-C.1.* Require development proposals to fully address impacts to public facilities and services.
- *Policy PF-F.6.* Coordinate land use planning and wastewater infrastructure planning to provide for future development and maintain adequate service levels.
- *Policy PF-G.2.* Install infrastructure that includes components to capture, minimize, and/or prevent pollutants in urban runoff from reaching receiving waters and potable water supplies.

The project is consistent with the General Plan policies in that the project would construct the necessary utilities to service the project, including water, sewer, and stormwater systems on-site to connect with existing off-site utilities within public roads. The sizing of the lines would be based on demand from the project. Levels of service would be maintained after the project construction is complete and fully occupied.

The General Plan Conservation Element contains policies to guide the conservation of the resources that are fundamental components of San Diego's environment, including:

- *Policy CE-A.5.* Employ sustainable or "green" building techniques for the construction and operation of buildings.
- *Policy CE-A.11.* Implement sustainable landscape design and maintenance.
- *Policy CE-E.2.* Apply water quality protection measures to land development projects early in the process - during project design, permitting, construction, and operations - in order to minimize the quantity of runoff generated on-site, the disruption of natural water flows and the contamination of stormwater runoff.
- *Policy CE-I.4.* Maintain and promote water conservation and waste diversion programs to conserve energy.
- *Policy CE-J.4.* Continue to require the planting of trees through the development permit process.

Sustainability features and practices of the project combined with the architectural and landscape design elements would establish a theme for the property and incorporate green building techniques in accordance with the California Building Code (CBC) and GHG reduction strategies in the project's CAP Consistency Checklist. The project prepared and would implement a waste management plan (WMP), consistent with the City's goals concerning waste management and reduction in Conservation Element. In addition, the project includes flow-through biofiltration planters to collect and treat runoff before it is discharged to the off-site stormwater system. The project's landscaping would meet the City's water conservation and urban forestry goals.

The General Plan Noise Element includes policies to ensure noise impacts are evaluated and compatible land uses are established as follows:

- *Policy NE-A.2.* Assure the appropriateness of proposed developments relative to existing and future noise levels by consulting the guidelines for noise-compatible land use (shown on Table NE-3) to minimize the effects on noise-sensitive land uses.
- *Policy NE-B.1.* Encourage noise-compatible land uses and site planning adjoining existing and future highways and freeways.

With respect to the General Plan policies concerning noise and land use compatibility, the project is in an area surrounded by urban uses and experiences transportation noise from major roadways and freeways. A noise study was conducted on the project, the results of which are presented in EIR Section 5.4, Noise. No land use-noise compatibility issues were identified. The project would not result in the exposure of people to current or future transportation noise levels that exceed City significance standards.

Community Plan Analysis

The Residential Element of the Navajo Community Plan includes objectives that seek to maintain and enhance the existing residential areas. Regarding objectives that are applicable to non-residential development in the community, the community plan includes the following:

- Within each new development and where possible in developed areas, plazas, squares, and other similar open space areas should be created. Emphasis should be placed on developing interconnected bikeways and walkways separated from auto traffic as part of the internal circulation system within the study area.
- Parking and storage areas should be screened from the street and other public areas.

The project proposes a site layout and architectural design that incorporate careful planning and sensitive development features that would create a well-defined, balanced and visually consistent design that is distinctive from the surrounding residential neighborhood. The proposed church building would be situated in the topographic low point of the site near the College Avenue off-ramp and setback from and below the adjacent, lower profile residential and commercial structures nearby. The project would feature extensive landscaping, including screening along the common property line with the nearby residential yards to conceal and soften views of facilities, walls and rooftops and would produce a positive visual appearance through its comprehensive design from public vantage points that surround the site The proposed landscaping would screen or conceal parking areas or structures from public viewing points and would use imaginative and innovative design to create visual interest and aesthetic appeal.

The Community Environment Element of the community plan established objectives that encourage an overall quality of design through building placement, landscaping, and natural elements, including the following:

- Encourage an overall quality of design by using materials, color and texture to give identity and focus to groups of structures within the urban landscape.
- Encourage an orderly transition of height, density, scale and arrangement of buildings to preserve the identity of each element as well as the cohesion of the whole.
- Promote the coordination of building groupings to foster neighborhood and community identity and unity.
- Develop points of visual relief in the urban landscape through the use of open spaces and landscaping, building setbacks, building materials, location of public facilities, and street and right-of-way design and maintenance.
- The following streets should receive first priority for such right-of-way improvements: Navajo Road, Mission Gorge Road, College Avenue and Waring Road. These improvements should include the planting of street trees as well as landscaping of the center median.

The project would be consistent with the policies in the community plan through its comprehensive design that coordinates its grading, architecture, and landscape to collectively provide visual interest and break up the massing of the structures such that the project would not exceed the bulk and scale of existing patterns of development by a substantial margin. The project's landscape

- 10 -

**Ex. A, p. 010**

improvements along College Avenue would remove the existing sidewalk and create a landscaped parkway with non-contiguous sidewalk featuring street side canopy trees and ground cover. The project balances its placement between urban uses with its proximity to undeveloped areas by creating grading and landscape transitions and installing biofiltration basins to protect water quality.

The Circulation Element of the community plan includes objectives to ensure members of the community with safe, ready access around, as well as in and out of the community, by a mode of transportation of individual choice including the following:

- Develop a balanced transportation system that adequately links the Navajo area to nearby communities as well as regional facilities.
- Strive to separate automobile, pedestrian and bicycle conflicts and, where safe and practical, provide specially designated bikeways to accommodate the increased demand for this mode of travel.

The proposed project adheres to the Circulation Element of the community plan since project improvements along the frontage would create a signalized intersection with a median break, an upgraded sidewalk experience, pedestrian linkages into the site and striping to create a bike lane. The visual character of College Avenue would be enhanced through landscape treatments and the installation of canopy trees within the parkway.

As consistent with the *Navajo Community Plan Goals and Recommendations Consistency Evaluation,* the proposal to add the church use to the project site would not create any inconsistencies with the policies in the community plan and less-than-significant land use policy impacts are identified in the EIR.

Environmental Analysis:

EIR No. 636444/SCH 2021100394 has been prepared for this project in accordance with CEQA guidelines and includes an MMRP to address required mitigation measures. The EIR determined that the project would result in significant but mitigated impacts to Biological Resources, Noise, Historical Resources (Archeology), and Tribal Cultural Resources. No significant, unmitigated impacts would result from project implementation. Please see EIR No. 636444 and the associated MMRP for a detailed description of the project impacts and required mitigation.

Project-Related Issues:

Environmentally Sensitive Lands

The site has been previously partially graded to its current configuration.  Based on a slope analysis, the project site does not contain steep hillsides as defined in SDMC Section 113.0103, which includes lands that have a slope with a natural gradient of 25 percent or greater and a minimum elevation differential of 50 feet, or a natural gradient of 200 percent or greater and a minimum elevation differential of 10 feet.  The site does contain Environmentally Sensitive Lands (ESL) in the form of biological resources.

The Biological Technical Report dated July 21, 2021, was prepared for the project and reflects the current conditions of the site and the project impacts to biological resources. The project proposes to mitigate impacts to biological resources through payment into the City Habitat Acquisition Fund, and through compliance with the Mitigation Monitoring and Reporting Program (MMRP). The project site is not located within or adjacent to the City's Multi-Habitat Planning Area. All impacts would be mitigated to below a level of significance.

Easements

Certain existing public easements on the subject property will no longer be utilized once the proposed public improvements are constructed. These include a 10-foot wide easement for public sewer recorded January 14, 1959; a portion of a 15-foot wide easement for storm drain recorded September 2, 1964, a 10-foot wide easement for storm drains recorded November 17, 1955, a 10-foot wide easement for storm drain recorded September 2, 1964, a storm drain easement recorded February 10, 1959, an easement for slope rights recorded January 10, 1959, which are proposed to be vacated through this Tentative Map action. In addition, a portion of the access rights that were relinquished by document recorded February 10, 1959, are to be revested at the proposed private driveway and the signalized intersection. Access rights from College Avenue to the site were relinquished in 1959, in an area south of the proposed signalized intersection.

Several on-site and off-site utility improvements would be required to implement the project. A 320-linear-foot, 8-inch-diameter public water main extension would be installed along College Avenue to a point of connection at its intersection with Del Cerro Boulevard. On-site improvements would include the installation of 2-inch-diameter public domestic water service connection; an 8-inch-diameter private water line for fire service; a 1-inch-diameter irrigation line; an 8-inch-diameter private gravity sewer line; and a private sewer lift station and private sewer force main. Many of these utility improvements would connect with existing public infrastructure in College Avenue, except for the sewer service which would connect off-site through an adjacent private residential lot via a private 4-inch-diameter sewer lateral to an 8-inch-diameter off-site public sewer main in Marne Avenue (i.e., within a private easement granted to the project). On-site stormwater runoff would be directed to four biofiltration basins and then discharged into existing storm drains and picked up by the existing headwall and public 48-inch storm drain that flows beneath I-8.

Climate Action Plan Consistency

The project would help implement the goals and objectives of the Climate Action Plan (CAP) by promoting energy and water efficient buildings, including design strategies to encourage bicycling, walking, and transit use. The proposed project contains specific features for multi-modal improvements that would facilitate access to transit and reduce visitor reliance on single-occupancy vehicles using electric vehicle charging stations, bicycle parking spaces, and parking spaces designated for a combination of low-emitting, fuel-efficient, and carpool/vanpool vehicles in accordance with the CAP Consistency (Baranek Consulting Group 2021; Appendix B to the EIR). Land use impacts related to policy consistency with the CAP would be less than significant.

<u>Conclusion</u>:

City Staff have reviewed the proposed project and all issues identified through the review process have been resolved in conformance with adopted City Council policies and regulations of the General Plan, Navajo Community Plan, and the Land Development Code. Staff has provided draft findings in the affirmative to support approval of the project. Staff recommends the Planning Commission recommend to the City Council approval of the Project as proposed.

<u>ALTERNATIVES</u>

1.  RECOMMEND CERTIFICATION of EIR No. 636444/SCH No. 2021100394, and ADOPTION of MMRP, and APPROVAL of General Plan Amendment and Community Plan Amendment No. 2292367; Site Development Permit No. 2292338; Planned Development Permit No. 2292339; Tentative Map No. 2490918; and Easement Vacation No. 2292340, with modifications.

2.  RECOMMEND City Council NOT CERTIFY EIR No. 636444/SCH No. 2021100394, and DO NOT ADOPT MMRP, and DENIAL of General Plan Amendment and Community Plan Amendment No. 2292367; Site Development Permit No. 2292338; Planned Development Permit No. 2292339; Tentative Map No. 2490918; and Easement Vacation No. 2292340, if the findings required to approve the project cannot be affirmed.

Respectfully submitted,


Renee Mezo
Assistant Deputy Director
Development Services Department

Martha Blake Project Manager
Supervising Project Manager
Development Services Department


Tait Galloway
Deputy Director
City Planning Department

Attachments:

1.      Location Map
2.      Aerial Photograph
3.      Community Plan Land Use Map
4.      Existing Zoning Map
5.      Planning Commission Initiation Resolution No. 4946-PC
6.      Draft Permit Resolution with Findings
7.      Draft Permit with conditions

8.    Draft TM Resolution with Findings
9.    Draft TM with conditions
10.   Draft EIR Environmental Resolution with Findings and MMRP
11.   Draft General Plan and Community Plan Amendment Resolution
12.   Community Planning Group Recommendation
13.   Ownership Disclosure Statement
14.   Tentative Map
15.   Site Development Plans

Project Site

**Project Location Map**



All People's Church
PROJECT NO. 636444



North

**ATTACHMENT 1**

Ex. A, p. 015



**Aerial Photo**

All People's Church
PROJECT NO.  636444



North

**ATTACHMENT 2**

Ex. A, p. 016

Project Site

**Aerial Photo**



All People's Church
PROJECT NO.  636444



North

**ATTACHMENT 2**

Ex. A, p. 017



Navajo Community Land Use

CITY OF SAN DIEGO • PLANNING DEPARTMENT

FIGURE 4:   LAND USE



## Community Plan Land Use Map

All People's Church
PROJECT NO.  636444



ATTACHMENT 3

North

**ATTACHMENT 4**





**Zoning Map**

<u>All Peoples Church</u>
PROJECT NO.  636444



PLANNING COMMISSION RESOLUTION NO. 4946-PC
INITIATING AN AMENDMENT TO THE
NAVAJO COMMUNITY PLAN TO
IDENTIFY "CHURCH" USE ON
FIGURE 24: OTHER COMMUNITY FACILITIES
ON THE PROPOSED SITE

WHEREAS, on July 19, 2018, the Planning Commission of the City of San
Diego held a public hearing for the purpose of considering a request to initiate an
amendment to the Navajo Community Plan; and

WHEREAS, the proposed amendment would not change the land use designation and
existing zoning of the 5.80-acre parcel, but to identify church use on Figure 24: Other
Community Facilities; and

WHEREAS, the Planning Commission of the City of San Diego considered all
maps, exhibits, and written documents presented for this project, and had considered the
oral presentations given at the public hearing; NOW, THEREFORE:

BE IT RESOLVED by the Planning Commission of the City of San Diego, that
the initiation of a plan amendment in no way confers adoption of a plan amendment, that
neither staff nor the Planning Commission is committed to recommend in favor or denial of
the proposed amendment, and the City Council is not committed to adopt or deny the
proposed amendment; and

BE IT FURTHER RESOLVED that the following issues will be considered as part of the
community plan amendment analysis:

- Evaluate sensitive site design with respect to the steep slopes and surrounding natural
  environment which avoids cut and fill development
- Determine the appropriate land use designation and density for the site
- Analyze design and access issues on the site with regards to neighborhood interface
  and pedestrian, bicycle, transit, and auto access and circulation

_____

Sara Toma
Assistant Planner
Planning Department

Approved on July 19, 2018
Vote:  6-0-1
PTS No. 609490

cc.    Legislative Recorder, Development Services Department

**Ex. A, p. 020**

**ATTACHMENT 6**

(R-2023-xx)

RESOLUTION NUMBER R-_____
DATE OF FINAL PASSAGE _____

A RESOLUTION OF THE COUNCIL OF THE CITY OF
SAN DIEGO APPROVING SITE DEVELOPMENT
PERMIT NO. 2292338 AND PLANNED DEVELOPMENT
PERMIT NO. 2292339 FOR ALL PEOPLES CHURCH –
PROJECT NO. 636444.

WHEREAS, LIGHT ON A HILL, LLC, a California Limited Liability Company, Owner/Permittee,

filed an application with the City of San Diego for a Planned Development Permit and a Site

Development Permit to develop a church on vacant property that would include a 900-seat

sanctuary, with accessory office, Sunday school classrooms and gymnasium/multi-purpose room for

All Peoples Church (Project); and

WHEREAS, the Project site is located at 5555 College Avenue and is legally described as

Portion of Lot 67 of Rancho Mission of San Diego, in the City of San Diego, County of San Diego,

State of California, as described in Grant Deed Recorded November 3, 1975 as Document 75-306249

in the Navajo Community Plan area. The Project site is in the RS-1-7 Base Zone, and within the

Airport Land Use Compatibility Overlay Zone (Montgomery Field), the Airport Influence Area

(Montgomery Field - Review Area 2), Sustainable Development Area, Parking Standards Transit

Priority Area, Parking Impact Overlay (Campus), and Very High Fire Hazard Severity Zone; and

WHEREAS, on September 28, 2023, the Planning Commission of the City of San Diego

considered Site Development Permit No. 2292338 and Planned Development Permit No. 2292339,

and pursuant to Resolution No. XXXX-PC voted to recommend the City Council of the City of San

Diego (City Council) approve the Permits; and

WHEREAS, under Charter section 280(a)(2), this resolution is not subject to veto by the Mayor

because this matter requires the City Council to act as a quasi-judicial body and where a public

**Ex. A, p. 021**

hearing was required by law implicating due process rights of individuals affected by the decision and where the City Council was required by law to consider evidence at the hearing and to make legal findings based on the evidence presented; and

WHEREAS, the matter was set for public hearing on _____, 2023, testimony having been heard, evidence having been submitted, and the City Council having fully considered the matter and being fully advised concerning the same;

WHEREAS, the Office of the City Attorney has drafted this Resolution based on the information provided by City staff, with the understanding that the information is complete, true, and accurate; NOW, THEREFORE, BE IT RESOLVED, by the Council of the City of San Diego, that it adopts the following findings with respect to Site Development Permit No. 2232338 and Planned Development Permit No. 2232339.

I.   **PLANNED DEVELOPMENT PERMIT [San Diego Municipal Code Section 126.0605]**

   A.   **Findings for all Planned Development Permits:**

      1.   **The proposed development will not adversely affect the applicable land use plan.**

         The proposed development is located on College Avenue, south of Del Cerro Boulevard in the RS-1-7 zone, within the Navajo Community Plan (NCP) area.   The site is designated for single-family residential development within the community plan, which will be amended with this project to add the designation of a "Church" use at this location through amending NCP Figure 24: Other Community Facilities Map. The underlying designation of single-family residential will remain.

         The project site is a 5.99-acre parcel located northeast of the interchange of Interstate 8 (I-8) and College Avenue of the NCP area. The site is predominately surrounded by single-family housing, neighborhood commercial, and I-8. North of the project site are single-family homes, neighborhood commercial and multi-family apartments. South of the project site is I-8 and San Diego State University. West and east of the project are single-family homes. The neighborhood commercial offers a grocery store (Windmill Farms), eating establishments, and convenient shopping services for the surrounding residents. Metropolitan Transit Service (MTS) Bus Routes 14 and 115 runs along the site's western boundary and provides service to the San Diego State University (SDSU) Transit Center located at College Avenue and Hardy Avenue.

Ex. A, p. 022

The proposed project will develop the 5.99-acre site with:

- An approximately 54,476 SF sanctuary/multipurpose building to accommodate 900 seats with the following accessory uses: Sunday school classrooms, offices and a multipurpose room/gym.
- A 71,010 SF two level parking garage with 203 spaces
- Surface parking for 153 spaces
- Site utilities and landscaping
- Offsite improvements to College Avenue to create a median break and a signalized intersection for the main driveway, the installation of new bicycle lane signage and striping, and the construction of a 12-foot shared (i.e., pedestrians and bicycles) contiguous sidewalk south of the project driveway and a 5-foot non-contiguous driveway north of the project driveway within the parkway
- On-site water quality basins to treat storm water runoff and a sewer/storm water connection to existing City facilities.
- Deviations to exceed the building height limit from 30 feet to 53 feet; to reduce side yard setbacks from 84 feet to 14 feet (as measured by the San Diego Municipal Code, the width of the site is approximately 1,052 linear feet by 154 linear feet depth); to exceed the maximum wall height in the side yard setback from 6 feet to 20 feet; and to reduce the required long-term bicycle storage from 17 spaces to 3 spaces.

The City of San Diego's General Plan Land Use Community Plan and Street System Map (Figure LU-2) identifies the site as Residential, which encompasses a wide range of recommended densities, referencing the refinement of ranges to be specified within each community plan. The adopted NCP land use designation is Single-Family Residential (5-9 du/acre). The NCP's overriding objective is to retain the residential character of the area, provide adequate community services, establish guidelines for the utilization of canyons and hillsides, and enhance the environment of the area as a pleasant, livable, walkable community. A well-balanced community is shaped by providing essential services. The NCP's "Other Community Facilities" Element addresses various facilities available to the Community. Figure 24: Other Community Facilities, identifies sites for churches, fire station, library, hospital, flood plain boundary, and San Diego Gas and Electric Co. Easement. The Figure identifies 12 existing church uses with the underlying land use designation and zone of single-family residential.

As recommended in the NCP Residential Element policies, the project design is sensitive to the existing neighborhood as it has been situated in the topographic low point of the site near the College Avenue/I-8 westbound off-ramp and set back from the adjacent, lower profile residential and commercial structures to the east and north; would feature extensive landscaping, including screening along the common property line with the nearby residential yards to conceal and soften views of facilities, walls and rooftops.

The project would produce a positive visual appearance through its comprehensive design from public vantage points along local roads/freeway that surround the site;

and it would screen or conceal parking areas and on-site retaining walls with landscaping or structures from public vantage points along local roads/freeway.  As such, the project design implements Community Environment Element policies through sensitive building design and massing, and landscaping improvements along College Avenue.

The City's *Transportation Study Manual* (TSM dated September 29, 2022) lists eight screening criteria for assessing whether a detailed Vehicle Miles Traveled (VMT) analysis is required. The project is forecast to generate approximately 280 weekday Average Daily Trips (ADT), which is below the City's screening criteria for a small project of less than 300 ADT. Therefore, the project was screened out from conducting a full VMT analysis and is presumed to have a less than significant transportation impact.

The project also complies with NCP's Circulation Element policies with the implementation of College Avenue frontage improvements, upgraded sidewalk facility, pedestrian linkages into the site, and striping to create a bike lane. In addition, a new traffic signal will be installed at the primary entry driveway for the project.

The project will install cool green roofs, low-flow fixtures/appliances and a low-flow irrigation system, electrical vehicle charging stations, designated and secure bicycle parking spaces, designated parking spaces for low-emitting, fuel-efficient, and carpool/vanpool vehicles, and implement a solid waste recycling plan to ensure compliance with the General Plan Conservation Element and the Climate Action Plan. The project landscape plan also results in a net increase of trees to facilitate the City's Climate Action Plan goals for greenhouse gas emissions reduction and the enhancement of carbon sequestration.

Environmental Impact Report (EIR) Project No. 636444/SCH No. 202110394 was prepared for the project disclosed potentially significant impacts in the areas of short-term construction noise, biological resources, cultural resources, and tribal cultural resources. All impacts will be fully mitigated to below a level of significance. Mitigation measures will be assured through a condition of approval of the development permit.

Therefore, the addition of a religious facility within the Navajo Community Plan at this location will not adversely affect the applicable land use plan.

2. **The proposed development will not be detrimental to the public health, safety, and welfare.**

The project has been designed in compliance with the Land Development Code which is portion of the San Diego Municipal Code and all applicable regulations to avoid detrimental impacts to the health, safety and welfare of residents, workers and visitors as well as adjacent development and people.  These requirements include the safe design of streets and sidewalks as well as grading and drainage that provides for control and treatment of stormwater.  Development of this project shall

Ex. A, p. 024

comply with all storm water construction requirements of the State Construction General Permit, Order No. 2009-0009DWQ, or subsequent order, and the Municipal Storm Water Permit Order No. R9-2013-0001, or subsequent order. Permit conditions require that best management practices (BMPs) and ongoing BMP maintenance will be implemented with the commencement of grading activities.

The project permit also contains specific conditions to ensure compliance with the regulations of the San Diego Municipal Code (SDMC), including those adopted to protect the public health, safety, and welfare.  Permit requirements include submitting an updated geotechnical report to address the construction plans; assuring plans for the revegetation and hydro-seeding of all disturbed lands and required brush maintenance, and the design and construction of all required public water and sewer facilities.   Conditions of approval address construction activities, the shielding of lighting, the attenuation for noise, and the appearance and placement of landscape and buildings.  Construction of the project will be pursuant to the applicable Uniform Building, Fire, Plumbing, Electrical, and Mechanical Codes. All Land Development Codes governing construction and continued operation of the development will apply to prevent the potential for future adverse impacts once development has occurred.

The Environmental Impact Report (EIR) (Project No. 636444/SCH No. 202110394) prepared for the project identified potentially significant impacts in the areas of biological resources, historical resources, temporary construction noise, and tribal cultural resources.  Mitigation has been identified to reduce all identified impacts below a level of significance. Mitigation will be assured as a condition of approval of the permit.

Therefore, with the approved design and required conditions of approval, the proposed development will not be detrimental to the public health, safety, and welfare.

3. **The proposed development will comply with the regulations of the Land Development Code including any proposed deviations pursuant to Section 126.06602(b)(1) that are appropriate for this location and will results in a more desirable project than would be achieved if designed in struct conformance with the development regulations of the applicable zone, and any allowable deviations that are otherwise authorized pursuit to the LDC.**

To achieve the project objectives of developing a church use that creates a positive sense of character and community, the project proposes minor deviations as allowed by the Land Development Code.  The deviations will be:

  i. An increase in height to 53-feet above grade for the church structure where 30 feet is the maximum height in the RS-1-7 zone.

    1. 88% of the building is 30 feet in height, while the remaining 12% is 48 feet to the top of the three tower elements of the roof and 53 feet to the top of the cross at one point.

ii.   A reduction in the side yard setback next to the Interstate 8 freeway of 14 feet where 82-feet is required.

1.   The site is an irregularly shaped lot with a natural slope from an elevation of 452 feet above sea level at the north property line, down to 354 feet above sea level adjacent to the south property line.  As measured by the San Diego Municipal Code, the site is approximately 1,052 linear feet in width by 154 linear feet in depth.

iii.   An increase in the maximum retaining wall height in the side yard setback from 6 feet to 20 feet.

1.   The irregularly-shaped, with a natural slope from 453 feet above sea level at its narrowest dimension in the north, to 375 feet above sea level at its widest dimension in the south adjacent to the Caltrans right-of-way, was modified by the addition of a retaining wall so that the new church could be built at the widest and lowest point of the site.

iv.   A decrease in the required long-term bicycle storage from 17 spaces to 3 spaces.

1.   SDMC Section 142.0530 (2) requires that long-term bicycle spaces be provided at 5% of the total required parking and states that the spaces are intended for use by employees; however, the parking supply is calculated on the maximum usage of the 900-seat sanctuary, whose attendees will likely use the 17 short-term bicycle spaces, but not the long-term bicycle spaces.  The project anticipates 20-30 employees, and therefore 3 long-term bicycle spaces have been provided.

The project proposes grading the site with approximately 16,500 cubic yards of cut and 39,000 cubic yards of fill with the maximum depth of fill outside the building of approximately 28 feet, and under the building of 10 feet.

Development of the site incorporates sensitive grading practices to utilize the natural slope of the site, with the new church and parking structure located at the lowest point of the site.  Adjacent single-family homes to the east, are developed on pads at elevations of 449 feet above sea level adjacent to the north property line, down to approximately 418 feet above sea level adjacent to the south property line. Therefore, the grade differential between the existing residences and the proposed church will be approximately 18 feet at the parking structure and up to 25 feet above the church building.

Therefore, the shape of the project site, the existing to-remain easements, and the natural topography of the site, will be utilized to minimize deviations and will result in a more desirable project than if strict adherence to the development regulation was complied with to develop a larger footprint development.

Ex. A, p. 026

**ATTACHMENT 6**

II.    **SITE DEVELOPMENT PERMIT [San Diego Municipal Code Section 126.0505]**

1.    **Findings for all Site Development Permits**:

    a.    **The proposed development will not adversely affect the applicable land use plan.**

    See Finding I.1.a. under "Planned Development Permit" above.

    b.    **The proposed development will not be detrimental to the public health, safety, and welfare.**

    See Finding 1.2.a under "Planned Development Permit".

    c.    **The proposed development will comply with the regulations of the Land Development Code including any allowable deviations pursuant to the Land Development Code.**

    To achieve the project objectives of developing a church use that creates a positive sense of character and community, the project proposes minor deviations as allowed by the Land Development Code.  The deviations will be an increase in height to 53-feet above grade for the church structure (48 feet to the top of the three tower elements of the roof and 53 feet to the top of the cross) where 30-feet is the maximum height in the RS-1-7 zone;  a reduced side yard setback next to the Interstate 8 freeway of 14 feet where 82-feet is required; an increased height for a retaining wall in the side yard setback from 6 feet to 20 feet; and reduction from the required long-term bicycle storage from 17 spaces to 3 spaces.

    The site is an irregularly shaped lot with a natural slope from an elevation of 452 feet above sea level at the north property line, down to 354 feet above sea level adjacent to the south property line.  As measured by the San Diego Municipal Code, the width of the site is approximately 1,052 linear feet by 154 linear feet depth.  The project proposes grading the site with approximately 16,500 cubic yards of cut and 39,000 cubic yards of fill with the maximum depth of fill outside the building of approximately 28 feet, and under the building of 10 feet.

    The natural slope of the site and with sensitive grading practices the new church and parking structure will be developed at the lowest point of the site.  Adjacent single-family homes to the east, are developed on pads at elevations of 449 feet above sea level adjacent to the north property line, down to approximately 418 feet above sea level adjacent to the south property line. Therefore, the grade differential of the two adjacent uses will be approximately 18 feet at the parking structure and up to 25 feet above the church building.

    Therefore, the shape of the project site, the existing to-remain easements, and the natural topography of the site, will be utilized to minimize deviations and will result

in a more desirable project than if strict adherence to the development regulation was complied with to develop a larger footprint development.

2.   **Supplemental Findings – Environmentally Sensitive Lands**

a.   **The site is physically suitable for the design and siting of the proposed development and the development will result in minimum disturbance to environmentally sensitive lands.**

The site is an irregularly shaped lot with a natural slope from an elevation of 452 feet above sea level at the north property line, down to 354 feet above sea level adjacent to the south property line.  As measured by the San Diego Municipal Code, the width of the site is approximately 1,052 linear feet by 154 linear feet depth.  The project proposes grading the site with approximately 16,500 cubic yards of cut and 39,000 cubic yards of fill with the maximum depth of fill outside the building of approximately 28 feet, and under the building of 10 feet.

The undeveloped site is outside the City's Multiple Species Conservation Program (MSCP) preserve, the Multi-habitat Planning Area (MHPA).  Vegetation communities including Diegan coastal sage scrub, non-native grassland, disturbed habitat, eucalyptus woodland, and ornamental are present on the site. No waters of the U.S., waters of the State, or City wetlands are present on site.

Development of the site incorporates sensitive grading practices to utilize the natural slope of the site, with the new church and parking structure located at the lowest point of the site.  Adjacent single-family homes to the east, are developed on pads at elevations of 449 feet above sea level adjacent to the north property line, down to approximately 418 feet above sea level adjacent to the south property line. Therefore, the grade differential between the existing residences and the proposed church will be approximately 18 feet at the parking structure and up to 25 feet above the church building.

A Biological Technical Report has been prepared to analyze the disturbance and the impact on the flora and fauna. It identified an impact to 3.1 acres of Diegan coastal sage scrub and 0.8 acres of non-native grassland.  Mitigation for this impact is proposed to be in the form of payment into the City's Habitat Acquisition Fund as required in the Mitigation, Monitoring and Reporting Program (MMRP) for the project. Compliance with the MMRP is required as a condition of the permit.

The project site was recently reviewed and approved for single-family residential development, and the current project to develop a religious assembly use on the site is similar in disturbance projections.  Therefore, the site is physically suitable for the design and siting of the proposed development and the development will result in minimum disturbance to environmentally sensitive land.

Ex. A, p. 028

**b. The proposed development will minimize the alteration of natural land forms and will not result in undue risk from geologic and erosional forces, flood hazards, or fire hazards.**

The project has been designed in compliance with the Land Development Code and other regional, State, and Federal regulations to prevent detrimental impacts to the health, safety, and welfare of residents, workers, and visitors as well as adjacent development and people.  These requirements include the safe design of streets and sidewalks as well as grading and drainage that provides for control and treatment of stormwater to reduce erosional forces. The construction will adhere to recommendations from a Geotechnical Engineer both in grading and construction. The religious structure will be buffered from the natural vegetation on the slope to the east by vehicle parking and fire access.  All flood and fire hazards will be addressed during construction review and permitting.

Therefore, the proposed development will minimize the alteration of natural landforms and will not result in undue risk from geologic and erosional forces, flood hazards, or fire hazards.

**c. The proposed development will be sited and designed to prevent adverse impacts on any adjacent environmentally sensitive lands.**

Development of the site incorporates sensitive grading practices to utilize the natural slope of the site, with the new church and parking structure located at the lowest point of the site.  Adjacent single-family homes to the east, are developed on pads at elevations of 449 feet above sea level adjacent to the north property line, down to approximately 418 feet above sea level adjacent to the south property line. Therefore, the grade differential between the existing residences and the proposed church will be approximately 18 feet at the parking structure and up to 25 feet above the church building.

The site is not within, nor is it adjacent to, the City's Multiple Species Conservation Program (MSCP) preserve, the Multi-habitat Planning Area.  The site is adjacent to City-owned open space, but no impacts to that site would result from the proposed project. Development of the site would impact 3.1 acres of Diegan coastal sage scrub and 0.8 acres of non-native grassland through removal. Mitigation for these impacts is proposed to be in the form of payment into the City's Habitat Acquisition Fund.

**d. The proposed development will be consistent with the City of San Diego's Multiple Species Conservation Program (MSCP) Subarea Plan and Vernal Pool Habitat Conservation Plan (VPHCP).**

The site is not within, nor is it adjacent to, the City's Multiple Species Conservation Program (MSCP) preserve, the Multi-habitat Planning Area or the Vernal Pool Habitat Conservation Plan (VPCHP). No vernal pools exist on or adjacent to the project site. Development of the site would impact 3.1 acres of Diegan coastal sage scrub and 0.8

**Ex. A, p. 029**

acres of non-native grassland through removal. Mitigation for these impacts is proposed to be in the form of payment into the City's Habitat Acquisition Fund.

Therefore, the proposed development will be consistent with the City of San Diego's Multiple Species Conservation Program (MSCP) Subarea Plan and Vernal Pool Habitat Conservation Plan.

**e.  The proposed development will not contribute to the erosion of public beaches or adversely impact local shoreline sand supply.**

Landscaping and irrigation associated with proposed development may result in increased runoff. Runoff due to irrigation is often associated with increased erosion, sedimentation, and pollution, which can significantly impact water quality. However, all runoff water from the project would be collected and treated on-site in water quality (BMP) basins and discharged into the City storm water system. Based on the project's drainage and water quality design features, no significant impacts resulting from drainage or impaired water quality would occur, and no mitigation would be required.

Located approximately ten miles east of local beaches and the shoreline, the development is not located in the Coastal Zone or an area that contributes to sand supply through natural erosion and drainage.  Hydrology for the site is designed to comply with stormwater and drainage requirements and does not alter or adversely impact the upstream and downstream conditions of the San Diego River.  Therefore, the proposed development will not contribute to the erosion of public beaches or adversely impact local shoreline sand supply.

**f.  The nature and extent of mitigation required as a condition of the permit is reasonably related to, and calculated to alleviate, negative impacts created by the proposed development.**

The proposed development of a vacant 5.99-acre site with an approximately 54,476 SF church will occur immediately north of Interstate 8 on College Avenue in the NCP area.  The project will include a sanctuary/multipurpose building to accommodate 900 seats, accessory uses of Sunday school classrooms, offices, a multipurpose room/gym, a 71,010 SF, two level parking structure and surface parking, landscaping and other improvements.  The project would also include on-site water quality basins to treat storm water runoff and a sewer/storm water connection to existing City facilities.

The following mitigation measures have been formulated to satisfy the requirements of the City's Subarea Plan (City 1997a), ESL Regulations, and Biology Guidelines (City 2018). The mitigation ratios used in this report follow the City's ESL categorized five-tier system for impacts to sensitive upland communities as outlined in the Biology Guidelines:

- Tier I:  There are no Tier I communities on site.

- Tier II:  Coastal sage scrub and coastal sage scrub/chaparral ecotone (1:1 to 1.5:1)
- Tier IIIA:  There are no Tier IIIA communities on site.
- Tier IIIB:  Non-native grasslands (0.5:1 to 1:1)
- Tier IV: Disturbed, agricultural, and eucalyptus (0:1) While there are Tier IV communities on site, mitigation is not required for impacts to them.

Mitigation for impacts to Diegan coastal sage scrub and Diegan coastal sage scrub-disturbed are proposed to be mitigated at a ratio of 1:1 where the impact occurs outside the MHPA, and the mitigation occurs inside the MHPA. Mitigation for impacts to non-native grassland are proposed to be mitigated at a ratio of 0.5:1 (for habitat not occupied by the burrowing owl) where the impact occurs outside the MHPA, and the mitigation occurs inside the MHPA.

The project proposes to provide 3.6 acres of mitigation and would accomplish this through payment into the City's Habitat Acquisition Fund, which the City uses to acquire habitat critical for biodiversity preservation and the success of the MSCP. According to the Biology Guidelines (City 2018), the Habitat Acquisition Fund is intended to be used for the mitigation of impacts to small (generally less than five acres), isolated sites with lower long-term conservation value. The project's impacts that require mitigation total 4.0 acres, and the site is surrounded by existing urban development (i.e., it has low long-term conservation value).

Therefore, the nature and extent of mitigation required as a condition of the permit is reasonably related to, and calculated to alleviate, negative impacts created by the proposed development.

The above findings are supported by the minutes, maps and exhibits, all of which are incorporated herein by this reference.

BE IT FURTHER RESOLVED, based on the findings hereinbefore adopted by the City Council, that Site Development Permit No. 2292338 and Planned Development Permit No. 2292339 are granted to Light on a Hill, LLC, a California Limited Liability Company, Owner/Permittee, under the terms and conditions set forth in the attached permit which is made a part of this resolution, and contingent upon final passage of Resolution No. R- XXXXXX approving amendments to the General Plan and the Navajo Community Plan.

**ATTACHMENT 6**

APPROVED: MARA W. ELLIOTT, City Attorney


By     _____
          Name
          Deputy City Attorney

XXX/xx
09/XX/2023
Or. Dept: DSD
Doc.No.XXXXXX

Ex. A, p. 032

**ATTACHMENT 7**

**RECORDING REQUESTED BY**
CITY OF SAN DIEGO
DEVELOPMENT SERVICES
PERMIT INTAKE, MAIL STATION
501

**WHEN RECORDED MAIL TO**
**CITY CLERK**
**MAIL STATION 2A**

INTERNAL ORDER NUMBER: 24008189          SPACE ABOVE THIS LINE FOR RECORDER'S USE

SITE DEVELOPMENT PERMIT NO. 2292338
PLANNED DEVELOPMENT PERMIT NO. 2292339
**ALL PEOPLES CHURCH PROJECT NO. 636444 [MMRP]**
CITY COUNCIL

This Site Development Permit No. 2292338, and Planned Development Permit No. 2292339 are granted by the City Council of the City of San Diego to Light on a Hill, LLC, Owner and Permittee, pursuant to San Diego Municipal Code [SDMC] sections 126.0505 and 126.0605. The 5.99-acre site is located at 5555 College Avenue in the RS-1-7, Base Zone, Airport Land Use Compatibility Overlay Zone (Montgomery Field), the Airport Influence Area (Montgomery Field Review Area 2), Parking Standards Transit Priority Area, Sustainable Development Area, and Parking Impact Overlay (Campus) Zones within the Navajo Community Plan. The project site is legally described as Portion of Lot 67 of Rancho Mission of San Diego, in the City of San Diego, County of San Diego, State of California, as described in Grant Deed Recorded December 17, 2017 as document 2017-0602317.

Subject to the terms and conditions set forth in this Permit, permission is granted to Owner/Permittee to develop the site with a described and identified by size, dimension, quantity, type, and location on the approved exhibits [Exhibit "A"] dated _____, on file in the Development Services Department.

The project shall include:

a.  The development of a 900-seat church with accessory classrooms, office and gymnasium;

b.  Allowable deviations from the development regulations pertaining to structure height, retaining wall height, and minimum side yard setback;

c.  Landscaping (planting, irrigation and landscape related improvements);

d.  Off-street parking; and

e.  Public and private accessory improvements determined by the Development Services Department to be consistent with the land use and development standards for this site in accordance with the adopted community plan, the California Environmental Quality Act

Page 1 of 11

**Ex. A, p. 033**

**ATTACHMENT 7**

[CEQA] and the CEQA Guidelines, the City Engineer's requirements, zoning regulations, conditions of this Permit, and any other applicable regulations of the SDMC.

**STANDARD REQUIREMENTS:**

1.      This permit must be utilized within thirty-six (36) months after the date on which all rights of appeal have expired.  If this permit is not utilized in accordance with Chapter 12, Article 6, Division 1 of the SDMC within the 36-month period, this permit shall be void unless an Extension of Time has been granted.  Any such Extension of Time must meet all SDMC requirements and applicable guidelines in effect at the time the extension is considered by the appropriate decision maker. This permit must be utilized by _[3 years after approval of City Council)___, 2026.

2.      No permit for the construction, occupancy, or operation of any facility or improvement described herein shall be granted, nor shall any activity authorized by this Permit be conducted on the premises until:

   a.      The Owner/Permittee signs and returns the Permit to the Development Services Department; and

   b.      The Permit is recorded in the Office of the San Diego County Recorder.

3.      While this Permit is in effect, the subject property shall be used only for the purposes and under the terms and conditions set forth in this Permit unless otherwise authorized by the appropriate City decision maker.

4.      This Permit is a covenant running with the subject property and all of the requirements and conditions of this Permit and related documents shall be binding upon the Owner/Permittee and any successor(s) in interest.

5.      The continued use of this Permit shall be subject to the regulations of this and any other applicable governmental agency.

6.      Issuance of this Permit by the City of San Diego does not authorize the Owner/Permittee for this Permit to violate any Federal, State or City laws, ordinances, regulations or policies including, but not limited to, the Endangered Species Act of 1973 [ESA] and any amendments thereto (16 U.S.C. § 1531 et seq.).

7.      In accordance with authorization granted to the City of San Diego from the United States Fish and Wildlife Service [USFWS] pursuant to Section 10(a) of the federal Endangered Species Act [ESA] and by the California Department of Fish and Wildlife [CDFW] pursuant to California Fish and Wildlife Code section 2835 as part of the Multiple Species Conservation Program [MSCP], the City of San Diego through the issuance of this Permit hereby confers upon Owner/Permittee the status of Third Party Beneficiary as provided for in Section 17 of the City of San Diego Implementing Agreement [IA], executed on July 16, 1997, and on file in the Office of the City Clerk as Document No. OO-18394. Third Party Beneficiary status is conferred upon Owner/Permittee by the City:  (1) to grant

**ATTACHMENT 7**

Owner/Permittee the legal standing and legal right to utilize the take authorizations granted to the City pursuant to the MSCP within the context of those limitations imposed under this Permit and the IA, and (2) to assure Owner/Permittee that no existing mitigation obligation imposed by the City of San Diego pursuant to this Permit shall be altered in the future by the City of San Diego, USFWS, or CDFW, except in the limited circumstances described in Sections 9.6 and 9.7 of the IA.

8.      The Owner/Permittee shall secure all necessary building permits.  The Owner/Permittee is informed that to secure these permits, substantial building modifications and site improvements may be required to comply with applicable building, fire, mechanical, and plumbing codes, and State and Federal disability access laws.

9.      Construction plans shall be in substantial conformity to Exhibit "A" on file in the Development Services Department.  Changes, modifications, or alterations to the construction plans are prohibited unless appropriate application(s) or amendment(s) to this Permit have been granted.

10.     All of the conditions contained in this Permit have been considered and were determined necessary to make the findings required for approval of this Permit.  The Owner/Permittee is required to comply with each and every condition in order to maintain the entitlements that are granted by this Permit.

If any condition of this Permit, on a legal challenge by the Owner/Permittee of this Permit, is found or held by a court of competent jurisdiction to be invalid, unenforceable, or unreasonable, this Permit shall be void.  However, in such an event, the Owner/Permittee shall have the right, by paying applicable processing fees, to bring a request for a new permit without the "invalid" conditions(s) back to the discretionary body which approved the Permit for a determination by that body as to whether all of the findings necessary for the issuance of the proposed permit can still be made in the absence of the "invalid" condition(s).  Such hearing shall be a hearing de novo, and the discretionary body shall have the absolute right to approve, disapprove, or modify the proposed permit and the condition(s) contained therein.

11.     The Owner/Permittee shall defend, indemnify, and hold harmless the City, its agents, officers, and employees from any and all claims, actions, proceedings, damages, judgments, or costs, including attorney's fees, against the City or its agents, officers, or employees, relating to the issuance of this permit including, but not limited to, any action to attack, set aside, void, challenge, or annul this development approval and any environmental document or decision.  The City will promptly notify Owner/Permittee of any claim, action, or proceeding and, if the City should fail to cooperate fully in the defense, the Owner/Permittee shall not thereafter be responsible to defend, indemnify, and hold harmless the City or its agents, officers, and employees.  The City may elect to conduct its own defense, participate in its own defense, or obtain independent legal counsel in defense of any claim related to this indemnification. In the event of such election, Owner/Permittee shall pay all of the costs related thereto, including without limitation reasonable attorney's fees and costs. In the event of a disagreement between the City and Owner/Permittee regarding litigation issues, the City shall have the authority to control the litigation and make litigation related decisions, including, but not limited to, settlement or other disposition of the matter. However, the Owner/Permittee shall not be required to pay or perform any settlement unless such settlement is approved by Owner/Permittee.

**Ex. A, p. 035**

12.     This Permit may be developed in phases.  Each phase shall be constructed prior to sale or lease to individual owners or tenants to ensure that all development is consistent with the conditions and exhibits approved for each respective phase per the approved Exhibit "A" on file in the Development Services Department.

**ENVIRONMENTAL/MITIGATION REQUIREMENTS:**

13.     Mitigation requirements in the Mitigation, Monitoring, and Reporting Program [MMRP] for Environmental Impact Report (EIR) No. 636444 (SCH #2021100394 ) shall apply to this Permit.  These MMRP conditions are hereby incorporated into this Permit by reference.

14.     The mitigation measures specified in the MMRP and outlined in EIR No.636444 (SCH #2021100394), shall be noted on the construction plans and specifications under the heading ENVIRONMENTAL MITIGATION REQUIREMENTS.

15.     The Owner/Permittee shall comply with the MMRP as specified in EIR No.636444 (SCH #2021100394), to the satisfaction of the Development Services Department and the City Engineer and/or Mitigation Monitoring Coordination, as applicable.  All mitigation measures described in the MMRP shall be implemented for the following issue areas:

- Biological Resources
- Historical Resources
- Noise
- Tribal Cultural Resources

**CLIMATE ACTION PLAN REQUIREMENTS:**

16.     The Owner/Permittee shall comply with the Climate Action Plan (CAP) Consistency Checklist stamped as Exhibit "A." Prior to issuance of any construction permit for a building, all CAP strategies shall be noted within the first three (3) sheets of the construction plans under the heading "Climate Action Plan Requirements" and shall be enforced and implemented to the satisfaction of the Development Services Department.

**ENGINEERING REQUIREMENTS:**

17.     The Planned Development Permit, Site Development Permit and Easement Vacation shall comply with all Conditions of the Final Map for Tentative Map No. 2490918.

18.     Prior to the issuance of any building permit, the Owner/Permittee shall obtain an Encroachment Maintenance Removal Agreement from the City Engineer for landscape, irrigation and private storm drain connections private storm drain adjacent to the site in the city easements, College Avenue and additional dedicated Right of Way, satisfactory to the city engineer.

**ATTACHMENT 7**

19.     Prior to the issuance of any building permit, the Owner/Permittee shall assure by permit and bond the construction of a new current City Standard 24-ft wide driveway, adjacent to the site on College Avenue.

20.     Prior to the issuance of any building permit, the Owner/Permittee shall assure by permit and bond the construction of new current City Standard curb ramps, at the project entrance on College Avenue, satisfactory to the City Engineer.

21.     Prior to the issuance of any construction permit, the Owners/Permittee shall obtain an approval from CALTRANS for the proposed work in the right of way/facilities.

**GEOLOGY REQUIREMENTS:**

22.     Prior to the issuance of any construction permits (either grading or building permit), the Owner/Permittee shall submit a geotechnical investigation report prepared in accordance with the City's "Guidelines for Geotechnical Reports" that specifically addressed the proposed construction plans.  The geotechnical investigation report shall be reviewed for adequacy by the Geology Section of Development Services prior to the issuance of any construction permit.

**LANDSCAPE REQUIREMENTS:**

23.     Prior to issuance of any construction permit for grading, the Owner/Permittee shall submit complete construction documents for the revegetation and hydro-seeding of all disturbed and previously disturbed land associated with the area of grading in accordance with the City of San Diego Landscape Standards, Storm Water Design Manual, and to the satisfaction of the Development Services Department. All plans shall be in substantial conformance to this permit (including Environmental conditions), Exhibit "A" on file in the Development Services Department, and the phasing schedule included therein.

24.     Prior to issuance of a construction permit for public improvements, the Owner/Permittee shall submit complete landscape construction documents for right-of-way improvements to the Development Services Department for approval. Improvement plans shall show, label, and dimension a 40-square-foot area around each tree which is unencumbered by utilities. Driveways, utilities, drains, water and sewer laterals shall be designed so as not to prohibit the placement of street trees.

25.     Prior to issuance of a construction permit for a building, the Owner/Permittee shall submit complete landscape and irrigation construction documents that demonstrate revegetation, landscaping and irrigation of the new proposed slopes, greenbelts and open space, which are consistent with the Landscape Standards, to the Development Services Department for approval. The construction documents shall be in substantial conformance with Landscape Development Plan of Exhibit "A" on file in the Development Services Department. Construction plans shall provide a 40-square-foot area around each tree that is unencumbered by hardscape and utilities unless otherwise approved per SDMC §142.0403(b)5.

26.     In the event that a "foundation only" permit is requested by the Owner/Permittee, a site plan or staking layout plan, shall be submitted to the Development Services Department identifying all landscape areas consistent with the Landscape Development Plan of Exhibit "A", on file in the Development Services Department. These landscape areas shall be clearly identified with a distinct symbol, noted with dimensions, and labeled as "landscaping area".

27.     The Owner/Permittee shall be responsible for the maintenance of all landscape improvements shown on the approved plans, including in the right-of-way, unless long-term maintenance of said landscaping will be the responsibility of another entity approved by the Development Services Department, All required landscape shall be maintained consistent with the Landscape Standards in a disease, weed, and litter free condition at all times. Severe pruning or "topping" of trees is not permitted.

28.     If any required landscape (including existing or new plantings, hardscape, landscape features, etc.) indicated on the approved construction documents is damaged or removed, the Owner/Permittee (or another entity approved by the Development Services Department, shall repair and/or replace in kind and equivalent size per the approved documents to the satisfaction of the Development Services Department within 30 days of damage or Certificate of Occupancy.

**BRUSH MANAGEMENT PROGRAM REQUIREMENTS:**

29.   Prior to issuance of any construction permit for grading, landscape construction documents required for the engineering permit shall be submitted showing the brush management zones on the property.

30.   Prior to issuance of any construction permit for building, a complete Brush Management Program shall be submitted for approval to the Development Services Department. The Brush Management Program shall comply with the City of San Diego's Landscape Regulations and the Landscape Standards.

31.   Within Zone One, combustible accessory structures (including, but not limited to decks, trellises, gazebos, etc.) shall not be permitted while accessory structures of non-combustible, one-hour fire-rated, and/or Type IV heavy timber construction may be approved within the designated Zone One area subject to Fire Marshal's approval.

32.   The Brush Management Program shall be maintained at all times in accordance with the City of San Diego's Landscape Standards.

**FIRE LIFE AND SAFETY REQUIREMENTS:**

33.     Prior to the issuance of any construction permit for grading the Owner/Permittee shall submit a Fire Access Plan for the subject development unit for approval by the Fire Marshal.

**PLANNING/DESIGN REQUIREMENTS:**

34.    The project shall comply with the California Energy Code (Title 24) and California Green Building Standards Code (CALGreen), including rooftop photovoltaic solar panels, energy-efficient lighting and appliances, cool roofs, and energy-efficient windows.

35.    Automobile, motorcycle and bicycle parking spaces shall be constructed in accordance with the requirements of the SDMC. All on-site parking stalls and aisle widths shall be in compliance with requirements of the City's Land Development Code and shall not be converted and/or utilized for any other purpose, unless otherwise authorized in writing by the appropriate City decision maker in accordance with the SDMC.

36.    A topographical survey conforming to the provisions of the SDMC may be required if it is determined, during construction, that there may be a conflict between the building(s) under construction and a condition of this Permit or a regulation of the underlying zone.  The cost of any such survey shall be borne by the Owner/Permittee.

37.    Environmentally Sensitive Lands that are outside of the allowable disturbance area as shown on the Exhibit "A" on file in the Development Services Department shall remain in a natural state.

38.    Sensitive biological resources that are outside of the allowable disturbance area on the project site, or are acquired as off-site mitigation as a condition of permit issuance, are to remain in a natural state.

39.    Conformance with the applicable supplemental requirements outlined in SDMC Sections 143.0410 and 143.0420 shall be demonstrated by the Owner/Permittee prior to issuance of construction permit for a building.

40.    All signs associated with the project shall be consistent with sign criteria established by either the approved Exhibit "A" on file in the Development Services or the San Diego Municipal Code Chapter 14, Article 2, Division 12.

41.    All private outdoor lighting shall be shaded and adjusted to fall on the same premises where such lights are located and in accordance with the applicable regulations in the SDMC.

42.    The Owner/Permittee shall implement the recommendations of the project-specific Waste Management Plan.

43.    The project is subject to SDMC Section 142.0151 and paleontological monitoring shall be required as outlined therein.


**TRANSPORTATION REQUIREMENTS:**

44.    All on-site parking stalls and aisle widths shall be in compliance with the requirements of the City's Land Development Code and shall not be converted and/or utilized for any other purpose, unless otherwise authorized in writing by the appropriate City decision maker in accordance with the SDMC.

45.    Prior to issuance of the first building permit, the Owner/Permittee shall assure by permit and bond the installation of a traffic signal and associated communication equipment at the intersection of College Avenue and the project's main entrance, satisfactory to the City Engineer. All improvements shall be completed and operational prior to first occupancy.

49.   Prior to issuance of the first building permit, the Owner/Permittee shall assure by permit and bond the construction of a southbound left turn lane at the intersection of College Avenue and the project's main entrance (south), satisfactory to the City Engineer. All improvements shall be completed and operational prior to first occupancy.

50.   Prior to the issuance of first building permit, the Owner/Permittee shall assure by permit and bond the construction of a new current City Standard 24-foot-wide driveway (north), adjacent to the site on College Avenue, satisfactory to the City Engineer. All improvements shall be completed and operational prior to first occupancy.

51.   Prior to the issuance of the first building permit, the Owner/Permittee shall assure by permit and bond the construction of a new current City Standard 30-foot-wide driveway at the main entrance (south), adjacent to the site on College Avenue, satisfactory to the City Engineer. All improvements shall be completed and operational prior to first occupancy.

52.   Prior to issuance of the first building permit, the Owner/Permittee shall dedicate 5.5 feet along the project's frontage on College Avenue between the southern boundary to the proposed signalized driveway to provide a 14-foot parkway and assure by permit and bond construction of a 12-foot shared sidewalk (6 foot-sidewalk, 6-foot pedestrian path) and 2 feet from the outside edge of pedestrian path/guardrail to Right-of-Way, satisfactory to the City Engineer. All improvements shall be completed and operational prior to first occupancy.

53.   Prior to issuance of the first building permit, the Owner/Permittee shall dedicate 2 feet along the project's frontage on College Avenue between the proposed signalized driveway to the northern end of the project and assure by permit and bond construction of  a 12-foot parkway including  a 5-foot non-contiguous sidewalk, satisfactory to the City Engineer. All improvements shall be completed and operational prior to first occupancy.

54.   The Owner/Permittee shall provide and maintain a 25-foot by 25-foot visibility triangle area on both sides of the main entrance driveway (south) measured along the property line on College Avenue. No obstruction higher than 36 inches shall be located within this area, e.g., shrubs, landscape, hardscape, walls, columns, signs etc.

55.   The Owner/Permittee shall provide and maintain a 10-foot by 10-foot visibility triangle area on both sides of the driveway (north) measured along the property line on College Avenue. No obstruction higher than 36 inches shall be located within this area, e.g., shrubs, landscape, hardscape, walls, columns, signs etc.

**ATTACHMENT 7**

**PUBLIC UTILITIES DEPARTMENT REQUIREMENTS:**

56.     Prior to the issuance of any construction permits for buildings, the Owner/Permittee shall assure, by permit and bond, the design and construction of new water and sewer service(s) outside of any driveway or drive aisle and the abandonment of any existing unused water and sewer services within the public right-of-way adjacent to the project site, in a manner satisfactory to the Public Utilities Department and the City Engineer.

57.     Prior to the issuance of any construction permit, the Owner/Permittee shall assure, by permit and bond the design and construction of an 8-inch public water main within College Avenue right-of-way as shown on the approved Exhibit "A", in a manner satisfactory to the Public Utilities Department and the City Engineer.

58.     Prior to the issuance of any building permits, the Owner/Permittee shall assure by permit and bond, the design and construction of 12-inch inline valves on the existing 12-inch diameter water main within Del Cerro Boulevard/College Avenue right-of-way as shown on the approved Exhibit "A", in a manner satisfactory to the Public Utilities Department and the City Engineer.

59.     Prior to the issuance of any building permits, the Owner/Permittee shall assure, by permit and bond, the design and construction of new water and sewer service(s) outside of any driveway or drive aisle and the abandonment of any existing unused water and sewer services within the public right-of-way adjacent to the project site, in a manner satisfactory to the Public Utilities Department and the City Engineer.

60.     Prior to the issuance of any building permits, the Owner/Permittee shall apply for a plumbing permit for the installation of appropriate private back flow prevention device(s) [BFPDs], on each water service (domestic, fire and irrigation), in a manner satisfactory to the Public Utilities Department and the City Engineer. BFPDs shall be located above ground on private property, in line with the service and immediately adjacent to the right-of-way.

61.     Prior to the issuance of any construction permit for buildings, the Owner/Permittee shall apply for a plumbing permit for the installation of appropriate private Back Flow Prevention Device(s) [BFPDs], on each water service (domestic, fire and irrigation), in a manner satisfactory to the Public Utilities  Department and the City Engineer. BFPDs shall be located above ground on private property, in line with the service and immediately adjacent to the right-of-way.

62.     Prior to the issuance of any construction permits for buildings, the Owner/Permittee shall obtain an Encroachment Maintenance Removal Agreement, from the City Engineer, for private sewer facilities encroaching into the Public Right-of-Way.

63.     All proposed private water and sewer facilities located within a single lot are to be designed to meet the requirements of the California Plumbing Code and will be reviewed as part of the building permit plan check.

64.     The Owner/Permittee shall be responsible for any damage caused to City of San Diego water and sewer facilities within the vicinity of the project site, due to the construction activities associated

**Ex. A, p. 041**

**ATTACHMENT 7**

with this project, in accordance with SDMC Section 142.0607. In the event that any such facility loses integrity, the Owner/Permittee shall repair or reconstruct, at no cost to the City, any damaged public water and sewer facility in a manner satisfactory to the Public Utilities Department and the City Engineer.

65.    No trees or shrubs exceeding three feet in height at maturity shall be installed within ten feet of any sewer facilities and five feet of any water facilities.

66.    The Owner/Permittee shall design and construct all proposed public water and sewer facilities, in accordance with established criteria in the current edition of the City of San Diego Water and Sewer Facility Design Guidelines and City regulations, standards and practices.

67.    Prior to final inspection, all public water and sewer facilities shall be complete and operational in a manner satisfactory to the Public Utilities and the City Engineer.

68.    The Owner/Permittee will be required to provide evidence, satisfactory to the Public Utilities Department, indicating the private sewer easement for all cross-lot private sewer service from one lot to the Public-Right-of-Way as shown on the approved Exhibit "A".

**INFORMATION ONLY:**

- The issuance of this discretionary permit alone does not allow the immediate commencement or continued operation of the proposed use on site. Any operation allowed by this discretionary permit may only begin or recommence after all conditions listed on this permit are fully completed and all required ministerial permits have been issued and received final inspection.

- Any party on whom fees, dedications, reservations, or other exactions have been imposed as conditions of approval of this Permit, may protest the imposition within ninety days of the approval of this development permit by filing a written protest with the City Clerk pursuant to California Government Code section 66020.

- This development may be subject to impact fees at the time of construction permit issuance.

APPROVED by the City Council of the City of San Diego on _____ and pursuant to

Resolution No.  _____.

**Ex. A, p. 042**

**ATTACHMENT 7**

Permit Type/PTS Approval No.636444
Site Development Permit No. 2292338
Planned Development Permit No. 2292339
Date of Approval:  Month, Day, 2023

AUTHENTICATED BY THE CITY OF SAN DIEGO DEVELOPMENT SERVICES DEPARTMENT

_____
Martha Blake
Supervising Project Manager

**NOTE:  Notary acknowledgment
must be attached per Civil Code
section 1189 et seq.**

**The undersigned Owner/Permittee**, by execution hereof, agrees to each and every condition of
this Permit and promises to perform each and every obligation of Owner/Permittee hereunder.

Owner/Permittee
LIGHT ON A HILL, LLC,

By _____
*NAME:*
*TITLE:*

By _____
*NAME:*
*TITLE:*

**NOTE:  Notary acknowledgments
must be attached per Civil Code
section 1189 et seq.**

**Ex. A, p. 043**

(R-2023-

RESOLUTION NUMBER R-_____

DATE OF FINAL PASSAGE _____

A RESOLUTION OF THE COUNCIL OF THE CITY OF SAN DIEGO
APPROVING TENTATIVE MAP NO. 2490918 AND EASEMENT
VACATIONS NO. 2292339
ALL PEOPLES CHURCH – PROJECT NO. 636444.

WHEREAS, Light on a Hill, LLC, a California Limited Liability Corporation, Subdivider, and

Pasco Laret Suiter, Engineer, submitted an application to the City of San Diego for a Tentative Map

No. 2490918 and Easement Vacations No. 2292340 for an institutional project known as All Peoples

Church; and

WHEREAS, the project site is located north of Interstate 8 and east of College Avenue at 5555

College Avenue within the RS-1-7 Zone and the Navajo Community Plan area. And the property is

legally described as Portion of Lot 67 of Rancho Mission of San Diego, In the City of San Diego,

County of San Diego, State of California, as described in Grant Deed Recorded December 21, 2017 as

Document 2017-0602317; and

WHEREAS, the Tentative Map proposes the subdivision of a 5.99 acre site into a one (1) lot

Parcel Map to consolidate the ownership interest of a 5.99-acre site; and

WHEREAS, the project complies with the requirements of a preliminary soils and/or

geological reconnaissance report pursuant to Subdivision Map Act sections 66490 and 66491(b)-(f)

and San Diego Municipal Code section 144.0220; and

WHEREAS, on September 28, 2023, the Planning Commission of the City of San Diego considered

Tentative Map No. 2490918 and Easement Vacations No. 2292339, and pursuant to Resolution

No.XXXX-PC, the Planning Commission voted to recommend City Council approval of the map with

Revestment of site access and Easement Vacations, and dedication of new easements; and

Page 1 of 8

WHEREAS, under Charter section 280(a)(2) this Resolution is not subject to veto by the Mayor because this matter requires the City Council to act as a quasi-judicial body and where a public hearing was required by law implicating due process rights of individuals affected by the decision and where the Council was required by law to consider evidence at the hearing and to make legal findings based on the evidence presented; and

WHEREAS, on XXXXXXX, 2023, the City Council of the City of San Diego considered Tentative Map No. 2490918 and Easement Vacations No. 2292340, and pursuant to San Diego Municipal Code sections 125.0440 and 125.1040, and Subdivision Map Act section 66428, received for its consideration written and oral presentations, evidence having been submitted, and testimony having been heard from all interested parties at the public hearing, and the City Council having fully considered the matter and being fully advised concerning the same;

WHEREAS, the Office of the City Attorney has drafted this Resolution based on the information provided by City staff, with the understanding that the information is complete, true, and accurate; NOW, THEREFORE,

BE IT RESOLVED by the City Council of the City of San Diego, that it adopts the following findings with respect to Tentative Map No.2490918:

I.      **TENTATIVE MAP FINDINGS SDMC Section 125.0440**

  A.   **Findings for all Tentative Map Permits**

   1.   **The proposed subdivision and its design or improvement are consistent with the policies, goals, and objectives of the applicable land use plan.**

        The proposed subdivision is located on College Avenue, south of Del Cerro Boulevard in the RS-1-7 zone, within the Navajo Community Plan (NCP) area.  The site is designated for single-family residential development within the community plan, which will be amended with this project to designate a "Church" use at this location through amending NCP Figure 24: Other Community Facilities Map.

        The project site is a 5.99-acre parcel located at the northeast corner of Interstate 8 (I-8) and College Avenue intersection of the NCP area. The subdivision is of one lot into one lot with easement vacations, revestment of access rights to College Avenue, fronting the lot, and dedication of new utility easements.  The site is predominately surrounded

by single-family housing, neighborhood commercial, and I-8. North of the project site are single-family homes, neighborhood commercial and multi-family apartments. South of the project site is I-8 and San Diego State University. West and east of the project are site single-family homes. The neighborhood commercial offers a vehicle service station, grocery store (Windmill Farms), eating establishments, and shopping services for the surrounding residents. Metropolitan Transit Service (MTS) Bus Routes 14 and 115 run along the site's western boundary and provide service to the SDSU Transit Center located at College Avenue and Hardy Avenue.

The proposed project will develop the 5.99-acre site with:

- An approximately 54,476 SF sanctuary/multipurpose building to accommodate 900 seats with the following accessory uses: Sunday school classrooms, offices and a multipurpose room/gym.
- A 71,010 SF two level parking garage with 203 spaces
- Surface parking for 153 spaces
- Site utilities and landscaping
- Offsite improvements to College Avenue to create a median break and a signalized intersection for the main driveway
- On-site water quality basins to treat storm water runoff and a sewer/storm water connection to existing City facilities.

The project includes deviations to development regulations.  Specifically, to exceed the building height limit from 30 feet to 53 feet; to reduce side yard setbacks from 84 feet to 14 feet (as measured by the San Diego Municipal Code, the width of the site is approximately 1,052 linear feet by 154 linear feet depth); an increase in the maximum retaining wall height in the side yard setback from 6 feet to 20 feet; and a decrease in the required long-term bicycle storage from 17 spaces to 3 spaces.

The City of San Diego's General Plan (General Plan)'s Land Use Community Plan and Street System Map (Figure LU-2) identifies the site as Residential, which encompasses a wide range of recommended densities, referencing the refinement of ranges to be specified within each community plan. The adopted NCP land use designation is Single-Family Residential (5-9 du/acre). The NCP's overriding objective is to retain the residential character of the area, provide adequate community services, establish guidelines for the utilization of canyons and hillsides, and enhance the environment of the area as a pleasant, livable, walkable community. A well-balanced community is shaped by providing essential services. The NCP's "Other Community Facilities" Element addresses various facilities available to the Community. Figure 24: Other Community Facilities, identifies sites for churches, fire station, library, hospital, flood plain boundary, and San Diego Gas and Electric Co. Easement. Figure 24 identifies 12 existing church uses with the underlying land use designation and zone of single-family residential.

Therefore the proposal to subdivide this land under one ownership and to allow for the development of the site with a church use is consistent with the NCP, and would not result in adverse impacts to the plan.

2    **The proposed subdivision complies with the applicable zoning and development**

**regulations of the Land Development Code including any allowable deviations pursuant to the Land Development Code.**

The proposed subdivision of a vacant 5.99-acre site with an approximately 54,476 SF church will occur immediately north of Interstate 8 on College Avenue in the Navajo NCP.  The subdivision is of one lot into one lot with easement vacations, revestment of access rights to College Avenue – one where the new traffic signal is, and the second access to the north as shown on the Tentative Map, and dedication of new utility easements.

The project will include a sanctuary/multipurpose building to accommodate 900 seats, accessory uses of Sunday school classrooms, offices, a multipurpose room/gym, a 71,010 SF, two level parking structure and surface parking, landscaping and other improvements.  The project includes a General Plan/Community Plan Amendment to modify the Navajo Community Plan, a Planned Development Permit, a Site Development Permit, a Tentative Map and various easement vacations.

The site is an irregularly shaped lot with a natural slope from an elevation of 452 feet above sea level at the north property line, down to 354 feet above sea level adjacent to the south property line.  The width of the site is approximately 1,052 linear feet by 154 linear feet depth.  The project proposes grading the site with approximately 16,500 cubic yards of cut and 39,000 cubic yards of fill with the maximum depth of fill outside the building pad of approximately 28-feet, and under the building of approximately10-feet.

To achieve the project objectives of developing a church use that creates a positive sense of character and community, the project proposes minor deviations as allowed by the Land Development Code through the approval of a Planned Development Permit.  The deviations will be an increase in building height from 30 feet to 53 feet above grade for the church structure (48 feet to the top of the tower elements of the roof and 53 feet to the top of the cross) where 30-feet is the maximum height in the RS-1-7 zone;  a reduced side yard setback next to the Interstate 8 freeway of 14 feet where 82-feet is required; an increase in the maximum retaining wall height in the side yard setback from 6 feet to 20 feet; and a decrease in the required long-term bicycle storage from 17 spaces to 3 spaces.

Compliance with the Planned Development Permit process and conditions to allow for the deviations in accordance with the SDMC will ensure that the proposed subdivision is in conformance with the applicable regulations of the Land Development Code.

3.    **The site is physically suitable for the type and density of development.**

The site is an irregularly shaped lot with a natural slope from an elevation of 452 feet above sea level at the north property line, down to 354 feet above sea level adjacent to the south property line. The width of the site is approximately 1,052 linear feet by 154 linear feet depth.  The project proposes grading the site with approximately 16,500 cubic yards of cut and 39,000 cubic yards of fill with the maximum depth of fill outside the building of approximately 28 feet, and under the building of 10 feet.

The undeveloped site is outside the City's Multiple Species Conservation Program (MSCP) preserve, the Multi-Habitat Planning Area (MHPA).  Vegetation communities including Diegan coastal sage scrub, non-native grassland, disturbed habitat, eucalyptus woodland, and ornamental are present on the site. No waters of the U.S., waters of the State, or City wetlands are present on site.

The natural slope of the site and with sensitive grading practices the new church and parking structure will be developed at the lowest point of the site. The site is located in a developed area, and was previously approved for single-family residential development, and the current project to develop a religious assembly use on the site is similar in disturbance projections.  Adjacent single-family homes to the east, are developed on pads at elevations of 449 feet above sea level adjacent to the north property line, down to approximately 418 feet above sea level adjacent to the south property line.  Therefore, the grade differential of the two adjacent uses will be approximately 18-feet at the parking structure and up to 25-feet above the church building.

Therefore, the site is physically suitable for the design and siting of the proposed development and the development will result in minimum disturbance to environmentally sensitive land.

4. **The design of the subdivision or the proposed improvements are not likely to cause substantial environmental damage or substantially and avoidably injure fish or wildlife or their habitat.**

The site is not within, nor is it adjacent to, the City's Multiple Species Conservation Program (MSCP) preserve, the Multi-habitat Planning Area.  Development of the site would impact 3.1 acres of Diegan coastal sage scrub and 0.8 acres of non-native grassland through removal.

Mitigation for these impacts is required in the form of payment into the City's Habitat Acquisition Fund, which will fully mitigate impacts to biological resources.

Therefore, the proposed project will result in minimum disturbance to environmentally sensitive land.

5. **The design of the subdivision or the type of improvement will not be detrimental to the public health, safety, and welfare.**

The project has been designed to comply with the Land Development Code and other regional, State, and Federal regulations to prevent detrimental impacts to the health, safety and welfare of residents, workers and visitors as well as adjacent development and people.  These requirements include the safe design of streets and sidewalks as well as grading and drainage that provides for control and treatment of stormwater. Construction of the project will be pursuant to the applicable Uniform Building, Fire, Plumbing, Electrical, and Mechanical Codes.  All Land Development Codes governing construction and continued operation of the development will apply to prevent the potential for future adverse impacts once development has occurred.

6.  **The design of the subdivision or the type of improvements will not conflict with easements acquired by the public at large for access through or use of property within the proposed subdivision.**

A four-foot public easement on the east property line is proposed to remain as is an 80-foot-wide public water easement that connects the adjacent Lot A to College Avenue.  Easements to be vacated and relocated are storm drain and public sewer easements.  The slope easement adjacent to College Avenue is to be vacated.

Therefore, any easements that provide a benefit to or are used by the public would remain in existence, and the project would not conflict with or interfere with the existing utilized easements.

7.  **The design of the proposed subdivision provides, to the extent feasible, for future passive or natural heating and cooling opportunities.**

The natural slope of the site and with sensitive grading practices the new church and parking structure will be developed at the lowest point of the site, so passive and natural heating and cooling opportunities will remain to surrounding development, which is located at a higher elevation than the proposed church.

8.  **The decision maker has considered the effects of the proposed subdivision on the housing needs of the region and that those needs are balanced against the needs for public services and the available fiscal and environmental resources.**

The site was previously approved for development of 24 dwelling units. While the proposal would result in no housing on this site, the project would serve community needs for religious assembly use, and the project is located in an area adjacent to a freeway and freeway interchange. This will allow the project to buffer residential development from that interchange.

The 24 dwelling units have not been realized, and so no occupied housing is being displaced with this proposal and could be provided elsewhere in the community or nearby communities. In addition, the subdivision in and of itself does not preclude future use of the site for residential development, and the base zone of the property will remain RS-1-7, so the proposal to subdivide the property will not impact the existing or future availability for housing at this site.

BE IT FURTHER RESOLVED, that portions of public sewer easement, storm drain easements, and slope easement, located within the project boundaries as shown in Tentative Map No.2490918, shall be vacated, contingent upon the recordation of the approved Final Map for the project, and that the following findings are supported by the minutes, maps, and exhibits, all of which are herein incorporated by reference:

II.    **PUBLIC SERVICE EASEMENT AND OTHER EASEMENT VACATIONS FINDINGS SDMC Section 125.1040**

A.    **Findings for all Public Service Easement and Other Easement Vacations**

1.    **There is no present or prospective public use for the easement, either for the facility or purpose for which it was originally acquired or for any other public use of a like nature that can be anticipated.**

A four-feet public easement on the east property line is proposed to remain, as is an 80-foot-wide public water easement that connects the adjacent Lot A to College Avenue.  Easements to be vacated and relocated are storm drain and public sewer easements.  A slope easement adjacent to College Avenue is to be vacated.  The easements to be vacated and relocated continue to fulfill the purpose for which they were acquired.

2.    **The public will benefit from the action through improved utilization of the land made available by the vacation.**

To achieve the project objectives of developing a church use in the community, current easements for sewer and storm drains must be vacated and relocated.  A slope easement will also be vacated as it is no longer necessary for the purpose for which it was required.  The vacations of these easements will allow the development of this vacant site with a community-serving religious facility.

3.    **The vacation is consistent with an applicable land use plan.**

The land use plan is proposed to be amended as a companion item to the easement vacations. The land use designation would change from residential to 'other' which would allow for the church use on the site, while leaving the underlying base zone of RS-1-7 in place, which is consistent with other religious uses in the NCP.

To allow for the development of church, current easements for sewer and storm drains must be vacated and relocated to accommodate new utilities.  A slope easement will also be vacated as no longer necessary.  The vacation of these easements will allow the development of the vacant site with a community-serving religious facility as allowed by the NCP as amended.

4.    **The public facility or purpose for which the easement was originally acquired will not be detrimentally affected by the vacation or the purpose for which the easement was acquired no longer exists.**

No public improvements exist within the easements to be vacated.  It has been determined these easements are unnecessary and the purpose for which the easement was originally acquired no longer exists. Therefore, the public facility or purpose for which the easement was originally acquired will not be detrimentally affected by the vacation or the purpose for which the easement was acquired no longer exists.  The easements to be vacated and relocated continue to fulfill the

purpose.

BE IT FURTHER RESOLVED that based on the Findings hereinbefore adopted by the City

Council, Tentative Map No. 2490918 and Easement Vacation No. 2292340 are hereby granted to

Light on a Hill, LLC, a California Limited Liability Corporation, Subdivider, subject to the attached

conditions which are made a part of this resolution by this reference.

APPROVED: MARA W. ELLIOTT, City Attorney

By _____
XXXXXXX
Deputy City Attorney

XXX;xx
XX/XX/2017
Or.Dept:DSD Doc.
No.: XXXXXX

Attachment:  Tentative Map Conditions

**ATTACHMENT  9**

CITY COUNCIL

CONDITIONS FOR TENTATIVE MAP NO. 2490918
**ALL PEOPLES CHURCH - PROJECT NO. 636444**

ADOPTED BY RESOLUTION NO. R-XXXXX ON _____

**GENERAL**

1.      This Tentative Map No. 2490918 will expire _(3 years after City Council approval)___2026.

2.      Compliance with all of the following conditions shall be completed and/or assured, to the satisfaction of the City Engineer, prior to the recordation of the Final Map, unless otherwise noted.

3.      Prior to the recordation of the Final Map, taxes must be paid or bonded for this property pursuant to Subdivision Map Act Section 66492. To satisfy this condition, a tax certificate stating that there are no unpaid lien conditions against the subdivision must be recorded in the Office of the San Diego County Recorder.

4.      The Tentative Map shall comply with the provisions of Site Development Permit No. 2292338, Planned Development Permit No. 2292339, and Easement Vacation No. 2292340.

5.      The Subdivider shall defend, indemnify, and hold the City (including its agents, officers, and employees [together, "Indemnified Parties"]) harmless from any claim, action, or proceeding, against the City and/or any Indemnified Parties to attack, set aside, void, or annul City's approval of this project, which action is brought within the time period provided for in Government Code section 66499.37. City shall promptly notify Subdivider of any claim, action, or proceeding and shall cooperate fully in the defense. If City fails to promptly notify Subdivider of any claim, action, or proceeding, or if City fails to cooperate fully in the defense, Subdivider shall not thereafter be responsible to defend, indemnify, or hold City and/or any Indemnified Parties harmless. City may participate in the defense of any claim, action, or proceeding if City both bears its own attorney's fees and costs, City defends the action in good faith, and Subdivider is not required to pay or perform any settlement unless such settlement is approved by the Subdivider.

**ENGINEERING**

6.      Compliance with all conditions shall be assured to the satisfaction of the City Engineer, prior to the recordation of the Final Map, unless otherwise noted.

7.      The Tentative Map shall comply with the Conditions of Site Development Permit No. 2292338, Planned Development Permit No. 2292339 and Easement Vacation No. 2292340.

**Ex. A, p. 052**

8.    The Subdivider shall ensure that all onsite utilities serving the subdivision shall be undergrounded with the appropriate permits. The subdivider shall provide written confirmation from applicable utility provider that the conversion has taken place, or provide other means to assure the undergrounding, satisfactory to the City Engineer.

9.    The Subdivider shall install new streetlights per the City of San Diego Street Design Manual-Street Light Standards, and Council Policy 200-18 throughout the project as shown on approved Exhibit "A".

10.   The drainage system proposed for this development, as shown on the site plan, is subject to approval by the City Engineer

11.   The Subdivider shall obtain a bonded grading permit for the grading proposed for this project. All grading shall conform to the requirements of the City of San Diego Municipal Code in a manner satisfactory to the City Engineer.

12.   The Subdivider shall vacate the non-utilized easements, satisfactory to the City Engineer.

13.   The Subdivider shall remove the portions of the existing Public Storm Drain system and construct a new Public Storm Drain system per current city standards.

14.   The Subdivider shall grant to the City of San Diego a 15-foot-wide storm drain easement.

15.   The subdivider shall incorporate any construction Best Management Practices necessary to comply with Chapter 14, Article 2, Division 1 (Grading Regulations) of the SDMC, into the construction plans or specifications.

16.   The subdivider shall submit a Technical Report that will be subject to final review and approval by the City Engineer, based on the Storm Water Standards in effect at the time of the construction permit issuance.

17.   The Subdivider shall enter into a Maintenance Agreement for the ongoing permanent BMP maintenance satisfactory to the City Engineer.

18.   Development of this project shall comply with all storm water construction requirements of the State Construction General Permit, Order No. 2009-0009DWQ, or subsequent order, and the Municipal Storm Water Permit, Order No. R9-2013-0001, or subsequent order. In accordance with Order No. 2009-0009DWQ, or subsequent order, a Risk Level Determination shall be calculated for the site and a Storm Water Pollution Prevention Plan (SWPPP) shall be implemented concurrently with the commencement of grading activities.

19.   Prior to issuance of a grading or a construction permit, a copy of the Notice of Intent (NOI) with a valid Waste Discharge ID number (WDID#) shall be submitted to the City of San Diego as a proof of enrollment under the Construction General Permit. When ownership of the entire site or portions of the site changes prior to filing of the Notice of Termination (NOT), a revised NOI shall be submitted electronically to the State Water Resources Board in

**Ex. A, p. 053**

accordance with the provisions as set forth in Section II.C of Order No. 2009-0009-DWQ and a copy shall be submitted to the City.

20. Prior to the issuance of any construction permit, the Owner/Permittee shall enter into a Maintenance Agreement for the ongoing permanent Best Management Practices (BMP) maintenance associated with the area of improvements, satisfactory to the City Engineer.

21. Prior to the issuance of any construction permit, the Owner/Permittee shall submit a Technical Report that will be subject to final review and approval by the City Engineer, based on the Storm Water Standards in effect at the time of the construction permit issuance.

### MAPPING

22. Prior to the expiration of the Tentative Map, a Parcel Map to consolidate the ownership interest shall be recorded at the San Diego County Recorder's Office.

23. Prior to the recordation of the Parcel Map, taxes must be paid or bonded for this property pursuant to section 66492 of the Subdivision Map Act. A current original tax certificate, recorded in the office of the San Diego County Recorder, must be provided to satisfy this condition. If a tax bond is required as indicated in the tax certificate, ensure that it is paid or posted at the County Clerk of the Board of Supervisors Office and supply proof prior to the recordation of the Parcel Map.

24. The Parcel Map shall be based on field survey and all lot corners must be marked with durable survey monuments pursuant to Section 144.0311(d) of the City of San Diego Land Development Codes and Subdivision Map Act Section 66495.All survey monuments shall be set prior to the recordation of the Parcel Map, unless the setting of monuments is deemed impractical due to the proposed improvements and/or grading associated with the project, in which case, delayed monumentation may be applied on the Final Map in accordance with Section 144.0130 of the City of San Diego Land Development Codes.

25. All subdivision maps in the City of San Diego are required to be tied to the California Coordinate System of 1983 (CCS83), Zone 6 pursuant to section 8801 through 8819 of the California Public Resources Code.

26. The Parcel Map shall:

   a. Use the California Coordinate System for its "Basis of Bearing" and express all measured and calculated bearing values in terms of said system. The angle of grid divergence from a true median (theta or mapping angle) and the north point of said map shall appear on each sheet thereof. Establishment of said Basis of Bearings may be by use of existing Horizontal Control stations or astronomic observations.

   b. Show two measured ties from the boundary of the map to existing Horizontal

Control stations having California Coordinate values of First Order accuracy. These tie lines to the existing control shall be shown in relation to the California Coordinate System (i.e., grid bearings and grid distances). All other distances shown on the map are to be shown as ground distances. A combined factor for conversion of grid-to-ground distances shall be shown on the map.

27.    Any public easements within the Tentative Map boundary being vacated as shown on the Approved Exhibit "A" shall be noted in the legal description on the Parcel Map in accordance with 66455(j) of the Subdivision Map Act and shall be vacated upon recordation of the Parcel Map.

28.    Revestment of access rights to the site will be shown on the final map in locations consistent with Approved Exhibit "A."

**PUBLIC UTILIITES**

29.    Prior to the recordation of the Parcel Map, the Subdivider is required to develop and record a 20-foot contiguous public sewer easement as shown on the approved Exhibit "A" in a manner satisfactory to the Public Utilities Department and City Engineer.

30.    Prior to the issuance of any building construction permits, the Subdivider is required to develop and record a contiguous public maintenance access easement as shown on the approved Exhibit "A", in a manner satisfactory to the Public Utilities Department and City Engineer.

31.    Prior to the recordation of the public sewer easement vacation, the Owner/Permittee shall assure, by permit, bond and As-built completion of the abandonment of the existing public sewer main as shown on the approved Exhibit "A", in a manner satisfactory to the Public Utilities Department and the City Engineer.

32.    Prior to the recordation of the Parcel Map, the Subdivider is required to vacate all public water easements as shown on the approved Exhibit "A", in a manner satisfactory to the Public Utilities Director and City Engineer.

**GEOLOGY**

33.    Prior to the issuance of a construction permit (either grading or building permit), the Owner/Permittee shall submit a geotechnical investigation report prepared in accordance with the City's "Guidelines for Geotechnical Reports" that specifically addresses the proposed construction plans. The geotechnical investigation report shall be reviewed for adequacy by the Geology Section of the Development Services Department prior to the issuance of any construction permit.

ATTACHMENT 9

**INFORMATION:**

- The approval of this Tentative Map by the City Council of the City of San Diego does not authorize the subdivider to violate any Federal, State, or City laws, ordinances, regulations, or policies including but not limited to, the Federal Endangered Species Act of 1973 and any amendments thereto (16 USC § 1531 et seq.).

- If the Subdivider makes any request for new water and sewer facilities (including services, fire hydrants, and laterals), the Subdivider shall design and construct such facilities in accordance with established criteria in the most current editions of the City of San Diego water and sewer design guides and City regulations, standards and practices pertaining thereto. Off-site improvements may be required to provide adequate and acceptable levels of service and will be determined at final engineering.

- Subsequent applications related to this Vesting Tentative Map will be subject to fees and charges based on the rate and calculation method in effect at the time of payment.

- Any party on whom fees, dedications, reservations, or other exactions have been imposed as conditions of approval of the Vesting Tentative Map, may protest the imposition within ninety days of the approval of this Vesting Tentative Map by filing a written protest with the San Diego City Clerk pursuant to Government Code sections 66020 and/or 66021.

- Where in the course of development of private property, public facilities are damaged or removed, the Subdivider shall at no cost to the City, obtain the required permits for work in the public right-of-way, and repair or replace the public facility to the satisfaction of the City Engineer (San Diego Municipal Code § 142.0607).

RESOLUTION NUMBER R- _____

ADOPTED ON _____

A RESOLUTION OF THE COUNCIL OF THE CITY OF SAN
DIEGO CERTIFYING ENVIRONMENTAL IMPACT REPORT
NO. 636444/SCH No. 2021100394, ADOPTING FINDINGS,
AND ADOPTING MITIGATION MONITORING AND
REPORTING PROGRAM NO. 636444 [MMRP] FOR
ALL PEOPLES CHURCH, PROJECT NO. 636444.

WHEREAS, Light on a Hill, LLC, a California Limited Liability Company, Owner/Permittee,
filed an application with the City of San Diego for a General Plan and Navajo Community Plan
Amendment No. 2292367, Planned Development Permit No. 2292339, Site Development
Permit No. 2292338, Tentative Map No. 2490918, and Easement Vacation No. 2292340 for the
All Peoples Church project (Project), and

WHEREAS, on September 21, 2023, the Planning Commission of the City of San Diego
considered General Plan and Navajo Community Plan Amendment No. 2292367, Planned
Development Permit No. 2292339, Site Development Permit No. 2292338, Tentative Map No.
2490918, and Easement Vacation No. 2292339 and voted _____ to approve the project by
Resolution No. _____; and

WHEREAS, under San Diego Charter Section 280(a)(2) this resolution is not subject to
veto by the Mayor because this matter requires the City Council to act as a quasi-judicial body,
a public hearing is required by law implicating due process rights of individuals affected by the
decision, and the Council is required by law to consider evidence at the hearing and to make
legal findings based on the evidence presented; and

WHEREAS, the Council has considered the issues discussed in Environmental Impact
report No. 636444/SCH No. 2021100394 (Report) prepared for this project; NOW THEREFORE,

BE IT RESOLVED, by the Council that it is certified that the Report has been completed
in compliance with the California Environmental Quality Act of 1970 (CEQA) (Public Resources
Code Section 21000 et seq.), as amended, and the State CEQA Guidelines thereto (California
Code of Regulations, Title 14, Chapter 3, Section 15000 et seq.), that the Report reflects the
independent judgment of the City of San Diego as Lead Agency and that the information
contained in said Report, together with any comments received during the public review
process, has been reviewed and considered by the City Council in connection with the approval
of the Project.

BE IT RESOLVED, that pursuant to CEQA Section 21081 and State CEQA Guidelines
Section 15091, the Council hereby adopts the Findings made with respect to the Project, which
are attached hereto as Exhibit A.

BE IT FURTHER RESOLVED, that pursuant to CEQA Section 21081.6, the City Council
hereby adopts the Mitigation Monitoring and Reporting Program, or alterations to implement

the changes to the Project as required by this Council in order to mitigate of avoid significant effects on the environment, which is attached hereto as Exhibit B.

BE IT FURTHER RESOLVED, that the Report and other documents constituting the record of proceedings upon which the approval is based area available to the public at the Office of the City Clerk, 202 C Street, San Diego, CA 92101.

BE IT FURTHER RESOLVED, that the City Clerk is directed to file a Notice of Determination with the Clerk of the Board of Supervisors for the County of San Diego regarding the Project.

APPROVED: MARA W. ELLIOTT, City Attorney


By: _____
XXXXXXXXXXXXXX
Deputy City Attorney


ATTACHMENTS: Exhibit A, Findings
                        Exhibit B, Mitigation Monitoring and Reporting Program

DRAFT CANDIDATE FINDINGS FOR THE
ALL PEOPLES CHURCH PROJECT
PROJECT No.  636444
SCH No. 2021100394
EXHIBIT A

## I.      INTRODUCTION

### A.      Findings of Fact

The following Candidate Findings are made for the All Peoples Church Project (hereinafter referred to as "project"). The environmental impacts of the project are addressed in the Final Environmental Impact Report (FEIR) dated July 31, 2023 (State Clearinghouse No. 2021100394), which is incorporated by reference herein.

The California Environmental Quality Act (CEQA) (Pub. Res. Code §§21000, *et seq.*) and the State CEQA Guidelines (Guidelines) (14 Cal. Code Regs §§15000, *et seq.*) require that no public agency shall approve or carry out a project for which an EIR has been certified which identifies one or more significant environmental impacts of the project unless the public agency makes one or more written findings for each of those significant impacts, accompanied by a brief explanation of the rationale for each finding. The possible findings are:

1.   Changes or alterations have been required in, or incorporated into, the project which avoid or substantially lessen the significant environmental impact as identified in the Final EIR.

2.   Such changes or alterations are within the responsibility and jurisdiction of another public agency and not the agency making the finding. Such changes have been adopted by such other agency or can and should be adopted by such other agency.

3.   Specific economic, legal, social, technological, or other considerations, including considerations for the provision of employment opportunities for highly trained workers, make infeasible the mitigation measures or project alternatives identified in the Final EIR.

CEQA also requires that the findings made pursuant to §15091 be supported by substantial evidence in the record (§15091(b) of the State CEQA Guidelines). Under CEQA, substantial evidence means that enough relevant information has been provided (and reasonable inferences from this information may be made) that a fair argument can be made to support a conclusion, even though other conclusions might also be reached. Substantial evidence may include facts, reasonable assumptions predicted upon facts, and expert opinion supported by facts (§15384 of the State CEQA Guidelines).

CEQA further requires the decision-making agency to balance, as applicable, the economic, legal, social, technological, or other benefits of a proposed project against its unavoidable environmental effects when determining whether to approve the project. If the specific economic, legal, social, technological, or other benefits of a proposed project outweigh the unavoidable adverse

July 2023

**Ex. A, p. 059**

environmental effects, the adverse environmental effects may be considered "acceptable" (§15093(a) of the State CEQA Guidelines). When the lead agency approves a project which will result in the occurrence of significant effects which are identified in the Final EIR but are not avoided or substantially lessened, the agency shall state in writing the specific reasons to support its actions based on the Final EIR and/or other information in the record.

## B.   Record of Proceedings

For purposes of CEQA and these Findings, the Record of Proceedings for the Project consists of the following documents and other evidence, at a minimum:

- The Notice of Preparation (NOP), dated October 22, 2021 and all other public notices issued by the City in conjunction with the project;

- The Draft EIR (DEIR), dated August 31, 2022;

- The FEIR, dated July 31, 2023;

- All written comments submitted by agencies or members of the public during the public review comment period on the DEIR;

- All responses to written comments submitted by agencies or members of the public during the public review comment period on the DEIR and included in the FEIR;

- The Mitigation Monitoring and Reporting Program (MMRP);

- The reports and technical memoranda included or referenced in the FEIR;

- All documents, studies, EIRs, or other materials incorporated by reference in the DEIR and the FEIR;

- Matters of common knowledge to the City, including but not limited to federal, state and local laws and regulations;

- Any documents expressly cited in these Findings; and

- Any other relevant materials required to be included in the Record of Proceedings pursuant to Public Resources Code §21167.6(e).

## C.   Custodian and Location of Records

The documents and other materials which constitute the administrative record for the City of San Diego's (City's) actions related to the project are located at the City of San Diego, Development Services Department (DSD), 1222 1st Avenue, 5th Floor, San Diego, CA 92101. The City DSD is the custodian of the administrative record for the project. Copies of these documents, which constitute the Record of Proceedings, are and at all relevant times have been and will be available upon request at the offices of the City DSD. The DEIR was also placed on the City's website at **www.sandiego.gov/ceqa/draft**, and the FEIR was placed on the City's website at **www.sandiego.gov/ceqa/final**. This information is provided in compliance with Public Resources Code §21081.6(a)(2) and CEQA Guidelines §15091(e).

## II.    PROJECT SUMMARY

### A.    Project Location

The approximately six-acre project site is vacant and located in the southern portion of the Del Cerro neighborhood in the Navajo Community Plan area in the City. The project site is located approximately 11 miles east of the Pacific Ocean, seven miles northeast of downtown San Diego, approximately three miles east of Interstate 15 and immediately north of Interstate 8 (I-8). The project site is bounded by College Avenue on the west, the westbound I-8 off-ramp at College Avenue and City fee-owned open space dedicated parkland to the south, single-family neighborhoods along Marne Avenue and the western end of Glenmont Street to the east, and neighborhood commercial properties to the north fronting Del Cerro Boulevard.

### B.    Project Objectives and Description

**Project Objectives**

The objectives of the All Peoples Church Project are as follows:

1.  Place the church/sanctuary in a central San Diego location that is both visible from and convenient to a regional freeway to facilitate church attendance;

2.  Relocate to a church-owned property that has proximity to its existing congregation, including its members in City Heights, Mid-Cities, College Area, and Del Cerro;

3.  Establish a place of worship that would accommodate the space needs of its staff and congregation;

4.  Design the structures and site improvements to be sensitive to the existing topography and surrounding neighborhoods;

5.  Address the parking needs on Sundays by constructing sufficient parking to accommodate the maximum projected parking demand;

6.  Develop the church/sanctuary near where transit connections are readily available to its congregation;

7.  Enhance the religious, spiritual and community-building activities, including Sunday School and adult education, through the design and character of the indoor and outdoor spaces; and

8.  Fulfill the institution's religious mission to be a multi-ethnic, multi-generational local church with a global vision.

**Project Description**

The All Peoples Church project consists of the construction and operation of a 54,476-square-foot (SF) church/sanctuary building and a 71,010 SF, two-level parking garage and surface parking areas on an approximately 6-acre vacant site. The proposed project would include a 900-seat sanctuary space with accessory uses (i.e., Sunday school classrooms, offices, and a multi-purpose room/gym), and various site improvements, such as circulation, landscaping, and utility connections which are described below. Of the 900 seats, 587 seats would be fixed in place and 3,690 SF would accommodate the remaining non-fixed seats. Congregation gatherings would primarily occur on

Sundays; small group activities may occur during the weekdays or on Saturdays. No primary educational school spaces are proposed as part of the project.

The two-level parking structure would be recessed into the terrain such that the top deck would be below grade of College Avenue. Smaller surface parking areas would be provided south and east of the parking structure and church/sanctuary building. The parking structure would contain 203 parking spaces, while surface parking areas would hold 153 spaces, for a total of 356 parking spaces, which would exceed the City's minimum parking requirements of 319 parking spaces by 37 parking spaces.

Vehicular access to the project and the parking structure would be via a proposed signalized full access driveway along College Avenue with a secondary gated driveway entrance connected to the northern parking lot for right-in/out only vehicle movements.  Off-site improvements to the new College Avenue intersection would include creating a median break and narrowing of the existing raised median to construct a new southbound left-turn lane, striping of a northbound right-turn lane, and installing a crosswalk.

New bicycle lane signage and striping would be installed along northbound College Avenue. Along the project's College Avenue frontage, a 12-foot shared (i.e., pedestrians and bicycles) contiguous sidewalk would be installed south of the project driveway and north of the driveway a 5-foot-wide non-contiguous sidewalk would be constructed within the parkway.

To implement the project, several deviations from the RS-1-7 zone related to building height, retaining wall height, side yard setback, and bicycle parking are proposed.  Specifically, the proposed building height deviation from San Diego Municipal Code (SDMC) §131.0431(b)] would allow an increase from the maximum height of 30 feet to 53 feet above grade; the wall height deviation from SDMC §142.0340(d)(1)] would increase from the maximum wall height from six feet to 20 feet above grade; the side yard setback deviation from SDMC §131.0431(b) would decrease the minimum side yard setback from 84 feet-2 inches to 14 feet setback; and the long-term bicycle parking requirements would be reduced from 16 spaces to three spaces. A Community Plan Amendment (CPA) is proposed to allow for the development of a religious assembly use within the Single Family residential land use designation.  A Planned Development Permit (PDP) is required to allow a use that is permitted by the land use plan but not allowed by the underlying zone. In addition, the PDP also permits deviations from the RS-1-7 zone.  A Site Development Permit (SDP) is required for the project to impact sensitive biological resources.  A Tentative Map (TM) is proposed to facilitate the vacation and granting of easements.   Numerous existing easements would be vacated by the TM. Specifically, existing sewer, telecom, and stormwater easements that cross the property would be abandoned. In addition, a portion of the access rights would be revested for the proposed signalized intersection and ingress/egress driveways along College Avenue and right-of-way would be dedicated to the City to accommodate the proposed parkway along the project frontage with College Avenue.

## III.    ENVIRONMENTAL REVIEW PROCESS AND PUBLIC PARTICIPATION

The lead agency approving the project and conducting environmental review under CEQA (California Public Resources Code §§21000, et seq.), and the Guidelines promulgated thereunder in California Code of Regulations, Title 14, §§15000 et seq. (CEQA Guidelines), shall be the City. The City as lead agency shall be primarily responsible for carrying out the project.

In compliance with §15082 of the State CEQA Guidelines, the City published an NOP on October 22, 2021, which began a 30-day period for comments on the appropriate scope of the EIR.  The City received comments on the NOP which were taken into consideration during the preparation of the DEIR (refer to Appendix A of the FEIR).

The City published a DEIR addressing the project on August 31, 2022 in compliance with CEQA. Pursuant to State CEQA Guidelines §15085 and upon publication of the DEIR, the City made the DEIR available for review and comment by the public for a period of 45 days. The City also posted a Notice of Availability of the DEIR at this time pursuant to State CEQA Guidelines §15087. During the public review period, the City received 156 comment letters on the environmental document; an additional six comment letters were received after the close of the public review period.  The City provided responses in writing to all comments received on the DEIR.

Minor clarifications were made to the information contained in the DEIR as a result of the response to comments and are reflected in the FEIR. No significant new information was added that would require recirculation of the document, per CEQA Guidelines Section 15088.5.  The FEIR for the project was published on July 31, 2023. The FEIR has been prepared in accordance with CEQA and the State CEQA Guidelines (§15132).

## IV.    SUMMARY OF IMPACTS

Impacts associated with specific issue areas resulting from approval of the project are discussed below.

The FEIR concludes the project would have **no impacts** with respect to the following issue areas:

- Agriculture and Forestry Resources
- Mineral Resources

The FEIR concludes the project would have **less than significant impacts** and require no mitigation measures with respect to the following issue areas:

- Air Quality
- Energy
- Geologic Conditions
- Greenhouse Gas Emissions
- Health and Safety
- Hydrology
- Land Use
- Paleontological Resources
- Population and Housing
- Public Services and Facilities
- Transportation
- Utilities and Service Systems
- Visual Effects/Neighborhood Character
- Water Quality
- Wildfire

The FEIR concludes the project would potentially have a **significant impact but mitigated to below a level of significance** with respect to the following issue areas:

- Biological Resources
- Historical Resources
- Noise
- Tribal Cultural Resources (TCRs)

The FEIR concludes the project would not have any **significant unavoidable impacts** for any CEQA issue areas.

## V.    FINDINGS REGARDING SIGNIFICANT IMPACTS

The Findings incorporate the facts and discussions in the FEIR for the project as fully set forth therein.

### A.    Findings Regarding Impacts That Will be Mitigated to Below a Level of Significance (CEQA §21081(a)(1) and CEQA Guidelines §15091(a)(1)

The City, having independently reviewed and considered the information contained in the FEIR and the public record for the project, finds, pursuant to Public Resource Code §21081(a)(1) and State CEQA Guidelines §15091(a)(1), that changes or alterations have been required in, or incorporated into, the project which would mitigate, significantly lessen or avoid the significant effects on the environment related to the following issues:

**BIOLOGICAL RESOURCES**

**Sensitive Species and Habitats (Issue 1 and Issue 2)**

Impact

Project construction would result in significant direct impacts to sensitive habitats.

Facts in Support of Finding

Project construction would result in direct, permanent on-site impacts to 2.3 acres of Tier II Diegan coastal sage scrub, 0.9 acres of Tier II Diegan coastal sage scrub-disturbed, and 0.8 acres of Tier IIIB non-native grassland (a total of 4.0 acres on site). The total acreage of impact to sensitive habitats would be 4.0 acres. Impacts to these habitats would be significant because they are Tier I through Tier IIIB.

Mitigation Measures

**Ex. A, p. 064**

The significant direct and indirect impact to sensitive habitat would be mitigated to below a level of significance with implementation of Mitigation Measure BIO-1, as identified in Section 5.2.3.4 of the FEIR. Mitigation Measure BIO-1 requires biological monitoring and resource protection during construction, with measures to be implemented in the event that impacts exceed previously allowed amounts.

The significant direct impact to 4.0 acres of sensitive habitat would be mitigated to below a level of significance with implementation of the Mitigation Measure BIO-2, as identified in Section 5.2.3.4 of the FEIR. Mitigation Measure BIO-2 requires mitigation for impacts to 3.2 acres of Diegan coastal sage scrub and Diegan coastal sage scrub-disturbed at a 1:1 ratio for impacts that would occur outside of the Multi-Habitat Planning Area (MHPA), with mitigation that would occur inside the MHPA. Mitigation for impacts to 0.8 acre of non-native grassland would be mitigated at a ratio of 0.5:1 (for habitat not occupied by the burrowing owl) since they occur outside the MHPA, and the mitigation would occur inside the MHPA. Mitigation would be accomplished via payment into the City's Habitat Acquisition Fund equal to 3.6 acres of habitat.

Finding

Implementation of actions pursuant to Mitigation Measures BIO-1 and BIO-2 would reduce impacts to sensitive habitats to less than significant.

Reference

See FEIR Section 5.2 for a complete discussion of the biological resources impacts associated with the project.

**HISTORICAL RESOURCES**

**Historical Resources (Issue 1)**

Impact

The construction of the project has the potential to encounter and potentially damage or destroy unknown buried archaeological and Native American resources where native material occurs.

Facts in Support of Finding

No prehistoric cultural resources were recorded or observed on site. However, there are recorded cultural resources within a one-mile radius of the project site. Based on the presence of prehistoric and historic resources in the project vicinity, and the low ground visibility at the project site during the pedestrian field survey, the potential exists for unknown buried archaeological and Native American resources to occur. The construction of the project has the potential to encounter and potentially damage or destroy unknown buried archaeological and Native American resources.

Mitigation Measures

The potentially significant impact to unknown buried archaeological and Native American resources would be mitigated to below a level of significance with implementation of the Mitigation Measure HR-1, as identified in Section 5.3.3.4 of the FEIR. Mitigation Measure HR-1 requires implementation of a monitoring program, which includes steps to be taken prior to permit issuance, prior to the start

of construction, during construction, in the event human remains are discovered, during night and/or weekend work, and post construction.

<u>Finding</u>

Implementation of actions pursuant to Mitigation Measure HR-1 would reduce impacts to unknown buried archaeological and Native American resources to less than significant.

<u>Reference</u>

See FEIR Section 5.3 for a complete discussion of the historical resource impacts associated with the project.

**Religious or Sacred Uses (Issue 2)**

<u>Impact</u>

Ground disturbance associated with the construction of the project has the potential to uncover previously unknown religious or sacred resources, resulting in a potentially significant impact.

<u>Facts in Support of Finding</u>

No religious or sacred uses are known to exist within the project site; however, research indicates that prehistoric and historic resources are frequent in the surrounding area. Areas in the Del Cerro neighborhood, including areas to the west and further east of the project site, have yielded cultural remains that document prehistoric occupation. While no known resources have been discovered onsite through background research or the on-site pedestrian survey, based on the presence of prehistoric and historic resources in the area, the project has the potential to encounter unknown religious or sacred resources during ground-disturbing activities.

<u>Mitigation Measures</u>

The potentially significant impact to unknown religious or sacred resources would be mitigated to below a level of significance with implementation of the Mitigation Measure HR-1, as identified in Section 5.3.3.4 of the FEIR. Mitigation Measure HR-1 requires implementation of a monitoring program, which includes steps to be taken prior to permit issuance, prior to the start of construction, during construction, in the event human remains are discovered, during night and/or weekend work, and post construction.

<u>Finding</u>

Implementation of actions pursuant to Mitigation Measure HR-1 would reduce impacts to unknown religious or sacred resources to less than significant.

<u>Reference</u>

See FEIR Section 5.3 for a complete discussion of historical resource impacts associated with the project.

**Ex. A, p. 066**

**Human Remains (Issue 3)**

Impact

Construction of the project would result in ground disturbance, which has the potential to uncover previously unknown resources, including unknown human remains.

Facts in Support of Finding

No formal cemeteries or known burial sites have been identified on or in the immediate vicinity of the project site. In the unlikely event of a discovery of human remains, the project would be required to comply with California PRC Section 5097.98, California Health and Safety Code Section 7050.5, and California Government Code Section 27491. These regulations identify procedures to be implemented in the event of a discovery of human remains. Work would be halted, and the procedures identified in PRC Section 5097.98 and the California Health and Safety Code would be followed.

Mitigation Measures

The potentially significant impact to unknown human remains would be mitigated to below a level of significance with implementation of the Mitigation Measure HR-1, as identified in Section 5.3.3.4 of the FEIR. Mitigation Measure HR-1 requires implementation of a monitoring program, which includes steps to be taken prior to permit issuance, prior to the start of construction, during construction, in the event human remains are discovered, during night and/or weekend work, and post construction.

Finding

Implementation of actions pursuant to Mitigation Measure HR-1 would reduce impacts to unknown human remains to less than significant.

Reference

See FEIR Section 5.3 for a complete discussion of historical resource impacts associated with the project.

**NOISE**

**Ambient Noise Increase (Issue 1)**

Impact

Implementation of the project has the potential to significantly impact off-site noise-sensitive receptors (i.e., nearby residential properties) through temporary increases in ambient noise levels caused by construction noise that has the potential to exceed the 12-hour 75 dBA Leq standard at the property line contained in Section 59.0404 of the SDMC.

Facts in Support of Finding

Construction associated with the project includes noise associated with the operation of off-road equipment for onsite construction activities, as well as construction vehicle traffic on area roadways.

Construction noise typically occurs intermittently and varies depending on the nature or phase of construction (e.g., building construction, paving). During construction, exterior noise levels could negatively affect sensitive receptors in the vicinity of the construction site. The City's noise construction standard of 75 dBA Leq would be exceeded for several construction phases (site preparation, grading, building construction, and paving) at the nearby residential property line resulting in a significant noise impact. Estimated exterior construction noise levels at the nearby property line in excess of the City's standards include noise levels of 76.1 dBA Leq during site preparation, 76.8 dBA Leq during grading, 77.9 dBA Leq for building construction, and 77.4 dBA Leq for paving.

<u>Mitigation Measures</u>

The potentially significant impact to ambient noise levels in the project area would be mitigated to below a level of significance with implementation of the Mitigation Measure NOI-1, as identified in Section 5.4.3.4 of the FEIR. Implementation of Mitigation Measure NOI-1 requires the incorporation of best management practices into project drawings, and implementation of these practices during construction to ensure sustained construction noise levels do not exceed 75 decibels over a 12-hour period at the nearest sensitive receptors.

<u>Finding</u>

Implementation of actions pursuant to Mitigation Measure NOI-1 would reduce impacts to ambient noise levels to less than significant.

<u>Reference</u>

See FEIR Section 5.4 for a complete discussion of the construction noise impacts associated with the project.

**TRIBAL CULTURAL RESOURCES**

**Tribal Cultural Resources (Issue 1)**

<u>Impact</u>

Ground disturbance associated with the construction of the project has the potential to uncover previously unknown TCRs.

<u>Facts in Support of Finding</u>

The City provided formal notification to the Iipay Nation of Santa Ysabel, Jamul Indian Village, and San Pasqual Band of Mission Indians, all of which requested consultation and agreed that construction monitoring should be conducted by a Native American monitor. The project site does not contain recorded sites listed or sites eligible for listing in the California Register of Historical Resources or in a local register of historical resources as defined by the Public Resources Code. Although TCRs have not been identified in the project area, the area is considered sensitive for potential TCRs. Therefore, there is the potential for the inadvertent discovery of a resource that could be impacted by project implementation.

<u>Mitigation Measures</u>

**Ex. A, p. 068**

The potentially significant impact to TCRs would be mitigated to below a level of significance with implementation of the Mitigation Measure HR-1, as identified in Section 5.6.3.3 of the FEIR.

<u>Finding</u>

Implementation of actions pursuant to Mitigation Measure HR-1 would reduce impacts to TCRs to less than significant.

<u>Reference</u>

See FEIR Section 5.6 for a complete discussion of the TCR impacts associated with the project.

## B.    Findings Regarding Alternatives (CEQA §21081(a)(3) and CEQA Guidelines §15091(a)(3))

In accordance with §15126.6(a) of the Guidelines, an EIR must contain a discussion of "a range of reasonable alternatives to a project, or the location of a project, which would feasibly attain most of the basic objectives of the project but would avoid or substantially lessen any of the significant effects of the project, and evaluate the comparative merits of the alternatives." The §15126.6(f) further states that "the range of alternatives in an EIR is governed by the 'rule of reason' that requires the EIR to set forth only those alternatives necessary to permit a reasoned choice." Thus, the following discussion focuses on alternatives to the project that are capable of eliminating significant environmental impacts or substantially reducing them as compared to the project, even if the alternative would impede the attainment of some project objectives, or would be more costly. In accordance with §15126.6(f)(1) of the Guidelines, among the factors that may be taken into account when addressing the feasibility of alternatives are: (1) site suitability; (2) economic viability; (3) availability of infrastructure; (4) general plan consistency; (5) other plans or regulatory limitations; (6) jurisdictional boundaries; and (7) whether the proponent can reasonably acquire, control, or otherwise have access to the alternative site.

As required in §15126.6(a), in developing the alternatives to be addressed in the FEIR, consideration was given to an alternative's ability to meet most of the basic objectives of the project. Because the project will cause potentially significant environmental effects unless mitigated, the City must consider the feasibility of any environmentally superior alternatives to the project, evaluating whether these alternatives could avoid or substantially lessen the potentially significant environmental effects while achieving most of the objectives of the project.

The City, having reviewed and considered the information contained in the FEIR and the Record of Proceedings, and pursuant to Public Resource Code §21081(a)(3) and State CEQA Guidelines §15091(a)(3), makes the following findings with respect to the alternatives identified in the FEIR.

Specific economic, legal, social, technological, or other considerations, including considerations for the provision of employment opportunities for highly trained workers, make infeasible the mitigation measures or alternatives identified in the FEIR (Project No. 636444 / SCH No. 2021100394) as described below.

***"Feasible" is defined in §15364 of the CEQA Guidelines to mean "capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, legal, social, and technological factors." The CEQA statute (§21081) and Guidelines***

**Ex. A, p. 069**

*(§15019(a)(3)) also provide that "other considerations" may form the basis for a finding of infeasibility.*

**Alternatives under Consideration**

The FEIR evaluated the following alternatives in detail:

- No Project/No Development Alternative;
- Reduced Residential Development Alternative; and
- Reduced Project Alternative.

These project alternatives are summarized below, along with the findings relevant to each alternative.

**1.  No Project/No Development Alternative**

Pursuant to CEQA Guidelines §15126.6(e), consideration of a no project alternative is required. The analysis of a no project alternative must discuss the existing conditions at the time the NOP was published (i.e., October 22, 2021), as well as "what would be reasonably expected to occur in the foreseeable future if the project were not approved, based on current plans and consistent with available infrastructure and community services" [CEQA Guidelines Section 15126.6(e)(2)]. The requirements also specify that, "if disapproval of the project under consideration would result in predictable actions by others, such as the proposal of some other project, this 'no project' consequence should be discussed" [CEQA Guidelines Section 15126.6(e)(3)(B)]. Under the No Project/No Development Alternative for this EIR, construction of the All Peoples Church Project would not occur. The site would remain in its existing condition and no changes to the site would occur under the No Project/No Development Alternative.

Potentially Significant Impacts

There would be no significant impacts associated with the No Project/No Development Alternative as described in Section 8.4.1 of the FEIR. The project site would remain vacant and undeveloped under the No Project/No Development Alternative. All impacts associated with the project would be avoided, and no impacts would occur. There would no significant impacts to sensitive habitat. No significant impacts to historical resources associated with unknown buried archaeological and Native American resources, unknown religious or sacred uses, and unknown human remains would occur. Additionally, no significant impacts associated with temporary ambient noise increases would occur and potentially significant impacts to TCRs would not occur.

Facts In Support of Finding

While the No Project/No Development Alternative would eliminate seven significant and mitigatable impacts (biological resources, historical resources, noise, and TCRs) resulting from the project, it would not meet any of the project objectives. Under the No Project/No Development Alternative no church would be constructed and the alternative would not achieve the project's objectives related to placing a church/sanctuary in a central San Diego location that is both visible from and convenient to a regional freeway, relocating to a church-owned property with proximity to its existing congregation, and establishing a place of worship that would accommodate the space needs of its staff and congregation, Additional objectives of the project related to site design and character,

**Ex. A, p. 070**

sufficient parking, proximity to transit, and fulfilling the institution's religious mission would not be met with the No Project/No Development Alternative.

<u>Finding</u>

The No Project/No Development Alternative is rejected because specific economic, social, or other considerations including matters of public policy make this alternative infeasible.

<u>Rationale</u>

Although the No Project/No Development Alternative would eliminate significant and mitigable impacts to biological resources, historical resources, noise, and TCRs associated with the project, it does not meet the project objectives outlined in Section 3.1.1 of the FEIR.

<u>Reference</u>

See FEIR Section 8.4.1 for a complete analysis of this alternative.

**2. Reduced Residential Development Alternative**

Under the Reduced Residential Alternative, the property would be developed with the Marburn Corporation residential subdivision which was approved by the City Council in 2018 (Project No. 435438).  Similar to the project, this alternative required approval of a Site Development Permit, Planned Development Permit, Easement Vacations, and Tentative Map. Similar to the project, several deviations from the LDC would be needed to implement this alternative. A Community Plan Amendment is not required to implement the Reduced Residential Alternative. The Reduced Residential Development Alternative consists of the construction of 24 residential units, five homeowner association lots, private access to the property, and other site improvements. The alternative also includes 12-foot-high masonry walls around the site perimeter with landscape screening. Nearly the entire project site would be graded to implement this alternative.

<u>Potentially Significant Impacts</u>

The Reduced Residential Development Alternative would result in similar potentially significant impacts as those identified for the project, however, mitigation would reduce these impacts to a less than significant level, as described in Section 8.4.2 of the FEIR.  Significant impacts to biological resources, historical resources, noise, and TCRs would occur, requiring mitigation. Specifically, significant impacts to sensitive habitats, unknown archaeological resources, construction noise impacts to ambient noise levels near noise-sensitive land uses, and unknown TCRs would still occur. Less than significant land use and visual effects/neighborhood character impacts would be associated with the Reduced Residential Alternative.

<u>Facts In Support of Finding</u>

The Reduced Residential Alternative would not eliminate or reduce significant impacts of the project to a less than significant level.  The Reduced Residential Development Alternative would directly align with the height and bulk regulations in the LDC and would construct residences that would comply with the height and bulk regulations in the RS-1-7 zone, whereas the project is requesting deviations from the height regulations to accommodate the roofline and cross on the

church/sanctuary building. Both this alternative and the project would result in less than significant visual effects and neighborhood character impacts. Additionally, due to the project site's proximity to the freeway and College Avenue, the Reduced Residential Development Alternative would not be considered a compatible land use given the exterior noise environment on site (i.e., greater than 65 dB CNEL as shown in Section 5.4 of the FEIR) based on the Land Use-Noise Compatibility Criteria in the Noise Element of the General Plan. Exterior use areas for the residential development would be considered "conditionally acceptable." To implement the Reduced Residential Alternative and comply with the land use compatibility policy in the Noise Element, noise walls and/or enhanced building materials and mechanical ventilation would likely be required.

The Reduced Residential Alternative would not achieve any of the project objectives related to placing a church/sanctuary in a central San Diego location visible from and convenient to regional freeway, relocating to a church-owned property that has proximity to its existing congregation, or establishing a place of worship that would accommodate the existing and future space needs of its staff and congregation. Additional objectives of the project related to site design and character, sufficient parking, proximity to transit, and fulfilling the institution's religious mission would not be met with the Reduced Residential Alternative.

<u>Finding</u>

The Reduced Residential Development Alternative is rejected because specific economic, social, or other considerations including matters of public policy make this alternative infeasible.

<u>Rationale</u>

The Reduced Residential Alternative would not eliminate the significant impacts to biological resources, historical resources, noise, and TCRs associated with the project, and it does not meet the project objectives outlined in Section 3.1.1 of the FEIR.

<u>Reference</u>

See FEIR Section 8.4.2 for a complete analysis of this alternative.

**3. Reduced Project Alternative**

Under the Reduced Project Alternative, the project's surface parking would be modified to comply with the City's parking regulations, rather than constructing 37 more parking spaces than required by the City. Specifically, the Reduced Project Alternative would construct a total of 319 parking spaces, which would be 37 fewer spaces than the project is providing but would comply with the City parking requirements. Surface parking for the project is proposed north of the parking structure and along the eastern edge of the parking structure and church/sanctuary building. To construct 37 fewer parking spaces, the project's grading footprint would be reduced by approximately 0.4 acre, depending on which spaces are removed under this alternative. All other features of the project would remain the same as described in the FEIR.

<u>Potentially Significant Impacts</u>

The Reduced Project Alternative would result in potentially significant impacts to the same resource areas as those identified for the project; however, mitigation would reduce these impacts to a less

than significant level, as described in Section 8.4.3 of the FEIR.  Significant impacts to biological resources, historical resources, noise, and TCRs would occur, requiring mitigation. Specifically, significant impacts to sensitive habitats, unknown archaeological resources, construction noise impacts to ambient noise levels near noise-sensitive land uses, and unknown TCRs would still occur; however, the reduced grading footprint of the Reduced Project Alternative would reduce the project's impacts to biological resources, historical resources, and TCRs. Less than significant land use and visual effects/neighborhood character impacts would be associated with the Reduced Project Alternative.

Facts In Supporting Finding

The Reduced Project Alternative would not eliminate the project's significant and mitigable impacts (i.e., biological resources, historical resources, noise, and TCRs) and although it would meet most of the project objectives, it would not meet all of the project objectives. The Reduced Project Alternative would not fully meet the project objective to address the parking needs on Sunday by constructing sufficient parking to accommodate the maximum projected parking demand. The Reduced Project Alternative would reduce impacts to sensitive habitat by up to approximately 0.4 acre but would still require mitigation to reduce this significant impact to a less than significant level. Similarly, reduction of the grading footprint under the Reduced Project Alternative would reduce the potential for causing impacts to cultural resources and TCRs; however, the impacts would still be significant and would require mitigation.

Finding

The Reduced Project Alternative is rejected because specific economic, social, or other considerations including matters of public policy make this alternative infeasible.

Rationale

The Reduced Project Alternative would not eliminate significant but mitigable impacts to biological resources, historical resources, noise, and TCRs associated with the project, and it does not meet all of the project objectives outlined in Section 3.1.1 of the FEIR.

Reference

See FEIR Section 8.4.3 for a complete analysis of this alternative.

## VI.   FINDINGS REGARDING OTHER CEQA CONSIDERATIONS

### A.   Growth Inducement

The §15126.2(e) of the CEQA Guidelines mandates that the growth-inducing impact of a project be discussed. This discussion is presented in Section 7.2 of the FEIR. The City finds that the project would not result in growth-inducing impacts.

The project is an institutional use that would serve the existing population in the project vicinity. The project does not include new residences or a large job-generating use that would cause workers to relocate to the area. Although the project site is currently vacant, it is located in an urbanized area with existing residential, commercial, institutional, and recreational uses with adequate utility

services. As such, the project would not result in substantial growth inducement. The infill nature of the project would not foster population growth, either directly or indirectly, as it would accommodate the population currently existing rather than opening up a new area of land for population growth. The project would not alter the planned location, distribution, density, or growth rate of the Navajo Community Plan area, adjacent communities, or the City as a whole.

Although the project includes improvements to existing on-site utilities such as water, sewer, and electricity, these improvements would be sized to only serve the needs of the project and would not extend into previously unserved areas. No new infrastructure would be provided that would exceed the needs of the project and/or that could accommodate future growth not already planned for the project area. Development of the proposed institutional use and associated parking and landscaping would not foster economic or population growth, either directly or indirectly, such that construction of additional housing in the surrounding area would be required. For these reasons, the project would not encourage or facilitate growth-inducing activities that could significantly affect the surrounding environment, individually or cumulatively.

## B.    Significant Environmental Effects that Cannot Be Avoided if the Project is Implemented

CEQA Guidelines §15126.2(b) requires an EIR to identify significant environmental effects that cannot be avoided if the project is implemented (14 CCR §15000 et seq.). As discussed in Chapter 5, *Environmental Analysis*, of the FEIR, implementation of the project would not result in any significant and unavoidable impacts.

# VII.    FINDINGS REGARDING RESPONSES TO COMMENTS AND REVISIONS IN THE FEIR

The FEIR includes comments received on the DEIR and responses to those comments. The focus of the responses to comments is on the disposition of significant environmental issues that are raised in the comments, as specified by CEQA Guidelines §15088(c). DEIR revisions were completed to clarify the role of the Vehicle Miles Travelled (VMT) assessment as the CEQA metric for assessing project transportation impacts, as compared to the Local Mobility Analysis (LMA) which is used for identifying access improvements in the project area.  Several policies from the Navajo Community Plan were removed from the land use policy analysis table in the DEIR due to their inapplicability to non-residential development.

Finding/Rationale: Responses to comments made on the DEIR and revisions in the FEIR merely clarify and amplify the analysis presented in the document, and do not trigger the need to recirculate per CEQA Guidelines §15088.5(b).

# MITIGATION MONITORING AND REPORTING PROGRAM (MMRP)
## ALL PEOPLES CHURCH PROJECT
## PROJECT No.  636444
## SCH No. 2021100394
## EXHIBIT B

As lead agency for the project under the California Environmental Quality Act, the City of San Diego will administer the Mitigation, Monitoring, and Reporting Program (MMRP) for the following environmental issue areas as identified in the All Peoples Church Project EIR: Biological Resources, Historical Resources, Noise, and Tribal Cultural Resources. The mitigation measures identified below include all feasible measures from the All Peoples Church Project EIR (SCH No. 2021100394; Project No. 636444). This MMRP shall be made a requirement of project approval.

California Public Resources Code Section 21081.6 requires a lead or responsible agency that approves or carries out a project where an EIR has identified significant environmental effects to adopt a "reporting or monitoring program for adopted or required changes to mitigate or avoid significant environmental effects." The City of San Diego is the lead agency for the All Peoples Church Project EIR and, therefore, must ensure the enforceability of the MMRP. An EIR has been prepared for this project that addresses potential environmental impacts and, where appropriate, recommends measures to mitigate these impacts. As such, an MMRP is required to ensure that adopted mitigation measures are implemented.

### A. GENERAL REQUIREMENTS – PART I: Plan Check Phase (prior to permit issuance)

1. Prior to the issuance of a Notice to Proceed for a subdivision, or any construction permits, such as demolition, grading, or building, or beginning any construction-related activity on site, the Development Services Department (DSD) director's environmental designee (ED) shall review and approve all construction documents (CDs) (plans, specification, details, etc.) to ensure that MMRP requirements are incorporated into the design.

2. In addition, the ED shall verify that the MMRP conditions/notes that apply ONLY to the construction phases of this project are included VERBATIM, under the heading "**ENVIRONMENTAL/MITIGATION REQUIREMENTS**."

3. These notes must be shown within the first three sheets of the CDs in the format specified for engineering CD templates as shown on the City website:

   http://www.sandiego.gov/development-services/industry/standtemp.shtml

4. The **TITLE INDEX SHEET** must also show on which pages the "Environmental/Mitigation Requirements" notes are provided.

5. **SURETY AND COST RECOVERY:** The DSD director or city manager may require appropriate surety instruments or bonds from private permit holders to ensure the long-term performance or implementation of required mitigation measures or programs. The City is authorized to recover its cost to offset the salary, overhead, and expenses for City personnel and programs to monitor qualifying projects.

Ex. A; p. 075

**B.   GENERAL REQUIREMENTS – PART II: Post Plan Check (after permit issuance/prior to start of construction)**

1. **PRE-CONSTRUCTION MEETING IS REQUIRED 10 WORKING DAYS PRIOR TO BEGINNING ANY WORK ON THIS PROJECT.** The PERMIT HOLDER/OWNER is responsible to arrange and perform this meeting by contacting the CITY RESIDENT ENGINEER (RE) of the Field Engineering Division and City staff from MITIGATION MONITORING COORDINATION (MMC). Attendees must also include the permit holder's representative(s), job site superintendent, noise control coordinator, and the following consultants:

   Qualified Biologist
   Qualified Archaeological Monitor
   Native American Monitor

   **Note: Failure of all responsible permit holder's representatives and consultants to attend shall require an additional meeting with all parties present.**

   CONTACT INFORMATION:

   a) The PRIMARY POINT OF CONTACT is the **RE** at the **Field Engineering Division – 858.627.3200**

   b) For Clarification of ENVIRONMENTAL REQUIREMENTS, applicant t is also required to call the **RE and MMC at 858.627.3360**

2. **MMRP COMPLIANCE:** This project, Project Tracking System No. 636444 and/or Environmental Document No. 636444, shall conform to the mitigation requirements contained in the associated environmental document and implemented to the satisfaction of the DSD's ED (MMC) and the city engineer (RE). The requirements may not be reduced or changed but may be annotated (i.e., to explain when and how compliance is being met and location of verifying proof, etc.). Additional clarifying information may also be added to other relevant plan sheets and/or specifications as appropriate (i.e., specific locations, times of monitoring, methodology, etc.).

   **Note: Permit Holder's Representatives must alert the RE and MMC if there are any discrepancies in the plans or notes, or any changes due to field conditions. All conflicts must be approved by the RE and MMC BEFORE the work is performed.**

3. **OTHER AGENCY REQUIREMENTS:** Evidence of compliance with all other agency requirements or permits shall be submitted to the RE and MMC for review and acceptance prior to the beginning of work or within one week of the permit holder obtaining documentation of those permits or requirements. Evidence shall include copies of permits, letters of resolution, or other documentation issued by the responsible agency:

   None Required

4. **MONITORING EXHIBITS:** All consultants are required to submit, to the RE and MMC, a monitoring exhibit on a 11x17-inch reduction of the appropriate construction plan, such as site plan, grading, landscape, etc., marked to clearly show the specific areas including the **LIMIT OF WORK**, scope of that discipline's work, and notes indicating when in the

construction schedule that work will be performed. When necessary for clarification, a detailed methodology of how the work will be performed shall be included.

> **NOTE: Surety and Cost Recovery – When deemed necessary by the DSD director or city manager, additional surety instruments or bonds from the private permit holder may be required to ensure the long-term performance or implementation of required mitigation measures or programs. The City is authorized to recover its cost to offset the salary, overhead, and expenses for City personnel and programs to monitor qualifying projects.**

5. **OTHER SUBMITTALS AND INSPECTIONS:** The Permit Holder/Owner's representative shall submit all required documentation, verification letters, and requests for all associated inspections to the RE and MMC for approval per the following schedule:

**Table 9-1**
**DOCUMENT SUBMITTAL/INSPECTION CHECKLIST**

| Issue Area | Document Submittal | Associated Inspection/Approvals/Notes |
|---|---|---|
| General | Consultant Qualification Letters | Prior to Preconstruction Meeting |
| Biological Resources | Biological Construction Mitigation/Monitoring Exhibit | Prior to Preconstruction Meeting |
| Historical Resources | Archaeology Report | Archaeology/Historic Site Observation During Construction |
| Noise | Noise Control Measures | Prior to Preconstruction Meeting |
| Bond Release | Request for Bond Release Letter | Final MMRP Inspections Prior to Bond Release Letter |

# Specific MMRP Issue Area Conditions/Requirements

## Biological Resources

**BIO-1:  Biological Resource Protection during Construction.**

**I.   Prior to Construction**

A. **Biologist Verification** – The owner/permittee shall provide a letter to the City's Mitigation Monitoring Coordination (MMC) section stating that a Project Biologist (Qualified Biologist) as defined in the City Biology Guidelines (City of San Diego 2018a), has been retained to implement the project's biological monitoring program. The letter shall include the names and contact information of all persons involved in the biological monitoring of the project.

B. **Preconstruction Meeting** – The Qualified Biologist shall attend the preconstruction meeting, discuss the project's biological monitoring program, and arrange to perform any follow up mitigation measures and reporting including site-specific monitoring, restoration or revegetation, and additional fauna/flora surveys/salvage.

C. **Biological Documents** – The Qualified Biologist shall submit all required documentation to MMC verifying that any special mitigation reports including but not limited to, maps, plans, surveys, survey timelines, or buffers are completed or scheduled per City Biology Guidelines, Multiple Species Conservation Program (MSCP), Environmentally Sensitive Lands Ordinance (ESL), project permit conditions; California Environmental Quality Act (CEQA); endangered species acts (ESAs); and/or other local, state or federal requirements.

D. **Biological Construction Mitigation/Monitoring Exhibit** – The Qualified Biologist shall present a Biological Construction Mitigation/Monitoring Exhibit (BCME), which includes the biological documents in C above. In addition, include: restoration/revegetation plans, plant salvage/relocation requirements (e.g., coastal cactus wren plant salvage, burrowing owl exclusions, etc.), avian or other wildlife surveys/survey schedules (including general avian nesting and USFWS protocol), timing of surveys, wetland buffers, avian construction avoidance areas/noise buffers/barriers, other impact avoidance areas, and any subsequent requirements determined by the Qualified Biologist and the City Assistant Deputy Director (ADD)/MMC. The BCME shall include a site plan, written and graphic depiction of the project's biological mitigation/monitoring program, and a schedule. The BCME shall be approved by MMC and referenced in the construction documents.

E. **Resource Delineation** – Prior to construction activities, the Qualified Biologist shall supervise the placement of orange construction fencing or equivalent along the limits of disturbance adjacent to sensitive biological habitats and verify compliance with any other project conditions as shown on the BCME. This phase shall include flagging plant specimens and delimiting buffers to protect sensitive biological resources (e.g., habitats/flora & fauna species, including nesting birds) during construction. Appropriate steps/care should be taken to minimize attraction of nest predators to the site.

F. **Education** – Prior to commencement of construction activities, the Qualified Biologist shall meet with the owner/permittee or designee and the construction crew and conduct an on-site educational session regarding the need to avoid impacts outside of the approved construction area and to protect sensitive flora and fauna (e.g., explain the avian and wetland buffers, flag system for removal of invasive species or retention of sensitive plants, and clarify acceptable access routes/methods and staging areas, etc.).

## II. **During Construction**

A. **Monitoring** – All construction (including access/staging areas) shall be restricted to areas previously identified, proposed for development/staging, or previously disturbed as shown on "Exhibit A" and/or the BCME. The Qualified Biologist shall monitor construction activities as needed to ensure that construction activities do not encroach into biologically sensitive areas, or cause other similar damage, and that the work plan has been amended to accommodate any sensitive species located during the pre-construction surveys. In addition, the Qualified Biologist shall document field activity via the Consultant Site Visit Record (CSVR). The CSVR shall be e-mailed to MMC on the first day of monitoring, the first week of each month, the

last day of monitoring, and immediately in the case of any undocumented condition or discovery.

B. **Subsequent Resource Identification** – The Qualified Biologist shall note/act to prevent any new disturbances to habitat, flora, and/or fauna onsite (e.g., flag plant specimens for avoidance during access, etc.). If active nests or other previously unknown sensitive resources are detected, all project activities that directly impact the resource shall be delayed until species specific local, state or federal regulations have been determined and applied by the Qualified Biologist.

III. **Post Construction Measures**

A. In the event that impacts exceed previously allowed amounts, additional impacts shall be mitigated in accordance with City Biology Guidelines, ESL and MSCP, CEQA, and other applicable local, state and federal law. The Qualified Biologist shall submit a final BCME/report to the satisfaction of the City ADD/MMC within 30 days of construction completion.

**BIO-2:**  **Sensitive Habitats.** Impacts to 4.0 acres of Diegan coastal sage scrub and non-native grassland shall be mitigated at ratios of 1:1 and 0.5:1 for impacts outside the Multi-Habitat Planning Area (MHPA) and mitigation inside the MHPA, respectively, pursuant to Table 3, *Upland Mitigation Ratios*, in the City's Biology Guidelines (City of San Diego 2018a). Mitigation shall be accomplished via payment into the City's Habitat Acquisition Fund equal to 3.6 acres of habitat.

# Historical Resources and Tribal Cultural Resources

**HR-1:**  **Cultural Resources (Archaeological Resources) Protection during Construction.**

I. **Prior to Permit Issuance**

A. *Entitlements Plan Check*

1. Prior to issuance of any construction permits, including but not limited to, the first Grading Permit, Demolition Plans/Permits and Building Plans/Permits or a Notice to Proceed for Subdivisions, but prior to the first preconstruction meeting, whichever is applicable, the Assistant Deputy Director (ADD) Environmental designee shall verify that the requirements for Archaeological Monitoring and Native American monitoring have been noted on the applicable construction documents through the plan check process.

B. *Letters of Qualification have been submitted to ADD*

1. The applicant shall submit a letter of verification to Mitigation Monitoring Coordination (MMC) identifying the Principal Investigator (PI) for the project and the names of all persons involved in the archaeological monitoring program, as defined in the City of San Diego Historical Resources Guidelines (HRG). If applicable, individuals involved in the archaeological monitoring program must have completed the 40-hour HAZWOPER training with certification documentation.

2. MMC will provide a letter to the applicant confirming the qualifications of the PI and all persons involved in the archaeological monitoring of the project meet the qualifications established in the HRG.

3. Prior to the start of work, the applicant must obtain written approval from MMC for any personnel changes associated with the monitoring program.

## II. **Prior to Start of Construction**

A. *Verification of Records Search*

1. The PI shall provide verification to MMC that a site-specific records search (0.25-mile radius) has been completed. Verification includes, but is not limited to, a copy of a confirmation letter from South Coastal Information Center, or, if the search was in-house, a letter of verification from the PI stating that the search was completed.

2. The letter shall introduce any pertinent information concerning expectations and probabilities of discovery during trenching and/or grading activities.

3. The PI may submit a detailed letter to MMC requesting a reduction to the 0.25-mile radius.

B. *PI Shall Attend Precon Meetings*

1. Prior to beginning any work that requires monitoring; the Applicant shall arrange a Precon Meeting that shall include the PI, Native American consultant/monitor (where Native American resources may be impacted), Construction Manager (CM) and/or Grading Contractor, Resident Engineer (RE), Building Inspector (BI), if appropriate, and MMC. The qualified Archaeologist and Native American Monitor shall attend any grading/excavation related Precon Meetings to make comments and/or suggestions concerning the Archaeological Monitoring program with the Construction Manager and/or Grading Contractor.

   a. If the PI is unable to attend the Precon Meeting, the Applicant shall schedule a focused Precon Meeting with MMC, the PI, RE, CM or BI, if appropriate, prior to the start of any work that requires monitoring.

2. *Identify Areas to Be Monitored*

   a. Prior to the start of any work that requires monitoring, the PI shall submit an Archaeological Monitoring Exhibit (AME) (with verification that the AME has been reviewed and approved by the Native American consultant/monitor when Native American resources may be impacted) based on the appropriate construction documents (reduced to 11x17) to MMC identifying the areas to be monitored including the delineation of grading/excavation limits.

   b. The AME shall be based on the results of a site-specific records search as well as information regarding existing known soil conditions (native or formation).

3. *When Monitoring Will Occur*

   a. Prior to the start of any work, the PI shall also submit a construction schedule to MMC through the RE indicating when and where monitoring will occur.

b. The PI may submit a detailed letter to MMC prior to the start of work or during construction requesting a modification to the monitoring program. This request shall be based on relevant information such as review of final construction documents which indicate site conditions such as depth of excavation and/or site graded to bedrock, etc., which may reduce or increase the potential for resources to be present.

### III. During Construction

A. *Monitor(s) Shall Be Present during Grading/Excavation/Trenching*

1. The Archaeological Monitor shall be present full time during all soil disturbing and grading/excavation/trenching activities which could result in impacts to archaeological resources as identified on the AME. The Construction Manager is responsible for notifying the RE, PI, and MMC of changes to any construction activities such as in the case of a potential safety concern within the area being monitored. In certain circumstances Occupational Safety and Health Administration safety requirements may necessitate modification of the AME.

2. The Native American consultant/monitor shall determine the extent of their presence during soil disturbing and grading/excavation/trenching activities based on the AME and provide that information to the PI and MMC. If prehistoric resources are encountered during the Native American consultant/monitor's absence, work shall stop and the Discovery Notification Process detailed in Section III.B–C and Section IV.A–D shall commence.

3. The PI may submit a detailed letter to MMC during construction requesting a modification to the monitoring program when a field condition such as modern disturbance post-dating the previous grading/trenching activities, presence of fossil formations, or when native soils are encountered that may reduce or increase the potential for resources to be present.

4. The archaeological and Native American consultant/monitor shall document field activity via the Consultant Site Visit Record (CSVR). The CSVR's shall be faxed by the CM to the RE the first day of monitoring, the last day of monitoring, monthly (Notification of Monitoring Completion), and in the case of ANY discoveries. The RE shall forward copies to MMC.

B. *Discovery Notification Process*

1. In the event of a discovery, the Archaeological Monitor shall direct the contractor to temporarily divert all soil disturbing activities, including but not limited to digging, trenching, excavating or grading activities in the area of discovery and in the area reasonably suspected to overlay adjacent resources and immediately notify the RE or BI, as appropriate.

2. The Monitor shall immediately notify the PI (unless Monitor is the PI) of the discovery.

3. The PI shall immediately notify MMC by phone of the discovery and shall submit written documentation to MMC within 24 hours by fax or email with photos of the resource in context, if possible.

4. No soil shall be exported off-site until a determination can be made regarding the significance of the resource specifically if Native American resources are encountered.

C. *Determination of Significance*

1. The PI and Native American consultant/monitor, where Native American resources are discovered shall evaluate the significance of the resource. If Human Remains are involved, follow protocol in Section IV below.

   a. The PI shall immediately notify MMC by phone to discuss significance determination and shall also submit a letter to MMC indicating whether additional mitigation is required.

   b. If the resource is significant, the PI shall submit an Archaeological Data Recovery Program (ADRP) which has been reviewed by the Native American consultant/monitor, and obtain written approval from MMC. Impacts to significant resources must be mitigated before ground-disturbing activities in the area of discovery will be allowed to resume. Note: If a unique archaeological site is also an historical resource as defined in CEQA, then the limits on the amount(s) that a project applicant may be required to pay to cover mitigation costs as indicated in CEQA Section 21083.2 shall not apply.

   c. If the resource is not significant, the PI shall submit a letter to MMC indicating that artifacts will be collected, curated, and documented in the Final Monitoring Report. The letter shall also indicate that that no further work is required.

**IV. Discovery of Human Remains**

If human remains are discovered, work shall halt in that area and no soil shall be exported off-site until a determination can be made regarding the provenance of the human remains; and the following procedures as set forth in CEQA Section 15064.5(e), the California Public Resources Code (PRC) (Section 5097.98) and State Health and Safety Code (Section 7050.5) shall be undertaken:

A. *Notification*

1. Archaeological Monitor shall notify the RE or BI as appropriate, MMC, and the PI, if the Monitor is not qualified as a PI. MMC will notify the appropriate Senior Planner in the Environmental Analysis Section (EAS) of the Development Services Department to assist with the discovery notification process.

2. The PI shall notify the Medical Examiner after consultation with the RE, either in person or via telephone.

B. *Isolate Discovery Site*

1. Work shall be directed away from the location of the discovery and any nearby area reasonably suspected to overlay adjacent human remains until a determination can be made by the Medical Examiner in consultation with the PI concerning the provenance of the remains.

2. The Medical Examiner, in consultation with the PI, will determine the need for a field examination to determine the provenance.

3. If a field examination is not warranted, the Medical Examiner will determine with input from the PI, if the remains are or are most likely to be of Native American origin.

C. *If human remains ARE determined to be Native American:*

1. The Medical Examiner will notify the Native American Heritage Commission (NAHC) within 24 hours. By law, ONLY the Medical Examiner can make this call.

2. NAHC will immediately identify the person or persons determined to be the Most Likely Descendent (MLD) and provide contact information.

3. The MLD will contact the PI within 24 hours or sooner after the Medical Examiner has completed coordination, to begin the consultation process in accordance with CEQA Section 15064.5(e), the California Public Resources and Health & Safety Codes.

4. The MLD will have 48 hours to make recommendations to the property owner or representative, for the treatment or disposition with proper dignity, of the human remains and associated grave goods.

5. Disposition of Native American Human Remains will be determined between the MLD and the PI, and, if:

   a. The NAHC is unable to identify the MLD, OR the MLD failed to make a recommendation within 48 hours after being granted access to the site, OR;

   b. The landowner or authorized representative rejects the recommendation of the MLD and mediation in accordance with PRC 5097.94 (k) by the NAHC fails to provide measures acceptable to the landowner, the landowner shall reinter the human remains and items associated with Native American human remains with appropriate dignity on the property in a location not subject to further and future subsurface disturbance, THEN

   c. To protect these sites, the landowner shall do one or more of the following:

      (1) Record the site with the NAHC;

      (2) Record an open space or conservation easement; or

      (3) Record a document with the County. The document shall be titled "Notice of Reinterment of Native American Remains" and shall include a legal description of the property, the name of the property owner, and the owner's acknowledged signature, in addition to any other information required by PRC 5097.98. The document shall be indexed as a notice under the name of the owner.

   d. Upon the discovery of multiple Native American human remains during a ground-disturbing land development activity, the landowner may agree that additional conferral with descendants is necessary to consider culturally appropriate treatment of multiple Native American human remains. Culturally appropriate treatment of such a discovery may be ascertained from review of the site utilizing cultural and archaeological standards. Where the parties are unable to agree on the appropriate treatment measures the

human remains and items associated and buried with Native American human remains shall be reinterred with appropriate dignity, pursuant to Section 5.c, above.

D. *If human remains are NOT Native American:*

1. The PI shall contact the Medical Examiner and notify them of the historic era context of the burial.

2. The Medical Examiner will determine the appropriate course of action with the PI and City staff (PRC Section 5097.98).

3. If the remains are of historic origin, they shall be appropriately removed and conveyed to the San Diego Museum of Man for analysis. The decision for internment of the human remains shall be made in consultation with MMC, EAS, the applicant/landowner, any known descendant group, and the San Diego Museum of Man.

**V. Night and/or Weekend Work**

A. *If night and/or weekend work is included in the contract:*

1. When night and/or weekend work is included in the contract package, the extent and timing shall be presented and discussed at the precon meeting.

2. The following procedures shall be followed:

   a. No Discoveries

   In the event that no discoveries were encountered during night and/or weekend work, the PI shall record the information on the CSVR and submit to MMC via fax by 8 a.m. of the next business day.

   b. Discoveries

   All discoveries shall be processed and documented using the existing procedures detailed in Section III, During Construction, and Section IV, Discovery of Human Remains. Discovery of human remains shall always be treated as a significant discovery.

   c. Potentially Significant Discoveries

   If the PI determines that a potentially significant discovery has been made, the procedures detailed under Section III, During Construction, and Section IV, Discovery of Human Remains, shall be followed.

   d. The PI shall immediately contact MMC, or by 8 a.m. of the next business day to report and discuss the findings as indicated in Section III.B, unless other specific arrangements have been made.

B. *If night and/or weekend work becomes necessary during the course of construction:*

1. The Construction Manager shall notify the RE, or BI, as appropriate, a minimum of 24 hours before the work is to begin.

2. The RE, or BI, as appropriate, shall notify MMC immediately.

C. *All other procedures described above shall apply, as appropriate.*

**VI. Post Construction**

    A.  *Preparation and Submittal of Draft Monitoring Report*

        1.  The PI shall submit two copies of the Draft Monitoring Report (even if negative), prepared in accordance with the Historical Resources Guidelines (Appendix C/D) which describes the results, analysis, and conclusions of all phases of the Archaeological Monitoring Program (with appropriate graphics) to MMC for review and approval within 90 days following the completion of monitoring. It should be noted that if the PI is unable to submit the Draft Monitoring Report within the allotted 90-day timeframe resulting from delays with analysis, special study results or other complex issues, a schedule shall be submitted to MMC establishing agreed due dates and the provision for submittal of monthly status reports until this measure can be met.

            a.  For significant archaeological resources encountered during monitoring, the Archaeological Data Recovery Program shall be included in the Draft Monitoring Report.

            b.  Recording Sites with State of California Department of Parks and Recreation. The PI shall be responsible for recording (on the appropriate State of California Department of Park and Recreation forms DPR 523 A/B) any significant or potentially significant resources encountered during the Archaeological Monitoring Program in accordance with the City's Historical Resources Guidelines, and submittal of such forms to the South Coastal Information Center with the Final Monitoring Report.

        2.  MMC shall return the Draft Monitoring Report to the PI for revision or, for preparation of the Final Report.

        3.  The PI shall submit revised Draft Monitoring Report to MMC for approval.

        4.  MMC shall provide written verification to the PI of the approved report.

        5.  MMC shall notify the RE or BI, as appropriate, of receipt of all Draft Monitoring Report submittals and approvals.

    B.  *Handling of Artifacts*

        1.  The PI shall be responsible for ensuring that all cultural remains collected are cleaned and catalogued.

        2.  The PI shall be responsible for ensuring that all artifacts are analyzed to identify function and chronology as they relate to the history of the area; that faunal material is identified as to species; and that specialty studies are completed, as appropriate.

        3.  The cost for curation is the responsibility of the property owner.

    C.  *Curation of Artifacts: Accession Agreement and Acceptance Verification*

        1.  The PI shall be responsible for ensuring that all artifacts associated with the survey, testing and/or data recovery for this project are permanently curated with an appropriate institution. This shall be completed in consultation with MMC and the Native American representative, as applicable.

**Ex. A, p. 085**

2. The PI shall include the Acceptance Verification from the curation institution in the Final Monitoring Report submitted to the RE or BI and MMC.

3. When applicable to the situation, the PI shall include written verification from the Native American consultant/monitor indicating that Native American resources were treated in accordance with state law and/or applicable agreements. If the resources were reinterred, verification shall be provided to show what protective measures were taken to ensure no further disturbance occurs in accordance with Section IV, Discovery of Human Remains, Subsection 5.

D. *Final Monitoring Report(s)*

1. The PI shall submit one copy of the approved Final Monitoring Report to the RE or BI as appropriate, and one copy to MMC (even if negative), within 90 days after notification from MMC that the draft report has been approved.

2. The RE shall, in no case, issue the Notice of Completion and/or release of the Performance Bond for grading until receiving a copy of the approved Final Monitoring Report from MMC which includes the Acceptance Verification from the curation institution.

## Noise

**NOI-1: Best Management Practices.** The following best management practices shall be incorporated into the project drawings and implemented during project construction to ensure sustained construction noise levels do not exceed 75 decibels over a 12-hour period at the nearest sensitive receivers:

- In order to reduce construction noise, a temporary noise barrier or enclosure shall be used along the property lines of adjacent residences to break the line-of-sight between the construction equipment and the adjacent residences. The temporary noise barrier shall consist of a solid plywood fence and/or flexible sound curtains attached to chain-link fencing.

- Barriers such as flexible sound control curtains shall be erected around stationary heavy equipment to minimize the amount of noise on the surrounding land uses to the maximum extent feasible during construction.

- Equipping of all internal combustion engine-driven equipment with intake and exhaust mufflers that are in good condition and appropriate for the equipment.

- Electrical power shall be used to run air compressors and similar power tools, where feasible.

- Internal combustion engines shall be equipped with a muffler of a type recommended by the manufacturer and in good repair.

- All diesel equipment shall be operated with closed engine doors and be equipped with factory recommended mufflers.

- Prohibiting unnecessary idling of internal combustion engines.

- Locating stationary noise-generating equipment, such as air compressors or portable power generators, as far as possible from sensitive receptors. Constructing temporary noise barriers to screen stationary noise-generating equipment when located near adjoining sensitive land uses.

- Utilization of "quiet" air compressors and other stationary noise sources where technology exists.

- Control of noise from construction workers' radios to a point where they are not audible at adjacent residences bordering the project site.

- Notifying of all adjacent residences of the construction schedule, in writing, and provide a written schedule of "noisy" construction activities to the adjacent and nearby residences at least 24 hours prior to initiation of construction activities that could result in substantial noise levels at outdoor or indoor living areas. This notification should include the anticipated hours and duration of construction and a description of noise reduction measures being implemented at the project site. The notification should include the telephone number and/or contact information for the on-site noise control coordinator that neighbors can use for inquiries and/or to submit complaints associated with construction noise.

- Designation of a noise control coordinator who shall be responsible for responding to any complaints about construction noise. The disturbance coordinator shall determine the cause of the noise complaint (e.g., bad muffler, etc.) and shall require that reasonable measures be implemented to correct the problem. Conspicuously post a telephone number for the disturbance coordinator at the construction site and include it in the notice sent to neighbors regarding the construction schedule.

INTENTIONALLY BLANK

(R-2023-    )

RESOLUTION NUMBER R-

ADOPTED ON

A RESOLUTION OF THE COUNCIL OF THE CITY OF SAN DIEGO
ADOPTING AN AMENDMENT TO THE GENERAL PLAN AND AN
AMENDMENT TO THE NAVAJO COMMUNITY PLAN TO AMEND FIGURE
24 IN THE NAVAJO COMMUNITY PLAN

WHEREAS, Light on a Hill, LLC, requested an amendment to the General Plan and the Navajo

Community Plan to amend Figure 24: Other Community Facilities map for the site located east of

College Avenue and north of Interstate 8 at 5555 College Avenue, from Single Family to Church; and

WHEREAS, the site is legally described as Portion of Lot 67 of Rancho Mission of San Diego, In

the City of San Diego, County of San Diego, State of California, as described in Grant Deed Recorded

December 21, 2017 as Document 2017-0602317; and

WHEREAS, the Planning Commission of the City of San Diego found the proposed amendment

consistent with the General Plan; and

WHEREAS, under Charter section 280(a)(2) this Resolution is not subject to veto by the Mayor

because this matter requires the City Council to act as a quasi-judicial body and where a public hearing

was required by law implicating due process rights of individuals affected by the decision and where

the Council was required by law to consider evidence at the hearing and to make legal findings based

on the evidence presented; and

WHEREAS, on _____, the City Council of the City of San Diego held a public

hearing for the purpose of considering an amendment to the General Plan and the Navajo Community

Plan; and

**ATTACHMENT 11**

WHEREAS, the Council of the City of San Diego has considered all maps, exhibits, and written documents contained in the file for this project on record in the City of San Diego, and has considered the oral presentations given at the public hearing; and

WHEREAS, the Office of the City Attorney has drafted this Resolution based on the information provided by City staff, with the understanding that the information is complete, true, and accurate; NOW, THEREFORE,

BE IT RESOLVED, by the Council of The City of San Diego, that it adopts the amendments to the Navajo Community Plan, a copy of which is on file in the office of the City Clerk as Document No. RR-_____.

BE IT FURTHER RESOLVED, that the Council adopts and amendment to the General Plan for the City of San Diego to incorporate the above amended plan.


APPROVED:  MARA ELLIOT, City Attorney


By _____

   Deputy City Attorney

MJL:pev
INSERT Date
Or.Dept:DSD
R-2016- INSERT
Form=r-t.frm(61203wct)

Revised 2-19-16 PJF

Ex. A, p. 090



FIGURE 24:  OTHER COMMUNITY FACILITIES

Ex. A, p. 091

ATTACHMENT 11

| Page 3 | City of San Diego · Information Bulletin 620 | August 2018 |
|---|---|---|

**SD**

**City of San Diego**
**Development Services**
1222 First Ave., MS-302
San Diego, CA 92101

# Community Planning Committee Distribution Form

Project Name:
All Peoples CPA/PDP/SDP/EV

Project Number:
PRJ-636444

Community: Navajo

For project scope and contact information (project manager and applicant),
log into OpenDSD at https://aca.accela.com/SANDIEGO.

Select "Search for Project Status" and input the Project Number to access project information.

☐ Vote to Approve
☐ Vote to Approve with Conditions Listed Below
☐ Vote to Approve with Non-Binding Recommendations Listed Below
● Vote to Deny

Date of Vote:
August 21, 2023

| # of Members Yes | # of Members No | # of Members Abstain |
|---|---|---|
| 7 | 0 | 0 |

Conditions or Recommendations:
None. See enclosed Motion language.

☐ No Action
(Please specify, e.g., Need further information, Split vote, Lack of quorum, etc.)

NAME: David Smith

| TITLE: Chair | DATE: August 28, 2023 |
|---|---|

*Attach additional pages if necessary (maximum 3 attachments).*

Visit our web site at www.sandiego.gov/development-services.
Upon request, this information is available in alternative formats for persons with disabilities.
DS-5620 (08-18) ONLINE FORM

**Ex. A, p. 092**

# NAVAJO COMMUNITY PLANNERS, INC.
## Allied Gardens-Del Cerro-Grantville-San Carlos

August 23, 2023

City of San Diego
Development Services Department
Attn: Derrick Johnson
1222 1st Ave
San Diego CA 92101
dnjohnson@sandiego.gov

### SUBJECT: All Peoples CPA/PDP/SDP/EV/Rev, Project #636444

Dear Mr. Johnson:

The Navajo Community Planning Group formally submits this letter and enclosed motion, regarding the All Peoples Church project in Del Cerro. The CPG held a special in-person meeting on August 21st 2023 to take an official position on the following requests:

- Modification to the Community Plan to allow a Church Use within the RS1-7 base zone.
- Plan Development Permit, for requested deviations of setbacks, heights, retaining wall and long-term bicycle parking.
- Site Development Permit, for environmentally sensitive lands.

There were approximately 27 public testimonies heard at the meeting, with the majority of them being in opposition of the project. It is the position of the CPG to request denial of the project, based on the motion language hereby enclosed. The motion passed (7 Yes, 0 No.)

I can be reached at navajoplanners@gmail.com or 619-990-6783 for more information.

Sincerely,

*David Smith*

David S. Smith
Chair
Navajo Community Planners, Inc.

*Brian Gile*

Brain Gile
Vice Chair
Navajo Community Planners, Inc

CC: Councilmember Raul Campillo (raulcampillo@sandiego.gov)

Ex. A, p. 093

The Navajo Community Planners, Inc. as the representative of the residents of the Navajo Communities makes its recommendation on the application of All Peoples Church as follows:

The Navajo Community Planners, Inc. concludes that the applicant has not established the factual findings required by Municipal Code Section 126.0505(a) in that:

1. The development will adversely affect the Navajo Community Plan because the development will be detrimental to public health, safety, and welfare, and

2. The development will not result in a more desirable project than would be achieved if designed in strict conformance with the developmental regulations of the applicable zone.

3. The development is not consistent with the Community Plan.

The Navajo Community Planners, Inc. recommends denial of the permit.

**ATTACHMENT 13**

| | | | |
|---|---|---|---|
| **SD** (logo) | **City of San Diego**<br>**Development Services**<br>1222 First Ave., MS 302<br>San Diego, CA 92101<br>(619) 446-5000 | **Ownership Disclosure Statement** | **FORM**<br>**DS-318**<br><br>October 2017 |

**Approval Type:** *Check appropriate box for type of approval(s) requested:* ☐ Neighborhood Use Permit  ☐ Coastal Development Permit
☐ Neighborhood Development Permit  ☒ Site Development Permit  ☒ Planned Development Permit  ☐ Conditional Use Permit  ☐ Variance
☐ Tentative Map  ☐ Vesting Tentative Map  ☐ Map Waiver  ☒ Land Use Plan Amendment  •  **Other** _____

**Project Title:** All Peoples Church                                      **Project No.** *For City Use Only:* 636444

**Project Address:** 5577 University Avenue, San Diego, CA 92105

**Specify Form of Ownership/Legal Status (please check):**

☐ Corporation  ☒ Limited Liability -or-  ☐ General – What State? CA _____  Corporate Identification No. _____

☐ Partnership  ☐ Individual

By signing the Ownership Disclosure Statement, the owner(s) acknowledge that an application for a permit, map or other matter will be filed with the City of San Diego on the subject property with the intent to record an encumbrance against the property.  Please list below the owner(s), applicant(s), and other financially interested persons of the above referenced property. A financially interested party includes any individual, firm, co-partnership, joint venture, association, social club, fraternal organization, corporation, estate, trust, receiver or syndicate with a financial interest in the application.  If the applicant includes a corporation or partnership, include the names, titles, addresses of all individuals owning more than 10% of the shares.  If a publicly-owned corporation, include the names, titles, and addresses of the corporate officers.  (A separate page may be attached if necessary.)  If any person is a nonprofit organization or a trust, list the names and addresses of **ANY** person serving as an officer or director of the nonprofit organization or as trustee or beneficiary of the nonprofit organization.  A signature is required of at least one of the property owners.  Attach additional pages if needed.  Note: The applicant is responsible for notifying the Project Manager of any changes in ownership during the time the application is being processed or considered.  Changes in ownership are to be given to the Project Manager at least thirty days prior to any public hearing on the subject property.  Failure to provide accurate and current ownership information could result in a delay in the hearing process.

**Property Owner**

Name of Individual:  Light on a Hill, LLC _____  ☒ Owner  ☐ Tenant/Lessee  ☐ Successor Agency

Street Address:  5577 University Avenue

City:  San Diego                                      State: CA    Zip: 92105

Phone No.: 619-286-3251 _____  Fax No.: _____  Email: Kendall@allpeopleschurch.org

Signature: _____  Date: 1-28-22

Additional pages Attached:      ☐ Yes      ☐ No

**Applicant**

Name of Individual:  All Peoples Church _____  ☐ Owner  ☒ Tenant/Lessee  ☐ Successor Agency

Street Address:  5577 University Avenue

City:  San Diego                                      State: CA    Zip: 92105

Phone No.: 619-286-3251 _____  Fax No.: _____  Email: Kendall@allpeopleschurch.org

Signature: _____  Date: 1-28-22

Additional pages Attached:      ☐ Yes      ☐ No

**Other Financially Interested Persons**

Name of Individual: _____  ☐ Owner  ☐ Tenant/Lessee  ☐ Successor Agency

Street Address: _____

City: _____  State: _____  Zip: _____

Phone No.: _____  Fax No.: _____  Email: _____

Signature: _____  Date: _____

Additional pages Attached:      ☐ Yes      ☐ No

Printed on recycled paper. Visit our web site at www.sandiego.gov/development-services.
Upon request, this information is available in alternative formats for persons with disabilities.

DS-318 (10-17)                                      **Ex. A, p. 095**

**ATTACHMENT 13**

Attachment to Disclosure
All Peoples Church

Owner:
Light on A Hill, LLC
5577 University San Diego, CA 92105
- Joel Sanders, Manager

All members of Light on A Hill, LLC, holding ≥10% interest:
- All Peoples Church, a California domestic nonprofit corporation, its sole member (100% owner)

All Peoples Church, a California domestic nonprofit corporation
5577 University San Diego, CA 92105
Officers:
- Robert Herber, President
- Kendall Laughlin, Jr., Secretary and Chief Financial Office
- Jonathan Lair, Vice President

ATTACHMENT 14

# SITE PLAN

## SITE DEVELOPMENT PERMIT NO. 2292338
## PLANNED DEVELOPMENT PERMIT NO. 2292339
## EASEMENT VACATION NO. 2292340
## TENTATIVE MAP NO. 2490918
## LAND USE PLAN NO. 2292367
## ALL PEOPLES CHURCH

**BASIS OF BEARINGS:**

THE BASIS OF BEARING FOR THIS SURVEY IS THE CALIFORNIA COORDINATE SYSTEM 1983 (CCS83), ZONE 6, 2011.00 EPOCH, AND IS DETERMINED BY G.P.S. MEASUREMENTS TAKEN ON FEBRUARY 24, 2015 AND ESTABLISHED FROM CONTINUOUSLY OPERATING REFERENCE STATIONS P472 AND P473 DERIVED FROM GEODETIC VALUES PUBLISHED BY THE CALIFORNIA SPATIAL REFERENCE CENTER (CSRC) AND/OR NATIONAL GEODETIC SURVEY (NGS), RESPECTIVELY. BEARING N 29°42'24" W.

QUOTED BEARINGS FROM REFERENCE MAPS OR DEEDS MAY OR MAY NOT BE IN TERMS OF SAID SYSTEM.

THE COMBINED GRID FACTOR AT POINT 'A' IS 0.99998386. GRID DISTANCE=GROUND DISTANCE X COMBINED GRID FACTOR ELEVATION AT POINT '115' IS 451.596 (NGVD29).

**SITE AREA TABULATIONS:**

TOTAL DISTURBANCE AREA: 5.99 AC
EXISTING AMOUNT OF IMPERVIOUS AREA: 0 ACRES
PROPOSED AMOUNT OF IMPERVIOUS AREA: 2.46 ACRES
EXISTING AMOUNT OF PERVIOUS AREA: 5.99 ACRES
PROPOSED AMOUNT OF PERVIOUS AREA: 3.54 ACRES
TOTAL IMPERVIOUS AREA: 2.46 ACRES
IMPERVIOUS % INCREASE: 41%

**REVESTMENT OF RIGHTS OF ACCESS:**

THE PROJECT INCLUDES THE REVESTMENT OF RIGHTS OF ACCESS TO COLLEGE AVENUE AT THE LOCATION OF THE PROPOSED DRIVEWAY & SIGNALIZED INTERSECTION AS SHOWN ON THIS PLAN

**NOTE:**

NO OBSTRUCTION INCLUDING SOLID WALLS IN THE VISIBILITY AREA SHALL EXCEED THREE FEET IN HEIGHT. PER SDMC SECTION 142.0409(b)(2), PLANT MATERIAL, OTHER THAN TREES, LOCATED WITHIN VISIBILITY AREAS OR THE ADJACENT PUBLIC RIGHT-OF-WAY SHALL NOT EXCEED 36 INCHES IN HEIGHT, MEASURED FROM THE LOWEST GRADE ABUTTING THE PLANT MATERIAL TO THE TOP OF THE PLANT MATERIAL

**TRANSIT NOTE:**

NO TRANSIT STOPS EXIST ON THE SITE FRONTAGE

**PUBLIC EASEMENTS TO BE VACATED (SEE SHEET C5.0):**

- (8) 10' WIDE EASEMENT FOR PUBLIC SEWER PER DOC REC. 1/14/1959, F/P 7931, BK. 7444, P. 508, O.R.
- (11a) PORTION OF 15' WIDE EASEMENT FOR STORM DRAIN PER DOC. REC. 9/2/1964, F/P. 160682, O.R.
- (11b) 10' WIDE EASEMENT FOR STORM DRAIN PER DOC. REC. 9/2/1964, F/P. 160682, O.R.
- (6) 10' WIDE EASEMENT FOR STORM DRAINS PER DOC. REC 11/17/1955, BK. 5873, P 468, O.R.
- (10 P2) EASEMENT FOR SLOPE RIGHTS PER DOC. REC. 1/10/1959, F/P. 27155, BK 7491, P. 10, O.R.
- (9) EASEMENT FOR STORM DRAINS TO CITY OF SAN DIEGO PER DOC. REC. 2/10/1959, F/P. 27152, BK 7491, P. 4, O.R.

PARCEL MAP 8393
PARCEL 1

**LEGEND**

| | |
|---|---|
| PROPERTY LINE | |
| DEDICATED RIGHT-OF-WAY | |
| RIGHT OF WAY | |
| EXISTING LOT LINE | |
| STREET CENTERLINE | |
| EXISTING EASEMENT | |
| PROPOSED EASEMENT | |
| LIMITS OF ACCESS RELINQUISHMENT | |
| PROPOSED BUILDING FOOTPRINT | |
| PROPOSED BMP | |
| PROPOSED STORMDRAIN | |
| EXISTING STORMDRAIN LINE | |
| PROPOSED TRAFFIC SIGNAL | |
| PROPOSED PERMEABLE PAVEMENT | |
| PROPOSED HARDSCAPE | |
| CUT/FILL SLOPE | |
| PROPOSED D-75 BROW DITCH | |

**GRADING QUANTITIES**

AMOUNT OF CUT: 16,500 CUBIC YARDS
MAXIMUM DEPTH OF CUT OUTSIDE OF BUILDING: 25.5' FEET
MAXIMUM DEPTH OF CUT UNDER THE BUILDING: 7.5 FEET
AMOUNT OF FILL: 39,000 CUBIC YARDS
MAXIMUM DEPTH OF FILL OUTSIDE OF BUILDING: 28' FEET
MAXIMUM DEPTH OF FILL UNDER THE BUILDING: 10 FEET

NET IMPORT: 22,500 CUBIC YARDS

SCALE: 1"=40'
40' 0 40' 80' 120'

**OWNER'S STATEMENT**

LIGHT ON A HILL LLC, AS OWNER OF THE PROPERTY DESCRIBED HEREIN ACKNOWLEDGE THESE PLANS HAVE BEEN PREPARED AT MY DIRECTION WITH MY FULL CONSENT. I FULLY UNDERSTAND AND ACCEPT THE TERMS AND CONDITIONS CONTAINED HEREIN AND AS ATTACHED BY REFERENCE ON THIS GRADING PLAN. APPLICANT WILL IMPLEMENT THE SPECIFIC HISTORICAL RESOURCES (ARCHAEOLOGY) MITIGATION, MONITORING AND REPORTING PROGRAM.

IT IS AGREED THAT FIELD CONDITIONS MAY REQUIRE CHANGES TO THESE PLANS.

IT IS FURTHER AGREED THAT THE OWNER (DEVELOPER) SHALL HAVE A REGISTERED CIVIL ENGINEER MAKE SUCH CHANGES, ALTERATIONS OR ADDITIONS TO THESE PLANS WHICH THE CITY ENGINEER DETERMINES ARE NECESSARY AND DESIRABLE FOR THE PROPER COMPLETION OF THE IMPROVEMENTS.

I FURTHER AGREE TO COMMENCE WORK ON ANY IMPROVEMENTS SHOWN ON THESE PLANS WITHIN EXISTING CITY RIGHT-OF-WAY WITHIN 60 DAYS OF THE CONSTRUCTION PERMIT AND TO PURSUE SUCH WORK ACTIVELY ON EVERY NORMAL WORKING DAY UNTIL COMPLETED, IRRESPECTIVE AND INDEPENDENT OF ANY OTHER WORK ASSOCIATED WITH THIS PROJECT OR UNDER MY CONTROL.

BY: KENDALL LAUGHLIN
LIGHT ON A HILL LLC
DATE

**DEVIATIONS TABLE**

| SDMC SECTION | REQUIRED | PROPOSED |
|---|---|---|
| BUILDING HEIGHT LIMIT, PER SDMC 131.0431(b) | 30 FEET | 53 FEET |
| SYSB RET. WALL HEIGHT LIMIT, SDMC 142.0340(d)(1) | 6 FEET | 20 FEET |
| SIDE YARD SETBACK, PER SDMC SECTION 131.0431(b) | 84 FEET, 2 INCHES | 14 FEET |
| LONG-TERM BIKE PARKING | 16 | 3 |

**UTILITY TABLE**

| UTILITY | EXISTING | PROPOSED |
|---|---|---|
| ELECTRIC | N/A | UNDERGROUND |
| WATER | N/A | UNDERGROUND |
| SEWER | UNDERGROUND | UNDERGROUND |
| STORMDRAIN | UNDERGROUND/ SURFACE FLOW | UNDERGROUND |

**NOTE:**

THE SUBDIVIDER SHALL ENSURE THAT ALL ONSITE UTILITIES SERVING THE SUBDIVISION SHALL BE UNDERGROUNDED WITH THE APPROPRIATE PERMITS.

**PARCEL NOTE:**

THIS IS A MAP OF A PARCEL AS DEFINED IN SECTION 8700-8704 OF THE CIVIL CODE OF THE STATE OF CALIFORNIA AND IS FILED PURSUANT TO THE SUBDIVISION MAP ACT.

**VICINITY MAP**

**DEVELOPMENT SUMMARY**

THE PROJECT CONSISTS OF THE DEVELOPMENT OF SIX-ACRE UNDEVELOPED SITE SITUATED NORTH OF INTERSTATE 8 AND EAST OF COLLEGE AVENUE IN THE NAVAJO COMMUNITY PLAN AREA.

- A 54,476 SF SANCTUARY/MULTIPURPOSE BUILDING TO ACCOMMODATE 900 SEATS (APPROXIMATELY 587 FIXED SEATS AND 3690 S.F. OF NON-FIXED SEATING) WITH SUNDAY SCHOOL, CLASSROOMS, OFFICES AND A MULTIPURPOSE ROOM/GYM.
- A 71,010 SF TWO LEVEL PARKING GARAGE WITH 203 SPACES
- SURFACE PARKING FOR 153 SPACES
- SITE UTILITIES AND LANDSCAPING
- OFFSITE IMPROVEMENTS TO COLLEGE AVENUE TO CREATE A MEDIAN BREAK AND A SIGNALIZED INTERSECTION FOR THE MAIN DRIVEWAY
- ON-SITE WATER QUALITY BASINS TO TREAT STORM WATER RUNOFF AND SEWER AND STORM WATER CONNECTIONS TO EXISTING CITY FACILITIES.
- PROPOSED DEVIATIONS TO EXCEED THE BUILDING HEIGHT LIMITS FROM 30' TO 53', TO REDUCE SIDE YARD SETBACKS FROM 84.17' TO 14', TO REDUCE LONG-TERM BIKE PARKING FROM 16 TO 3, SIDE-YARD SETBACK WALL HEIGHT TO EXCEED HEIGHT LIMITS FROM 6' TO 20'
- REQUIRED APPROVALS; THE PROJECT WOULD REQUIRE CITY APPROVAL OF A COMMUNITY PLAN AMENDMENT TO MODIFY THE NAVAJO COMMUNITY PLAN, A PLANNED DEVELOPMENT PERMIT, A SITE DEVELOPMENT PERMIT, A TENTATIVE MAP AND VARIOUS EASEMENT VACATIONS & REVESTMENT OF ACCESS RIGHTS ON COLLEGE AVENUE (PROCESS 5)

**SITE DESCRIPTION**

APN: 463-010-10-00 SITE AREA: 5.99 ACRES
ABBREVIATED LEGAL DESCRIPTION:
PORTION OF LOT 67 OF RANCHO MISSION OF SAN DIEGO, IN THE CITY OF SAN DIEGO, COUNTY OF SAN DIEGO, STATE OF CALIFORNIA, AS DESCRIBED IN GRANT DEED RECORDED NOVEMBER 3, 1975 AS DOCUMENT 75-306249, O.R.

SURVEY NOTES:

1) THE BOUNDARIES AND DIMENSIONS OF THE SURVEYED PARCEL SHOWN HEREON ARE BASED ON A FIELD SURVEY. RECORD DIMENSIONS MAY VARY. THE BOUNDARIES OF ADJOINING PARCELS WERE COMPILED FROM RECORDED OR FILED DATA, AND ARE TO BE USED FOR PLANNING PURPOSES ONLY.
BENCHMARK:
BRASS PLUG LOCATED AT THE SOUTHWEST CURB RETURN AT THE INTERSECTION OF DEL CERRO BOULEVARD AND COLLEGE AVENUE AS SHOWN IN THE CITY OF SAN DIEGO BENCH MARK BOOK, ELEVATION 461.997 FEET. DATUM IS MEAN SEA LEVEL PER SAID BENCH MARK BOOK.
2) THE LOCATIONS OF UNDERGROUND UTILITY LINES AND/OR STRUCTURES AS SHOWN HEREON ARE BASED ON OBSERVED ABOVE GROUND EVIDENCE AND RECORD INFORMATION PROVIDED TO THE SURVEYOR. NO EXCAVATIONS WERE MADE DURING THE COURSE OF THIS SURVEY TO LOCATE UNDERGROUND UTILITIES. LOCATIONS OF UNDERGROUND UTILITIES MAY VARY FROM LOCATIONS SHOWN HEREON. ADDITIONAL UNDERGROUND UTILITIES MAY EXIST.
3) MAPPING DATA FLOWN ON FEBRUARY 26,2015 AND PROVIDED BY AEROTECH MAPPING.
4) TITLE COMMITMENT PROVIDED BY FIRST AMERICAN TITLE INSURANCE COMPANY, ORDER NO. NCS-959140-SD WITH AN EFFECTIVE DATE OF JANUARY 20, 2021 AND AMENDED FEBRUARY 12, 2021.

LAMBERT COORDINATES: 224-1749 CCS 83 COORDINATES: 1864-6309

**PROJECT INFORMATION**

TOTAL PROJECT OWNERSHIP: 5.99 ACRES
TOTAL GRADED AREA: 5.60 ACRES
PERCENT OF SITE TO BE GRADED: 93%
TYPE OF CONSTRUCTION: TYPE III-B
EXISTING USE: VACANT LAND
PROPOSED USE: RELIGIOUS ASSEMBLY
NUMBER OF EXISTING LOTS: 1
NUMBER OF PROPOSED LOTS: 1

EXISTING ZONE: RS1-7
COMMUNITY PLAN: NAVAJO COMMUNITY PLAN AREA
OCCUPANCY TYPE: SINGLE FAMILY RESIDENTIAL
GEOLOGIC HAZARD CATEGORY: 52

GROSS SITE AREA: 260,944 SF
FLOOR AREA MAXIMUM: 45% (117,416 SF)
FLOOR AREA RATIO: 42% (108,654 SF)
SANCTUARY-1ST FLOOR 37,357 SF
SANCTUARY-2ND FLOOR 14,802 SF
SANCTUARY-PHANTOM FLOOR 22,555 SF
PARKING- 1ST FLOOR 33,940 SF
COVERAGE MAX ALLOWED: 50% (130,462 SF)
COVERAGE PROPOSED: 26% (72,822 SF)
SANCTUARY 1ST FLOOR 37,357 SF
PARKING-1ST FLOOR 35,465 SF

PARKING REQUIRED: 319 SPACES
PARKING PROVIDED: 356 STANDARD SPACES
2 VAN ACCESSIBLE SPACES
6 ACCESSIBLE SPACES
36 CLEAN AIR VEHICLE SPACES
22 FUTURE EV CHARGING STATIONS
(37 CARPOOL SPACES INCLUDED IN COUNT ABOVE)
7 MOTORCYCLE SPACES
18 SHORT-TERM BICYCLE SPACES
3 LONG-TERM BICYCLE STORAGE
1 LOADING ZONE

LANDSCAPE AREA: 153,757 SF

MONTGOMERY FIELD AIRPORT LAND USE COMPATIBILITY OVERLAY ZONE
AIRPORT INFLUENCE AREA (REVIEW AREA 2)
PARKING IMPACT OVERLAY ZONE (CAMPUS)

**SHEET INDEX**

CIVIL (7)
C 1.0 SITE PLAN
C 2.0 PRELIMINARY GRADING PLAN
C 3.0 PRELIMINARY UTILITY PLAN
C 4.0 SECTIONS AND DETAILS
C 5.0 EXISTING CONDITIONS EXHIBIT
C 6.0 OFFSITE IMPROVEMENTS
C 7.0 TRAFFIC SIGNAL INSTALLATION PLAN
ARCHITECTURAL (19)
A.1 TITLE
A.2 SITE PLAN
A.2a SETBACK SITE PLAN
A.2b FIRE ACCESS PLAN
A.3 COLORED SITE PLAN
A.3b ENLARGED COLORED SITE
A.4 FIRST FLOOR
A.5 SECOND FLOOR
A.5b AREA SCHEDULE
A.6 STADIUM SEATING
A.7 ELEVATIONS
A.8 ELEVATIONS
A.9 SECTIONS
A.10 ROOF
A.11 PARKING GARAGE GROUND LEVEL
A.12 PARKING GARAGE SECOND LEVEL
A.13 PARKING GARAGE ELEVATIONS
A.14 CARPORT
A.15 SITE SECTIONS
LANDSCAPE (6)
L-1 TO L-6 LANDSCAPE DEVELOPMENT PLAN

**PUBLIC SERVICES**

| | |
|---|---|
| GAS AND ELECTRIC: | SDG&E |
| TELEPHONE: | AT&T |
| CABLE TELEVISION: | COX COMMUNICATIONS |
| SEWER AND WATER: | CITY OF SAN DIEGO |
| DRAINAGE SYSTEM: | CITY OF SAN DIEGO |
| FIRE DEPARTMENT: | CITY OF SAN DIEGO |
| SCHOOL DISTRICT: | SAN DIEGO UNIFIED SCHOOL DISTRICT |

**PROJECT TEAM**

OWNER/DEVELOPER:
ALL PEOPLES CHURCH
5577 UNIVERSITY AVENUE
SAN DIEGO, CA 92105

ARCHITECT:
KENNETH D SMITH ARCHITECT & ASSOCIATES
500 FESLER STREET, SUITE 102
EL CAJON, CALIFORNIA 92020
T: (619) 444-2182

LANDSCAPE ARCHITECT:
AHLES LANDSCAPE ARCHITECTURE
2410 MANCHESTER AVENYE
RANCHO SANTA FE, CA 92091
T: (858) 756-8693

CIVIL ENGINEER/SURVEY:
PASCO LARET SUITER AND ASSOCIATES
535 N HWY 101, SUITE A
SOLANA BEACH, CALIFORNIA 92075
T: (858) 259-8212 FAX: (858) 259-4812

TRAFFIC ENGINEER:
LOS ENGINEERING, INC.
11622 EL CAMINO REAL, SUITE 100
SAN DIEGO, CA 92130
T: (619) 890-1253
LANDSCAPE ARCHITECT:

GEOTECHNICAL:
ADVANCED GEOTECHNICAL SOLUTIONS, INC.
485 CORPORATE DR, SUITE B
ESCONDIDO, CA 92029
T: (619) 850-3980

**PREPARED BY:**

PASCO LARET SUITER & ASSOCIATES
CIVIL ENGINEERING + LAND PLANNING + LAND SURVEYING
535 North Highway 101, Ste A, Solana Beach, CA 92075
ph 858.259.8212 | fx 858.259.4812 | plsaengineering.com

REGISTERED PROFESSIONAL ENGINEER No. 73820 CIVIL STATE OF CALIFORNIA

WILLIAM GREGG MACK RCE 73820 DATE

**PROJECT NAME:** ALL PEOPLES CHURCH

**PROJECT ADDRESS:** NORTHEAST CORNER OF COLLEGE AVENUE & INTERSTATE 8, SAN DIEGO, CALIFORNIA 92120

**PROJECT TRACKING SYSTEM NUMBER:** 636444

**INTERNAL ORDER NUMBER:** 24008189

**SHEET TITLE:** SITE PLAN

**SHEET NUMBER:** C 1.0 OF 7

**DRAWN BY:** GJK
**CHECKED BY:** W. MACK
**ORIGINAL DATE:** 04-22-2019

REVISIONS:
1. 03-17-2020
2. 08-28-2020
3. 2-12-2021
4. 7-30-2021
5. 9-24-2021
6. 12-3-2021
7. 6-23-2022

PLS# 2836

**ATTACHMENT 14**

# PRELIMINARY GRADING PLAN

## SITE DEVELOPMENT PERMIT NO. 2292338 ,PLANNED DEVELOPMENT PERMIT NO. 2292339, EASEMENT VACATION NO. 2292340, TENTATIVE MAP NO. 2490918

## LAND USE PLAN NO. 2292367

## ALL PEOPLES CHURCH

**TOPOGRAPHY:**

SURVEY NOTES:

1) THE BOUNDARIES AND DIMENSIONS OF THE SURVEYED PARCEL SHOWN HEREON ARE BASED ON A FIELD SURVEY. RECORD DIMENSIONS MAY VARY. THE BOUNDARIES OF ADJOINING PARCELS WERE COMPILED FROM RECORDED OR FILED DATA, AND ARE TO BE USED FOR PLANNING PURPOSES ONLY.
BENCHMARK:

   BRASS PLUG LOCATED AT THE SOUTHWEST CURB RETURN AT THE INTERSECTION OF DEL CERRO BOULEVARD AND COLLEGE AVENUE AS SHOWN IN THE CITY OF SAN DIEGO BENCH MARK BOOK, ELEVATION 461.997 FEET. DATUM IS MEAN SEA LEVEL PER SAID BENCH MARK BOOK

2) THE LOCATIONS OF UNDERGROUND UTILITY LINES AND/OR STRUCTURES AS SHOWN HEREON ARE BASED ON OBSERVED ABOVE GROUND EVIDENCE AND RECORD INFORMATION PROVIDED TO THE SURVEYOR. NO EXCAVATIONS WERE MADE DURING THE COURSE OF THIS SURVEY TO LOCATE UNDERGROUND UTILITIES. LOCATIONS OF UNDERGROUND UTILITIES MAY VARY FROM LOCATIONS SHOWN HEREON. ADDITIONAL UNDERGROUND UTILITIES MAY EXIST.

3) MAPPING DATA FLOWN ON FEBRUARY 26, 2015 AND PROVIDED BY AEROTECH MAPPING.

4) TITLE COMMITMENT PROVIDED BY FIDELITY NATIONAL TITLE COMPANY, ORDER NO. NCS-581014-SD WITH AN EFFECTIVE DATE OF MAY 27, 2015.

**LEGEND**

| | |
|---|---|
| BOUNDARY LINE | |
| ADJACENT PROPERTY LINE | |
| EASEMENT LINE | |
| RIGHT OF WAY | |
| EXISTING STREET CENTERLINE | |
| EXISTING IMPROVEMENTS | |
| EXISTING CONTOUR | 139 |
| EXISTING CURB & GUTTER | |
| EXISTING SEWER MAIN | |
| EXISTING STORM DRAIN MAIN | |
| EXISTING CURB INLET | |
| EXISTING WATER MAIN | |
| EXISTING WATER VALVE | |
| EXISTING FIRE HYDRANT | |
| EXISTING STREET LIGHT | |
| EXISTING STRUCTURE | |
| EXISTING VEGETATION | |
| PROPOSED IMPROVEMENTS | |
| PROPOSED ROAD CENTERLINE | |
| LIMIT OF WORK LINE | |
| CURB AND GUTTER | |
| 24' RESIDENTIAL DRIVEWAY | |
| PROPOSED CONTOURS | 148 |
| PROPOSED SPOT ELEVATION | FS=145.0 |
| RETAINING WALL | |
| SDRSD D-75 BROW DITCH | |
| BIORETENTION BASIN | |
| STORM DRAIN HEADWALL | |
| STORM DRAIN CLEANOUT | |
| AREA DRAIN | |
| STORM DRAIN INLET | |
| TYPE F CATCH BASIN | |
| RIP RAP ENERGY DISSIPATOR PER SDD-104 | |
| PVC STORM DRAIN (SIZE VARIES) | |
| WATER SERVICE | |
| TRAFFIC SIGNAL | |
| PARKING GARAGE WALL | |
| CUT/FILL SLOPE | |
| PERMEABLE PAVERS | |
| PROPOSED RIP-RAP | |
| TREE PER LANDSCAPE PLANS | |

**PREPARED BY:**

**PASCO LARET SUITER & ASSOCIATES**
CIVIL ENGINEERING + LAND PLANNING + LAND SURVEYING
535 North Highway 101, Ste A, Solana Beach, CA 92075
ph 858.259.8212 | fx 858.259.4812 | plsaengineering.com

REGISTERED PROFESSIONAL ENGINEER, WILLIAM GREGG MACK, No. 73620, CIVIL, STATE OF CALIFORNIA

WILLIAM GREGG MACK RCE 73620 DATE

| | |
|---|---|
| **PROJECT NAME:** ALL PEOPLES CHURCH | **DRAWN BY:** GJK |
| | **CHECKED BY:** W. MACK |
| **PROJECT ADDRESS:** NORTHEAST CORNER OF COLLEGE AVENUE & INTERSTATE 8, SAN DIEGO, CALIFORNIA 92120 | **ORIGINAL DATE:** 04-22-2019 |
| **PROJECT TRACKING SYSTEM NUMBER:** 636444 | REVISIONS: 1. 03-17-2020; 2. 08-28-2020; 3. 2-12 2021; 4. 7-30-2021; 5. 9-24-2021; 6. 12-3-2021; 7. 6-23-2022; 8.; 9.; 10.; 11.; 12.; 13.; 14.; 15.; 16.; 17.; 18.; 19.; 20. |
| **INTERNAL ORDER NUMBER:** 24008189 | |
| **SHEET TITLE:** PRELIMINARY GRADING PLAN | |
| **SHEET NUMBER:** C 2.0 OF 7 | |

PLSA 2836



PRELIMINARY UTILITY PLAN
SITE DEVELOPMENT PERMIT NO. 2292338
PLANNED DEVELOPMENT PERMIT NO. 2292339
EASEMENT VACATION NO. 2292340
TENTATIVE MAP NO. 2490918
LAND USE PLAN NO. 2292367
ALL PEOPLES CHURCH



### SECTIONS AND DETAILS

SITE DEVELOPMENT PERMIT NO. 2292338
PLANNED DEVELOPMENT PERMIT NO. 2292339
EASEMENT VACATION NO. 2292340
TENTATIVE MAP NO. 2490918
LAND USE PLAN NO. 2292367
ALL PEOPLES CHURCH

SECTION A-A: THROUGH TO 5608 MARNE AVE
NOT TO SCALE

SECTION B-B: THROUGH TO 6301 GLENMONT STREET
NOT TO SCALE

SECTION C-C: SOUTHWEST-CALTRANS ROW
NOT TO SCALE

TYPICAL SECTION: COLLEGE AVENUE
NOT TO SCALE

SECTION D-D: WEST FROM COLLEGE AVENUE
NOT TO SCALE

SECTION E-E: EASTERLY BOUNDARY BASIN
NOT TO SCALE

SECTION F-F: CALTRANS ROW THROUGH CHURCH
NOT TO SCALE

SECTION G-G: CALTRANS ROW
NOT TO SCALE

TYPICAL SECTION NORTHERN EX DRIVEWAY
NOT TO SCALE

TYPICAL SECTION 30' SIGNALIZED INTERSECTION

**PREPARED BY:**

PASCO LARET SUITER
& ASSOCIATES

| PROJECT NAME: | DRAWN BY: | |
|---|---|---|
| ALL PEOPLES CHURCH | CHECKED BY: | W. MACK |
| PROJECT ADDRESS: | ORIGINAL DATE: | 04-22-2019 |
| NORTHEAST CORNER OF COLLEGE AVENUE & INTERSTATE 8 | REVISIONS: | |
| SAN DIEGO, CALIFORNIA 92115 | | |
| PROJECT TRACKING SYSTEM NUMBER: | | |
| INTERNAL ORDER NUMBER: | | |
| SHEET TITLE: | | |
| SECTIONS & DETAILS | | |
| SHEET NUMBER: | | |
| C 40 of 7 | | |

Ex. A, p. 100

**ATTACHMENT 14**

# EXISTING + PROPOSED EASEMENTS, EASEMENT VACATIONS, DEDICATION, + REVESTMENT OF ACCESS RIGHTS

## SITE DEVELOPMENT PERMIT NO. 2292338
## PLANNED DEVELOPMENT PERMIT NO. 2292339
## EASEMENT VACATION NO. 2292340
## TENTATIVE MAP NO. 2490918
## LAND USE PLAN NO. 2292367
## ALL PEOPLES CHURCH

### SURVEYOR'S CERTIFICATE

THIS MAP CORRECTLY REPRESENTS A SURVEY MADE BY ME OR UNDER MY DIRECTION IN CONFORMANCE WITH THE REQUIREMENTS OF THE PROFESSIONAL LAND SURVEYORS' ACT ON MARCH 16, 2015

GARY D. MELLOM, PLS 8537 12-31-2022

### PROJECT INFORMATION

CLIENT: ALL PEOPLE'S CHURCH
ADDRESS: COLLEGE AVE AND I-8 FREEWAY, SAN DIEGO, CA
APN: 463-010-10

### ABBREVIATED LEGAL DESCRIPTION

PORTION OF LOT 67 OF RANCHO MISSION OF SAN DIEGO, IN THE CITY OF SAN DIEGO, COUNTY OF SAN DIEGO, STATE OF CALIFORNIA, AS DESCRIBED IN GRANT DEED RECORDED NOVEMBER 3, 1975 AS DOCUMENT NO. 75-306249, O.R

### SURVEY NOTES

1. THE BOUNDARIES AND DIMENSIONS OF THE SURVEYED PARCEL(S) SHOWN HEREON ARE BASED ON A FIELD SURVEY RECORD DIMENSIONS MAY VARY. THE BOUNDARIES OF ADJOINING PARCELS WERE COMPILED FROM RECORDED OR FILED DATA, AND ARE TO BE USED FOR PLANNING PURPOSES ONLY. BENCHMARK:

   BRASS PLUG LOCATED AT THE SOUTHWEST CURB RETURN AT THE INTERSECTION OF DEL CERRO BOULEVARD AND COLLEGE AVENUE AS SHOWN IN THE CITY OF SAN DIEGO BENCH MARK BOOK, ELEVATION 461.997 FEET. DATUM IS MEAN SEA LEVEL PER SAID BENCH MARK BOOK

2. THE LOCATIONS OF UNDERGROUND UTILITY LINES AND/OR STRUCTURES AS SHOWN HEREON ARE BASED ON OBSERVED ABOVE GROUND EVIDENCE AND RECORD INFORMATION PROVIDED TO THE SURVEYOR. NO EXCAVATIONS WERE MADE DURING THE COURSE OF THIS SURVEY TO LOCATE UNDERGROUND UTILITIES. LOCATIONS OF UNDERGROUND UTILITIES MAY VARY FROM LOCATIONS SHOWN HEREON ADDITIONAL UNDERGROUND UTILITIES MAY EXIST

3. MAPPING DATA FLOWN ON FEBRUARY 26, 2015 AND PROVIDED BY AEROTECH MAPPING.

4. TITLE COMMITMENT PROVIDED BY FIRST AMERICAN TITLE INSURANCE COMPANY, ORDER NO NCS-959140-SD WITH AN EFFECTIVE DATE OF JANUARY 20, 2021 AND AMENDED FEBRUARY 12, 2021.

### LEGEND

### EXISTING EASEMENTS AND RELINQUISHMENTS

| No. | Easement | EX. UTILITY STATUS |
|---|---|---|
| 8 | 10' WIDE EASEMENT FOR PUBLIC SEWER TO CITY OF SAN DIEGO PER DOC. REC. 1/14/1959, F/P. 7931, BK. 7444, P. 508, O.R. (TO BE VACATED) | INACTIVE (TO BE REMOVED) |
| 6 | 10' WIDE EASEMENT FOR PACIFIC TELEPHONE AND TELEGRAPH COMPANY PER DOC. REC. 6/22/1955, BK. 5690, P. 98, O.R. (TO REMAIN) | |
| 11a | 15' WIDE EASEMENT FOR STORM DRAINS TO CITY OF SAN DIEGO PER DOC. REC. 9/2/1964, F/P. 160682, O.R. (PORTION TO BE VACATED) | VACANT |
| 11b | 10' WIDE EASEMENT FOR STORM DRAINS TO CITY OF SAN DIEGO PER DOC. REC. 9/2/1964, F/P. 160682, O.R. (TO BE VACATED) | VACANT |
| 8 | 10' WIDE EASEMENT FOR STORM DRAINS TO CITY OF SAN DIEGO PER DOC. REC. 11/17/1955, BK. 5873, P. 468, O.R. (TO BE VACATED) | ACTIVE (80' SECTION TO BE REMOVED AND REROUTED THROUGH PROJECT SITE) |
| 10 P1 | EASEMENT FOR PUBLIC STREET ROW TO CITY OF SAN DIEGO PER DOC. REC. 1/10/1959, F/P. 27155, BK 7491, P. 10, O.R | |
| 10 P2 | EASEMENT FOR SLOPE RIGHTS TO CITY OF SAN DIEGO PER DOC. REC. 1/10/1959, F/P. 27155, BK 7491, P. 11, O.R. (TO BE VACATED) | INACTIVE (TO BE REMOVED) |
| 9 | EASEMENT FOR STORM DRAINS TO CITY OF SAN DIEGO PER DOC. REC. 2/10/1959, F/P. 27152, BK 7491, P. 4, O.R. (TO BE VACATED) | ACTIVE (PORTION TO BE REMOVED & REROUTED DOWN COLLEGE AVENUE) |
| 14 | 80' WIDE CITY OF SAN DIEGO MURRAY PIPELINE EASEMENT PER DOC. REC. 10/3/1947, BK. 2492, P. 369, O.R. AS SHOWN ON MAP 3664 | ACTIVE |
| 15 | 20' WIDE EASEMENT FOR SAN DIEGO GAS AND ELECTRIC PER BOOK 2998, PAGE 282. AS SHOWN ON MAP 3664 | VACANT |
| 12 | 8' WIDE EASEMENT FOR SAN DIEGO GAS AND ELECTRIC PER DOC. REC. 5/16/1972, F/P. 123315, O.R. | VACANT |
| 7 | ACCESS RIGHTS RELINQUISHED TO STATE OF CALIFORNIA PER DOC. REC. 7/30/1958, F/P. 122561, BK. 7189, P. 181, O.R. | |
| 4 | ACCESS RIGHTS RELINQUISHED TO CITY OF SAN DIEGO PER DOC. REC. 2/10/1959, BK 7491, P. 10, O.R. (PORTION TO BE REVESTED AT PVT. DWY/SIGNALIZED INTERSECTION) | |

VICINITY MAP

PREPARED BY:

PASCO LARET SUITER & ASSOCIATES
CIVIL ENGINEERING + LAND PLANNING + LAND SURVEYING
535 North Highway 101, Ste A, Solana Beach, CA 92075
ph 858.259.8212 | fx 858.259.4812 | plsaengineering.com

WILLIAM GREGG MACK RCE 73620 DATE

| | |
|---|---|
| PROJECT NAME: | ALL PEOPLES CHURCH |
| PROJECT ADDRESS: | NORTHEAST CORNER OF COLLEGE AVENUE & INTERSTATE 8 SAN DIEGO, CALIFORNIA 92120 |
| PROJECT TRACKING SYSTEM NUMBER: | 635444 |
| INTERNAL ORDER NUMBER: | 24008169 |
| SHEET TITLE: | |
| SHEET NUMBER: | C 5.0 OF 7 |
| DRAWN BY: | G.K |
| CHECKED BY: | W. MACK |
| ORIGINAL DATE: | 04-22-2019 |

REVISIONS:
1. 03-17-2020
2. 08-28-2020
3. 2-12-2021
4. 7-30-2021
5. 8-24-2021
6. 12-3-2021
7. 6-23-2022

ATTACHMENT 14



OFFSITE IMPROVEMENTS
SITE DEVELOPMENT PERMIT NO. 2292338
PLANNED DEVELOPMENT PERMIT NO. 2292339
EASEMENT VACATION NO. 2292340
TENTATIVE MAP NO. 2490918
LAND USE PLAN NO. 2292367
ALL PEOPLES CHURCH

DEL CERRO BLVD

COLLEGE AVENUE

DETAIL A

DETAIL A: 12' SHARED SIDEWALK TRANSITION
SCALE 1"=10'

DETAIL B

DETAIL B: SIGNALIZED INTERSECTION AND RESURFACING

PASCO LARET SUITER
ASSOCIATES

PROJECT NAME:
ALL PEOPLES CHURCH

PROJECT ADDRESS:
NORTHEAST CORNER OF COLLEGE AVENUE & INTERSTATE 8
SAN DIEGO, CALIFORNIA 92120

DRAWN BY: CA
CHECKED BY: R. MACK
ORIGINAL DATE: 04-22-2019

C 6.0 of 7

Ex. A, p. 102



ATTACHMENT 14

# TRAFFIC SIGNAL INSTALLATION PLAN
## SITE DEVELOPMENT PERMIT NO. 92338
## PLANNED DEVELOPMENT PERMIT NO. 92339
## EASEMENT VACATION NO. 92340
## TENTATIVE MAP NO.________
## ALL PEOPLES CHURCH

### TRAFFIC SIGNAL GENERAL NOTES ●

1. PULL BOXES SHALL BE NO. 6 AND CONDUIT 3" UNLESS NOTED OTHERWISE.
2. LOCATIONS OF ALL UNDERGROUND UTILITIES ARE APPROXIMATE. IT IS THE RESPONSIBILITY OF THE CONTRACTOR TO DETERMINE AND VERIFY THE EXACT LOCATIONS AND CONDITIONS ON THE JOB SITE.
3. THE TRAFFIC SIGNAL CONTRACTOR SHALL OBTAIN A TRAFFIC CONTROL PLAN PERMIT FROM THE CITY OF SAN DIEGO DEVELOPMENT SERVICES DEPARTMENT PERMIT CENTER A MINIMUM OF FIVE (5) WORKING DAYS PRIOR TO START OF WORK.
4. ALL TRAFFIC SIGNAL POLE FOUNDATIONS SHALL HAVE A 3" CONDUIT INSTALLED TO THE ADJACENT NO. 6 PULL BOX. THE CONTROLLER FOUNDATION SHALL HAVE A SPARE 3" CONDUIT INSTALLED TO THE ADJACENT NO. 6 PULL BOX FOR FUTURE USE AS SHOWN ON CONDUIT SCHEDULE. (NEEDS TO BE ADDED AS A NOTE AT THE BOTTOM OF THE CONDUIT SCHEDULE)
   A. ALL CONDUIT CROSSINGS SHALL INCLUDE A MINIMUM OF TWO (2) 3" CONDUITS.
5. THE TRAFFIC SIGNAL CONTRACTOR IS RESPONSIBLE FOR THE LAYOUT AND INSTALLATION OF LOOP DETECTORS, TRAFFIC STRIPING, PAVEMENT MARKINGS, PARKING REMOVAL AND TRAFFIC SIGNING (EXCEPT "G" SERIES STREET NAME SIGNS) AS SHOWN ON THESE PLANS.
   A. THE TRAFFIC SIGNAL CONTRACTOR SHALL OBTAIN THE APPROVAL OF CITY RESIDENT TRAFFIC ENGINEER (ETS DIVISION) OF THE LOOP LOCATIONS PRIOR TO CUTTING, AS WELL AS, PRIOR TO ANY INSTALLATION AND/OR REMOVAL OF STRIPING, PAVEMENT MARKING, PARKING REMOVAL AND SIGN LOCATIONS.
   B. THE TRAFFIC SIGNAL CONTRACTOR IS RESPONSIBLE FOR THE REMOVAL OF ALL UNNECESSARY AND CONFLICTING STRIPING AND PAVEMENT MARKINGS.
   C. THE TRAFFIC SIGNAL CONTRACTOR IS RESPONSIBLE FOR REMOVAL OF ALL PAVEMENT MARK-OUTS.
6. THE TRAFFIC SIGNAL CONTRACTOR SHALL NOT ERECT ANY SIGNAL STANDARDS MORE THAN THREE (3) WEEKS PRIOR TO SCHEDULED TRAFFIC SIGNAL TURN-ON.
7. CONTRACTOR SHALL PROVIDE ALL CABLING AND CONDUCTORS NECESSARY TO PERFORM ALL FUNCTIONS SHOWN ON THESE PLANS.
8. ALL POLES, CONDUIT, PULL BOXES, STRIPING AND LOOP DETECTOR LOCATIONS SHOWN ON THESE PLANS ARE APPROXIMATE. ACTUAL LOCATIONS SHALL BE DETERMINED BY FIELD CONDITIONS AT THE TIME ON CONSTRUCTION AND AS DIRECTED BY THE CITY OF SAN DIEGO.
9. ROUTING AND LOCATIONS OF UNDERGROUND ELECTRICAL SYSTEM IS DIAGRAMMATIC AND SUBJECT TO APPROVAL OF THE CITY ELECTRICAL ENGINEER. UNDERGROUND ELECTRICAL LINES AND SUBSURFACE STRUCTURES MAY BE RELOCATED IF NECESSARY TO CLEAR OTHER EXISTING UNDERGROUND FACILITIES.
10. ALL TREES AND SHRUBS SHALL BE TRIMMED OR REMOVED AS DETERMINED BY THE CITY RESIDENT ENGINEER AS REQUIRED TO MAINTAIN SIGNAL HEAD VISIBILITY AND SIGHT DISTANCE.
11. ALL VEHICLE HEADS SHALL BE 12" L.E.D. WITH AN INCANDESCENT LOOK AND BACKPLATES.
12. ALL VEHICLE DETECTOR LOOPS SHALL BE TYPE "E" AS SHOWN ON THIS PLAN.
    A. DETECTOR LOOPS SHALL BE 6' DIAMETER WITH 10' SPACING AND POSITIONED IN CENTER OF LANE UNLESS OTHERWISE SHOWN.
    B. FRONT DETECTOR LOOPS SHALL BE TYPE "E" MODIFIED LOOPS PER SDE – 104.
    C. ALL LOOP LAYOUTS SHALL INCLUDE LAYOUT OF HOMERUN LINES, WHICH MUST BE APPROVED PRIOR TO INSTALLATION.
    D. BICYCLE DETECTOR LOOPS SHALL BE TYPE Q.
13. PEDESTRIAN SIGNAL INDICATIONS AND PUSH BUTTONS SHALL BE INTERNATIONAL SYMBOLS. PEDESTRIAN SIGNAL INDICATIONS SHALL BE 16"X18" L.E.D. COUNTDOWN TIMER WITH AN INCANDESCENT LOOK. PEDESTRIAN PUSH BUTTONS SHALL BE 2" PER ADA REQ.
14. ALL CROSSWALKS SHALL BE CONTINENTAL TYPE PER SDM-116.
15. PEDESTRIAN PUSH BUTTON HOUSING COLOR SHALL MATCH COLOR NO. 33538 OF FED-STD-595 WHEN PEDESTRIAN PUSH BUTTONS ARE PLACED ON A TRAFFIC SIGNAL POLE.
16. PEDESTRIAN PUSH BUTTON LOCATIONS SHALL FOLLOW THE CA MUTCD STANDARDS AND THE THE ADA REQUIREMENTS.

### POLE SCHEDULE *

| NO. | TYPE | STANDARD MAST | SIG M.A. | LUM M.A. | LUMINAIRE LED | PLACEMENT A | PLACEMENT B | SIGNAL MOUNTING VEHICLE | PEDESTRIAN SIGNAL | PED | QUAD | REMARKS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| B | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| C | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | ALL PEOPLES CHURCH |
| D | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | COLLEGE AVE. |
| E | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | ALL PEOPLES CHURCH |
| F | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |

ALL VEHICLE HEADS SHALL BE 12" WITH BACKPLATES AND CLEAR LENSES. ANCHOR BOLT NUT COVERS SHALL BE PROVIDED.

### CONDUCTOR TABLE *

[illegible]

NOTES:
1. USE ALL NEW SIGNAL CABLE AND/OR CONDUCTORS.
2. INSTALL 1 UNBROKEN GROUND FROM MP TO CONTROLLER.

LEGEND
- VIDEO DETECTION CAMERA
- VIDEO DETECTION ZONE (SIZE AND LOCATION TO BE DETERMINED IN FIELD)

SIGN LEGEND

### DETECTOR ASSIGNMENT *

| DETECTOR | PHASE | SLOT | FIELD TERMINAL |
|---|---|---|---|
| [illegible] | [illegible] | [illegible] | [illegible] |
| EVA | 2 | J17U | [illegible] |
| EVC | [illegible] | J13L | [illegible] |
| EVD | 8 | J18U | [illegible] |
| FLASH SENSE | | J14U | T8-10 & COM 12 |
| STOP TIMING | | J14L | T8-11 & COM 12 |
| RR1 FLASH | | J14U | T8-10 & COM 12 |
| RR2 L.T. OPE | | J14L | T8-11 & COM 12 |

THE LOCATIONS OF EXISTING UTILITY INSTALLATIONS AS SHOWN ON THIS PLAN ARE APPROXIMATE. THERE MAY BE OTHER UNDERGROUND UTILITY INSTALLATIONS WITHIN THE PROJECT AREA THAT ARE NOT SHOWN.

TRAMES SOLUTIONS, INC. ASSUMES NO RESPONSIBILITY FOR DAMAGES, LIABILITY OR COSTS RESULTING FROM CHANGES OR ALTERATIONS MADE TO THIS PLAN WITHOUT THE EXPRESSED WRITTEN CONSENT OF TRAMES SOLUTIONS, INC.

ENGINEERING PERMIT NO:__________
DISCRETIONARY PERMIT NO:__________

### TRAFFIC SIGNAL CONSTRUCTION NOTES ●

1. FURNISH AND INSTALL 2770 CONTROLLER IN A TYPE 332 CABINET, EQUIPPED WITH ONE MODEL 412C SYSTEM MEMORY MODULE, ONE MODEL 404 MODEM FOR 8-PHASE CAPABILITY AND CITY APPROVED BATTERY BACKUP.
2. FURNISH AND INSTALL TYPE III SERVICE PEDESTAL AND CABINET WITH 50A-1P CIRCUIT BREAKER AND 30A-1P BREAKER FOR STREET LIGHTS.
3. CONTRACTOR TO VERIFY SERVICE REQUIREMENTS WITH SDG&E.
4. FURNISH AND INSTALL COUNTDOWN PEDESTRIAN SIGNAL HEADS PER CITY OF SAN DIEGO REQUIREMENTS.
5. FURNISH AND INSTALL CCTV CAMERA ON POLE G WITH ALL APPURTENANT EQUIPMENT, CONTRACTOR SHALL SUPPLY ALL NECESSARY HARDWARE PER CITY REQUIREMENTS.
6. INSTALL #6 PULL BOX. NO SPLICING IN HANDHOLE.
7. FURNISH AND INSTALL VIDEO DETECTION CAMERA ON TELSPAR WITH ALL EQUIPMENT, CONTRACTOR SHALL SUPPLY ALL NECESSARY HARDWARE PER CITY REQUIREMENTS.
8. FURNISH AND INSTALL 522B1-DIRECTIONAL DUAL CHANNEL EVPE DETECTOR PER CITY OF SAN DIEGO REQUIREMENTS.

PRELIMINARY
NOT FOR CONSTRUCTION

The City of SAN DIEGO
DEVELOPMENT SERVICES DEPARTMENT

STREET DATA TABLE

| STREET NAME | CLASSIFICATION | SPEED (MPH) | ADT (VEHICLES) | R/W (FT) |
|---|---|---|---|---|
| COLLEGE AVENUE | 4 LANE MAJOR | 40 | - | 102 |
| PRIVATE DRIVE | 2 LANE LOCAL | 25 | - | 0 |
| | | | | |
| | | | | |

PREPARED BY:

TRAMES SOLUTIONS INC.

SOROOSH RODBACK No. 72472 Exp. 06/30/22 CIVIL STATE OF CALIFORNIA REGISTERED PROFESSIONAL ENGINEER

SOROOSH RAHEEM R.C.E. 72472 DATE
EXPIRATION: 6/30/2023

| | |
|---|---|
| PROJECT NAME: ALL PEOPLES CHURCH | DRAWN BY: BEW |
| PROJECT ADDRESS: NORTHEAST CORNER OF COLLEGE AVENUE & INTERSTATE 8, SAN DIEGO, CALIFORNIA 92120 | CHECKED BY: - |
| PROJECT TRACKING SYSTEM NUMBER: 636444 | ORIGINAL DATE: 3-17-20 |
| INTERNAL ORDER NUMBER: PENDING | REVISIONS: 1. 03-17-2020 |
| SHEET TITLE: TRAFFIC SIGNAL INSTALLATION PLAN | |
| SHEET NUMBER: ____ OF 7 | |

6-8-2021

PLSA 2938







# ALL PEOPLES CHURCH

## COLLEGE AVE.
## SAN DIEGO CA







## BUILDING CODE DATA

## PARKING TABULATION

## SITE LEGEND

## ACCESSIBLE PATH OF TRAVEL

### SQUARE FOOTAGE CHURCH

| Name | Area |
| --- | --- |
| FIRST FLOOR | 36,869 SF |
| VESTIBULE | 526 SF |
| REAR VESTIBULE | 484 SF |
| 01 FIRST FLOOR | 37,878 SF |
| SECOND FLOOR | 16,598 SF |
| 02 SECOND FLOOR | 16,598 SF |
| Grand total | 54,476 SF |

### SQUARE FOOTAGE GARAGE

| Name | Area |
| --- | --- |
| FIRST LEVEL | 35,465 SF |
| 01 PARKING FIRST FLOOR | 35,465 SF |
| SECOND LEVEL | 35,545 SF |
| 02 PARKING SECOND FLOOR | 35,545 SF |
| Grand total | 71,010 SF |
| COVERED PARKING STRUCTURE | 1,000 SF |

EXTERIOR PARKING: 153 SPACES
PARKING STRUCTURE: 203 SPACES
TOTAL: 356 SPACES

PROPOSED PARKING STRUCTURE

PROPOSED BUILDING

COLLEGE AVE.

TRAFFIC GATE

NO PARKING

## SITE PLAN

KENNETH D. SMITH ARCHITECT & ASSOCIATES, INC.

500 FESLER ST. SUITE 102
EL CAJON · CA · 92020
PH / 619 444 2182
Fax / 619 442 2699

Revision Schedule

| # | Date | Description |
| --- | --- | --- |

**A church and parking struct. for**

## All Peoples Church
5551 College Ave, San Diego

PREPARED BY:
KENNETH D SMITH ARCHITECT
500 FESLER ST #101
EL CAJON CA 92020
PHONE 619 444 2182

PROJECT ADDRESS
5551 COLLEGE AVE

PROJECT NAME
ALL PEOPLES CHURCH

PROJECT TRACKING SYSTEM NUMBER
636444

SHEET TITLE
SITE PLAN

SHEET NUMBER
2 OF 19

| | |
| --- | --- |
| REVISION 01 | |
| REVISION 02 | |
| REVISION 03 | |
| REVISION 04 | |
| REVISION 05 | |
| REVISION 06 | |
| REVISION 07 | |
| REVISION 08 | |
| REVISION 09 | |
| REVISION 10 | |
| REVISION 11 | |
| REVISION 12 | |

**ATTACHMENT 15**



SETBACK
SITE
PLAN

**ATTACHMENT 15**



FIRE
ACCESS
SITE
PLAN



| SQUARE FOOTAGE GARAGE | |
|---|---|
| Name | Area |
| FIRST LEVEL | 35,465 SF |
| 01 PARKING FIRST FLOOR | 35,465 SF |
| SECOND LEVEL | 35,545 SF |
| 02 PARKING SECOND FLOOR | 35,545 SF |
| Grand total | 71,010 SF |

| SQUARE FOOTAGE CHURCH | |
|---|---|
| Name | Area |
| FIRST FLOOR | 36,869 SF |
| VESTIBULE | 526 SF |
| REAR VESTIBULE | 484 SF |
| 01 FIRST FLOOR | 37,878 SF |
| SECOND FLOOR | 16,598 SF |
| 02 SECOND FLOOR | 16,598 SF |
| Grand total | 54,476 SF |

# COLORED SITE PLAN

PREPARED BY:
NAMES
    KENNETH D SMITH ARCHITECT
    500 FESLER  ST #101
    EL CAJON, CA 92020
PHONE 619 444 2182

PROJECT ADDRESS
    5551 COLLEGE AVE

PROJECT NAME
    ALL PEOPLES CHURCH

PROJECT TRACKING SYSTEM NUMBER
    636444

SHEET TITLE
    COLORED SITE PLAN

SHEET NUMBER
    5 OF 19

A church and parking struct. for

**All Peoples Church**

5551 College Ave, San Diego

project:



ENLARGED
COLORED
SITE
PLAN







**ATTACHMENT 15**

| SQUARE FOOTAGE CHURCH | |
|---|---|
| Name | Area |
| FIRST FLOOR | 36,869 SF |
| VESTIBULE | 526 SF |
| REAR VESTIBULE | 484 SF |
| 01 FIRST FLOOR | 37,878 SF |
| SECOND FLOOR | 16,598 SF |
| 02 SECOND FLOOR | 16,598 SF |
| Grand total | 54,476 SF |

PREPARED BY:
NAMES
KENNETH D SMITH ARCHITECT
500 FESLER ST #101
EL CAJON, CA 92020
PHONE 619 444 2182

PROJECT ADDRESS
5551 COLLEGE AVE

PROJECT NAME
ALL PEOPLES CHURCH

PROJECT TRACKING SYSTEM NUMBER
636444

SHEET TITLE
FIRST FLOOR PLAN

SHEET NUMBER
7 OF 19

REVISION 01
REVISION 02
REVISION 03
REVISION 04
REVISION 05
REVISION 06
REVISION 07
REVISION 08
REVISION 09
REVISION 10
REVISION 11
REVISION 12

KENNETH D. SMITH
ARCHITECT
& ASSOCIATES, INC.

500 FESLER ST. SUITE 102
EL CAJON - CA - 92020
PH / 619 444 2182
Fax / 619 442 2699

LICENSED ARCHITECT KENNETH DUANE SMITH No. C25315 STATE OF CALIFORNIA

DATE: Issue Date
JOB NO: 17005
DRAWN BY: Author
CHECKED BY: Checker

| Revision Schedule | | |
|---|---|---|
| # | Date | Description |

ORIGINAL DRAWING PREPARATION DATE 04-23-2019
REVISIONS: 03-17-2020

project: A church and parking struct. for
**All Peoples Church**
5551 College Ave., San Diego

**ATTACHMENT 15**

| Room Schedule | | | | |
|---|---|---|---|---|
| Department | Name | Number | Area | Level |
| 01 FIRST FLOOR | | | | |
| | ENTRY LOBBY | 101 | 3629 SF | 01 FIRST FLOOR |
| | STORAGE | 115 | 1569 SF | 01 FIRST FLOOR |
| | GREEN ROOM | 114 | 196 SF | 01 FIRST FLOOR |
| | RR | 113 | 80 SF | 01 FIRST FLOOR |
| | SHOWER & 2 LOCKERS | 118 | 268 SF | 01 FIRST FLOOR |
| | STORAGE | 119 | 123 SF | 01 FIRST FLOOR |
| | BOOKSTORE | 120 | 401 SF | 01 FIRST FLOOR |
| | WOMEN | 125 | 363 SF | 01 FIRST FLOOR |
| | MULTI PURPOSE | 139 | 6709 SF | 01 FIRST FLOOR |
| | KITCHEN | 131 | 426 SF | 01 FIRST FLOOR |
| | STOR. | 129 | 73 SF | 01 FIRST FLOOR |
| | ELECT. | 127 | 106 SF | 01 FIRST FLOOR |
| | STAGE | 122 | 1929 SF | 01 FIRST FLOOR |
| | ELEV. | 128 | 59 SF | 01 FIRST FLOOR |
| | MEN | 151 | 338 SF | 01 FIRST FLOOR |
| | RECEPTION | 154 | 317 SF | 01 FIRST FLOOR |
| | SDG&E | 188 | 136 SF | 01 FIRST FLOOR |
| | ELECT. | 189 | 73 SF | 01 FIRST FLOOR |
| | CRY | 191 | 338 SF | 01 FIRST FLOOR |
| | BAND | 193 | 319 SF | 01 FIRST FLOOR |
| | RR | 195 | 84 SF | 01 FIRST FLOOR |
| | OFFICE | 196 | 79 SF | 01 FIRST FLOOR |
| 01 FIRST FLOOR: 22 | | | 18044 SF | |
| 02 SECOND FLOOR | | | | |
| | RESRM | 214 | 100 SF | 02 SECOND FLOOR |
| | RESTM | 187 | 84 SF | 02 SECOND FLOOR |
| | TRANSLATION | 192 | 307 SF | 02 SECOND FLOOR |
| | EQUIPMENT PLATFORM | 194 | 325 SF | 02 SECOND FLOOR |
| | VIDEO | 199 | 247 SF | 02 SECOND FLOOR |
| | RSTRM | 207 | 70 SF | 02 SECOND FLOOR |
| 02 SECOND FLOOR: 6 | | | 1133 SF | |
| : 28 | | | 19177 SF | |
| 01 FIRST FLOOR | | | | |
| | BACK STAGE | 226 | 969 SF | 01 FIRST FLOOR |
| | RISER ROOM | 161 | 36 SF | 01 FIRST FLOOR |
| 01 FIRST FLOOR: 2 | | | 1005 SF | |
| : 2 | | | 1005 SF | |
| ASSEMBLY FIXED SESATING | | | | |
| 01 FIRST FLOOR | | | | |
| ASSEMBLY FIXED SESATING | SANCTUARY fixed seating | 225 | 4776 SF | 01 FIRST FLOOR |
| 01 FIRST FLOOR: 1 | | | 4776 SF | |
| ASSEMBLY FIXED SESATING: 1 | | | 4776 SF | |
| ASSEMBLY W/O FIXED SESATING | | | | |
| 01 FIRST FLOOR | | | | |
| ASSEMBLY W/O FIXED SESATING | SANCTUARY w/o fixed seating | 117 | 3690 SF | 01 FIRST FLOOR |
| 01 FIRST FLOOR: 1 | | | 3690 SF | |
| ASSEMBLY W/O FIXED SESATING: 1 | | | 3690 SF | |
| CLASSROOM | | | | |
| 01 FIRST FLOOR | | | | |
| CLASSROOM | CLASSROOM 2 | 140 | 347 SF | 01 FIRST FLOOR |
| CLASSROOM | CLASSROOM 3 | 138 | 388 SF | 01 FIRST FLOOR |
| CLASSROOM | CLASSROOM 4 & 5 | 136 | 675 SF | 01 FIRST FLOOR |
| CLASSROOM | CLASSROOM GR 1 & 2 | 133 | 662 SF | 01 FIRST FLOOR |
| CLASSROOM | RR | 135 | 80 SF | 01 FIRST FLOOR |
| CLASSROOM | INFANT | 134 | 210 SF | 01 FIRST FLOOR |
| CLASSROOM | CLASSROOM 1 | 152 | 344 SF | 01 FIRST FLOOR |
| CLASSROOM | RSTRM | 153 | 70 SF | 01 FIRST FLOOR |
| CLASSROOM | RSTRM | 158 | 71 SF | 01 FIRST FLOOR |
| CLASSROOM | CORRIDOR | 160 | 771 SF | 01 FIRST FLOOR |
| 01 FIRST FLOOR: 10 | | | 3615 SF | |
| 02 SECOND FLOOR | | | | |
| CLASSROOM | CLASSROOM | 231 | 612 SF | 02 SECOND FLOOR |
| CLASSROOM | CLASSROOM | 230 | 353 SF | 02 SECOND FLOOR |
| CLASSROOM | CLASSROOM | 213 | 597 SF | 02 SECOND FLOOR |
| CLASSROOM | CLASSROOM | 212 | 499 SF | 02 SECOND FLOOR |
| CLASSROOM | CLASSROOM | 206 | 577 SF | 02 SECOND FLOOR |
| CLASSROOM | CLASSROOM | 210 | 433 SF | 02 SECOND FLOOR |
| CLASSROOM | CLASSROOM | 215 | 350 SF | 02 SECOND FLOOR |
| CLASSROOM | CLASSROOM | 216 | 350 SF | 02 SECOND FLOOR |
| CLASSROOM | CLASSROOM | 217 | 696 SF | 02 SECOND FLOOR |
| CLASSROOM | CLASSROOM | 211 | 1093 SF | 02 SECOND FLOOR |
| CLASSROOM | RSTRM | 218 | 243 SF | 02 SECOND FLOOR |
| CLASSROOM | RSTRM | 219 | 243 SF | 02 SECOND FLOOR |
| CLASSROOM | CORRIDOR | 224 | 854 SF | 02 SECOND FLOOR |
| 02 SECOND FLOOR: 13 | | | 6901 SF | |
| CLASSROOM: 23 | | | 10517 SF | |
| OFFICE | | | | |
| 01 FIRST FLOOR | | | | |
| OFFICE | LOBBY | 108 | 566 SF | 01 FIRST FLOOR |
| OFFICE | RR | 112 | 79 SF | 01 FIRST FLOOR |
| OFFICE | CONF. | 178 | 314 SF | 01 FIRST FLOOR |
| OFFICE | OFFICE | 179 | 121 SF | 01 FIRST FLOOR |
| OFFICE | OFFICE | 180 | 121 SF | 01 FIRST FLOOR |
| OFFICE | OPEN OFFICE | 181 | 767 SF | 01 FIRST FLOOR |
| OFFICE | OFFICE | 182 | 121 SF | 01 FIRST FLOOR |
| OFFICE | OFFICE | 183 | 121 SF | 01 FIRST FLOOR |
| OFFICE | OFFICE | 184 | 114 SF | 01 FIRST FLOOR |
| OFFICE | OFFICE | 185 | 143 SF | 01 FIRST FLOOR |
| OFFICE | RECEPT | 186 | 67 SF | 01 FIRST FLOOR |
| 01 FIRST FLOOR: 11 | | | 2885 SF | |
| 02 SECOND FLOOR | | | | |
| OFFICE | CORRIDOR | 258 | 1220 SF | 02 SECOND FLOOR |
| OFFICE | OFFICE | 241 | 130 SF | 02 SECOND FLOOR |
| OFFICE | OFFICE | 246 | 341 SF | 02 SECOND FLOOR |
| OFFICE | OFFICE | 247 | 220 SF | 02 SECOND FLOOR |
| OFFICE | OFFICE | 250 | 474 SF | 02 SECOND FLOOR |
| OFFICE | OFFICE | 242 | 116 SF | 02 SECOND FLOOR |
| OFFICE | LUNCH | 243 | 220 SF | 02 SECOND FLOOR |
| OFFICE | OFFICE | 244 | 125 SF | 02 SECOND FLOOR |
| OFFICE | OFFICE | 245 | 112 SF | 02 SECOND FLOOR |
| OFFICE | OFFICE | 251 | 114 SF | 02 SECOND FLOOR |
| OFFICE | OFFICE | 252 | 114 SF | 02 SECOND FLOOR |
| OFFICE | OFFICE | 253 | 114 SF | 02 SECOND FLOOR |
| OFFICE | OFFICE | 254 | 114 SF | 02 SECOND FLOOR |
| OFFICE | OFFICE | 255 | 100 SF | 02 SECOND FLOOR |
| OFFICE | WOMEN | 256 | 238 SF | 02 SECOND FLOOR |
| OFFICE | MEN | 257 | 238 SF | 02 SECOND FLOOR |
| OFFICE | OFFICE | 248 | 260 SF | 02 SECOND FLOOR |
| OFFICE | OFFICE | 249 | 236 SF | 02 SECOND FLOOR |
| 02 SECOND FLOOR: 18 | | | 4468 SF | |
| OFFICE: 29 | | | 7353 SF | |
| Grand total: 84 | | | 46517 SF | |

PREPARED BY:
NAMES
KENNETH D SMITH ARCHITECT
500 FESLER ST #101
EL CAJON, CA 92020
PHONE 619 444 2182

PROJECT ADDRESS
5551 COLLEGE AVE

PROJECT NAME
ALL PEOPLES CHURCH

PROJECT TRACKING SYSTEM NUMBER
636444

SHEET TITLE
AREA SCHEDULE

SHEET NUMBER
9 OF 19

REVISION 01________
REVISION 02________
REVISION 03________
REVISION 04________
REVISION 05________
REVISION 06 ________
REVISION 07________
REVISION 08________
REVISION 09________
REVISION 10________
REVISION 11________
REVISION 12________

KENNETH D. SMITH
ARCHITECT
& ASSOCIATES, INC.

500 FESLER ST. SUITE 102
EL CAJON - CA - 92020
PH / 619 444 2182
Fax / 619 442 2699

DATE: Issue Date
JOB NO: 17005
DRAWN BY: Author
CHECKED BY: Checker

| Revision Schedule | | |
|---|---|---|
| # | Date | Description |

ORIGINAL DRAWING
PREPARATION DATE
04-22-2019
REVISIONS: 03-17-2020

project: A church and parking struct. for
**All Peoples Church**
5551 College Ave., San Diego

8/2/2021 10:21:35 AM D:\Users\Ken Smith\My Documents\17005 All Peoples Church [2019]-CENTRAL_shifted3_detached_shorter_ksmith@kdsarch.com.rvt

**ATTACHMENT 15**



SECOND FLOOR PLAN

Department Legend
- ASSEMBLY FIXED SEATING
- CLASSROOM
- OFFICE



**ATTACHMENT 15**

EAST

NORTH

3/32" = 1'-0"

KENNETH D. SMITH ARCHITECT & ASSOCIATES, INC.

500 FESLER ST. SUITE 102
EL CAJON · CA · 92020
PH / 619 444 2182
Fax / 619 442 2699

DATE: Issue Date
JOB NO: 17005
DRAWN BY: Author
CHECKED BY: Checker

| Revision Schedule | | |
|---|---|---|
| # | Date | Description |

ORIGINAL DRAWING PREPARATION DATE
04-22-2019
REVISIONS 03-17-2020

PREPARED BY:
NAMES
KENNETH D SMITH ARCHITECT
500 FESLER ST #101
EL CAJON, CA 92020
PHONE 619 444 2182

PROJECT ADDRESS
5551 COLLEGE AVE

PROJECT NAME
ALL PEOPLES CHURCH

PROJECT TRACKING SYSTEM NUMBER
636444

SHEET TITLE
ELEVATIONS

SHEET NUMBER
11 OF 19

REVISION 01
REVISION 02
REVISION 03
REVISION 04
REVISION 05
REVISION 06
REVISION 07
REVISION 08
REVISION 09
REVISION 10
REVISION 11
REVISION 12

project: A church and parking struct. for
**All Peoples Church**
5551 College Ave., San Diego



WEST

SOUTH



Section 1/A.9
3/32" = 1'-0"

Section 2/A.9
1/8" = 1'-0"

Section 3/A.9
3/32" = 1'-0"



ROOF
PLAN



THERE IS NO ACCESSIBLE
ACCESS IN THE PARKING
GARAGE. COVERED PARKING
IS AVAILABLE IN ANOTHER LOCATION

LOWER
LEVEL
PLAN-
GARAGE

| SQUARE FOOTAGE GARAGE | |
|---|---|
| Name | Area |
| FIRST LEVEL | 35,465 SF |
| 01 PARKING FIRST FLOOR | 35,465 SF |
| SECOND LEVEL | 35,545 SF |
| 02 PARKING SECOND FLOOR | 35,545 SF |
| Grand total | 71,010 SF |

KENNETH D. SMITH
ARCHITECT
& ASSOCIATES, INC.

500 FESLER ST. SUITE 102
EL CAJON · CA · 92020
PH / 619 444 2182
Fax / 619 442 2699

A church and parking struct. for

**All Peoples Church**
5551 College Ave, San Diego

project:

**ATTACHMENT 15**



UPPER
LEVEL
PLAN-
GARAGE

ADJACENT RESIDENTIAL

THERE IS NO ACCESSABLE
PATH ON THIS PARKING DECK
DUE TO THE SLOPE

PLANTER AREA

3' WIDE PLANTER
WITH 3'6" HIGH WALLSQUARE FOOTAGE GARAGE

| Name | Area |
|---|---|
| FIRST LEVEL | 35,465 SF |
| 01 PARKING | 35,465 SF |
| FIRST FLOOR | |
| SECOND LEVEL | 35,545 SF |
| 02 PARKING | 35,545 SF |
| SECOND FLOOR | |
| Grand total | 71,010 SF |

PREPARED BY:
NAMES
KENNETH D SMITH ARCHITECT
500 FESLER  ST #101
EL CAJON, CA 92020
PHONE 619 444 2182

PROJECT ADDRESS
5551 COLLEGE AVE

PROJECT NAME
ALL PEOPLES CHURCH

PROJECT TRACKING SYSTEM NUMBER
636444

SHEET TITLE
UPPER LEVEL GARAGE PLAN

SHEET NUMBER
16 OF 19

REVISION 01_____
REVISION 02_____
REVISION 03_____
REVISION 04_____
REVISION 05_____
REVISION 06_____
REVISION 07_____
REVISION 08_____
REVISION 09_____
REVISION 10_____
REVISION 11_____
REVISION 12_____

KENNETH D. SMITH
ARCHITECT
& ASSOCIATES, INC.

500 FESLER ST.  SUITE 102
EL CAJON · CA · 92020
PH / 619 444 2182
Fax / 619 442 2699

DATE:          Issue Date
JOB NO:          / 7005
DRAWN BY:     Author
CHECKED BY: Checker

Revision Schedule
# | Date | Description

ORIGINAL DRAWING
PREPARATION DATE
04/25/2019
REVISIONS  03-17-2019

All Peoples Church

5551 College Ave, San Diego

project:     A church and parking struct. for



**ATTACHMENT 15**

SOUTH-WEST GARAGE ELEVATION

3/32" = 1'-0"

SOUTH-EAST GARAGE ELEVATION

3/32" = 1'-0"

NORTH-WEST GARAGE ELEVATION

3/32" = 1'-0"

PREPARED BY:
NAMES
KENNETH D SMITH ARCHITECT
500 FESLER ST #101
EL CAJON, CA 92020
PHONE 619 444 2182

PROJECT ADDRESS
5551 COLLEGE AVE

PROJECT NAME
ALL PEOPLES CHURCH

PROJECT TRACKING SYSTEM NUMBER
636444

SHEET TITLE
PARKING GARAGE ELEVATIONS

SHEET NUMBER
17 OF 19

REVISION 01_____
REVISION 02_____
REVISION 03_____
REVISION 04_____
REVISION 05_____
REVISION 06_____
REVISION 07_____
REVISION 08_____
REVISION 09_____
REVISION 10_____
REVISION 11_____
REVISION 12_____

KENNETH D. SMITH ARCHITECT & ASSOCIATES, INC.
500 FESLER ST. SUITE 102
EL CAJON - CA - 92020
PH / 619 444 2182
Fax / 619 442 2699

DATE: Issue Date
JOB NO: 17005
DRAWN BY: Author
CHECKED BY: Checker

| Revision Schedule | | |
|---|---|---|
| # | Date | Description |

ORIGINAL DRAWING PREPARATION DATE
04-22-2019
REVISIONS: 03-17-2020

project: A church and parking struct. for
**All Peoples Church**
5551 College Ave., San Diego

**ATTACHMENT 15**



**ATTACHMENT 15**



SECTION 4 @ LOT 13

SECTION 3 @ LOT 12

SECTION 2 @ LOT 8

SECTION 1 @ LOT 3

**ATTACHMENT 15**

Landscape Development Plan for:

# ALL PEOPLES CHURCH

5551 COLLEGE AVENUE
San Diego, California

## NOTES

### DESIGN STATEMENT

LANDSCAPE FOR THIS BUILDING FEATURES A DROUGHT TOLERANT PLANTING WITH STREET SIDE CANOPY TREES, PARKING LOT TREE PLANTING, ACCENT PLANTING ZONES, AND GRADED SLOPE PLANTING. STORM WATER TREATMENT IS ACCOMMODATED WITH BIO RETENTION BASINS AND OTHER IMPROVEMENTS COORDINATED WITH THE PROJECTS CIVIL ENGINEER.

### LANDSCAPE REGULATION CONFORMANCE

ALL LANDSCAPE AND IRRIGATION SHALL CONFORM TO THE STANDARDS OF THE CITY WIDE LANDSCAPE REGULATIONS AND THE CITY OF SAN DIEGO LAND DEVELOPMENT MANUAL LANDSCAPE STANDARDS AND ALL OTHER LANDSCAPE RELATED CITY AND REGIONAL STANDARDS.

**R-O-W PERMIT REQUIRED**
A PUBLIC RIGHT-OF-WAY PERMIT IS REQUIRED FOR ANY PLANTING GREATER THAN 30 INCHES IN HEIGHT IN THE PUBLIC RIGHT-OF-WAY.

### MINIMUM TREE SEPARATION DISTANCE

IMPROVEMENT / MINIMUM DISTANCE TO STREET TREE:

| | |
|---|---|
| TRAFFIC SIGNALS (STOP SIGN)- | 20 FEET |
| UNDERGROUND UTILITY LINES- | 5 FEET |
| UNDERGROUND SEWER LATERALS- | 10 FEET |
| ABOVE GROUND UTILITY STRUCTURES- | 10 FEET |
| DRIVEWAY (ENTRIES)- | 10 FEET |
| INTERSECTIONS (INTERSECTING CURB LINES OF TWO STREETS)- | 25 FEET |

VERIFY MINIMUM SEPARATION DISTANCE IN FIELD PRIOR TO PLANTING. UPON IDENTIFICATION OF CONFLICT, CONTACT LANDSCAPE ARCHITECT AND ADJUST TREE LOCATION AS DIRECTED.

### EXISTING LANDSCAPE NOTE

NO NEW LANDSCAPING IS PROPOSED FOR SITE AREAS NOT OTHERWISE DEVELOPED, INDICATED ON THE PLANS AS 'EXISTING TO REMAIN'.

IF ANY REQUIRED LANDSCAPE INDICATED ON THE APPROVED CONSTRUCTION DOCUMENT PLANS IS DAMAGED OR REMOVED DURING DEMOLITION OR CONSTRUCTION, IT SHALL BE REPAIRED AND/OR REPLACED IN KIND AND EQUIVALENT SIZE PER THE APPROVED DOCUMENTS TO THE SATISFACTION OF THE DEVELOPMENT SERVICES DEPARTMENT WITHIN 30 DAYS OF DAMAGE.

### CITY INSPECTION

OBTAIN A FINAL INSPECTION OF THE COMPLETED LANDSCAPE PLANTING AND IRRIGATION INSTALLATION BY CITY LANDSCAPE INSPECTOR. SCHEDULE INSPECTOR AND LANDSCAPE ARCHITECT AT LEAST ONE WEEK IN ADVANCE OF INSPECTION. CITY FEES PROVIDE FOR ONLY ONE INSPECTION, ADDITIONAL INSPECTIONS WILL REQUIRE ADDITIONAL FEES.

### CURB NOTE:

ALL LANDSCAPE AREAS ARE SEPARATED FROM VEHICULAR DRIVES AND PARKING BY 6 IN. CONCRETE CURBS- CONSTRUCTED PER SITE IMPROVEMENT PLANS ALL PARKING SPACES FACING LANDSCAPE AREAS 5 FT. OR LESS IN WIDTH SHALL HAVE WHEEL STOPS PROVIDED AT LEAST TWO FEET FROM THE LANDSCAPE AREA.

### ROOT ZONE

MINIMUM ROOT ZONE OF 40 S.F. IN AREA SHALL BE PROVIDED FOR ALL TREES. THE MINIMUM DIMENSION FOR THIS AREA SHALL BE 5 FEET, PER SDMC 142.0403(B)(5).

### ROOT BARRIER

TREE ROOT BARRIERS SHALL BE INSTALLED WHERE TREES ARE PLACED WITHIN 5 FEET OF PUBLIC IMPROVEMENTS INCLUDING WALKS, CURBS OR STREET PAVEMENT OR WHERE NEW PUBLIC IMPROVEMENTS ARE PLACED ADJACENT TO EXISTING TREES. THE ROOT BARRIER SHALL NO WRAP AROUND THE ROOT BALL. (SDMC 142.0409(A)(1).

### MULCH

MULCH: ALL REQUIRED PLANTING AREAS AND ALL EXPOSED SOIL AREAS WITHOUT VEGETATION SHALL BE COVERED WITH MULCH TO A MINIMUM DEPTH OF 3 INCHES, EXCLUDING SLOPES REQUIRING REVEGETATION PER SDMC 142.0411.

### IRRIGATION

IRRIGATION: AN AUTOMATIC, ELECTRICALLY CONTROLLED IRRIGATION SYSTEM SHALL BE PROVIDED AS REQUIRED BY LDC 142.0403(C) FOR PROPER IRRIGATION, DEVELOPMENT, AND MAINTENANCE OF THE VEGETATION IN A HEALTHY, DISEASE-RESISTANT CONDITION. THE DESIGN OF THE SYSTEM SHALL PROVIDE ADEQUATE SUPPORT FOR THE VEGETATION SELECTED."

A COMBINATION OF IRRIGATION TYPES- DRIP IRRIGATION (FOR SMALL PLANTERS AND ACCENT PLANTING AREAS), INDIVIDUAL TREE BUBBLERS (FOR TREES LOCATED WITHIN DRIP ZONES), ROTATOR TYPE OVERHEAD IRRIGATION (FOR BIO-RETENTION BASINS AND LARGE MANUFACTURED SLOPES)- IS ANTICIPATED. SOME AREAS OF EXISTING VEGETATION WILL REMAIN UN-IRRIGATED.

THE FINAL LANDSCAPE WILL COMPLY WITH THE REQUIREMENTS OF THE MODEL WATER EFFICIENT LANDSCAPE ORDINANCE IN ACCORDANCE WITH STATE LAW AND LAND DEVELOPMENT CODE SECTN 142.0413(h).

### MAINTENANCE NOTE

ALL REQUIRED LANDSCAPE AREAS SHALL BE MAINTAINED BY THE PROPERTY OWNER. LANDSCAPE AND IRRIGATION AREAS IN THE PUBLIC RIGHT OF WAY SHALL BE MAINTAINED BY THE PROPERTY OWNER. THE LANDSCAPE AREAS SHALL BE MAINTAINED FREE OF DEBRIS AND LITTER AND ALL PLANT MATERIAL SHALL BE MAINTAINED IN HEALTHY CONDITION. DISEASED OF DEAD PLANT MATERIAL SHALL BE SATISFACTORILY TREATED OR REPLACED PER THE CONDITIONS OF THE PERMIT.

TREES SHALL BE MAINTAINED SO THAT ALL BRANCHES OVER PEDESTRIAN WALKWAYS ARE 6 FEET ABOVE THE WALKWAY GRADE AND BRANCHES OVER VEHICULAR TRAVEL WAYS ARE 16 FEET ABOVE THE GRADE OF THE TRAVEL WAY PER THE SAN DIEGO MUNICIPAL CODE SECTION 142.0403(B)(10).

### DRAINAGE BEST MANAGEMENT PRACTICES

NO IRRIGATION RUN OFF SHALL DRAIN OFF SITE INTO THE PUBLIC RIGHT OF WAY, STREETS, DRIVES OR ALLEYS. NO CONNECTION SHALL BE MADE TO ANY STORM WATER SEWER SYSTEM WITHOUT PROPER PBMP'S. ALL ROOF DISCHARGE TO BE TO SURFACE DRAINAGE. REFER TO STORM WATER PLANS.

PRELIMINARY

### CANOPY TREE COVERAGE (CLIMATE ACTION PLAN NOTE)

| | | |
|---|---|---|
| EXISTING RIGHT OF WAY TREES - | 0 | |
| PROPOSED RIGHT OF WAY TREES - | 32 | |
| NET INCREASE IN RIGHT OF WAY TREES - | 32 | |
| EXISTING ON SITE TREES - | 40 +/- | (INCLUDES 10+/- PALMS) |
| PROPOSED ON SITE TREES- | 100+ | |
| NET INCREASE IN ON SITE TREES - | 60+ | |

### DRAWING INDEX

| SHEET | CONTENTS |
|---|---|
| L-1 | TITLE SHEET, NOTES |
| L-2 | LANDSCAPE YARD AND AREA CALCULATIONS |
| L-3 | PLANTING PLAN |
| L-4 | PLANTING PLAN |
| L-5 | PLANTING SCHEDULE |
| L-6 | WATER CONSERVATION PLAN |

### SITE ADDRESS

5551 COLLEGE AVENUE
SAN DIEGO, CALIFORNIA

## CONDITIONS

PRIOR TO ISSUANCE OF ANY GRADING PERMIT, THE OWNER/PERMITTEE SHALL SUBMIT COMPLETE CONSTRUCTION DOCUMENTS FOR THE REVEGETATION AND HYDRO-SEEDING OF ALL DISTURBED LAND IN ACCORDANCE WITH THE CITY OF SAN DIEGO LANDSCAPE STANDARDS AND TO THE SATISFACTION OF THE DEVELOPMENT SERVICES DEPARTMENT. ALL PLANS SHALL BE IN SUBSTANTIAL CONFORMANCE TO THIS PERMIT (INCLUDING ENVIRONMENTAL CONDITIONS) AND EXHIBIT "A," ON FILE IN THE DEVELOPMENT SERVICES DEPARTMENT.

PRIOR TO ISSUANCE OF ANY PUBLIC IMPROVEMENT PERMIT, THEOWNER/PERMITTEE SHALL SUBMIT COMPLETE LANDSCAPE CONSTRUCTION DOCUMENTS FOR RIGHT-OF-WAY IMPROVEMENTS TO THE DEVELOPMENT SERVICES DEPARTMENT FOR APPROVAL. IMPROVEMENT PLANS SHALL SHOW, LABEL, AND DIMENSION A 40-SQUARE-FOOT AREA AROUND EACH TREE WHICH IS UNENCUMBERED BY UTILITIES. DRIVEWAYS, UTILITES, DRAINS, WATER AND SEWER LATERALS SHALL BE DESIGNED SO AS NOT TO PROHIBIT THE PLACEMENT OF STREET TREES.

PRIOR TO ISSUANCE OF ANY BUILDING PERMIT (INCLUDING SHELL), THE OWNER/PERMITTEE SHALL SUBMIT COMPLETE LANDSCAPE AND IRRIGATION CONSTRUCTION DOCUMENTS, WHICH ARE CONSISTENT WITH THE LANDSCAPE STANDARDS, TO THE DEVELOPMENT SERVICES DEPARTMENT FOR APPROVAL. THE CONSTRUCTION DOCUMENTS SHALL BE IN SUBSTANTIAL CONFORMANCE WITH EXHIBIT "A," LANDSCAPE DEVELOPMENT PLAN, ON FILE IN THE DEVELOPMENT SERVICES DEPARTMENT. CONSTRUCTION PLANS SHALL PROVIDE A 40-SQUAREFOOT AREA AROUND EACH TREE THAT IS UNENCUMBERED BY HARDSCAPE AND UTILITIES UNLESS OTHERWISE APPROVED PER §142.0403(B)(6).

THE OWNER/PERMITTEE SHALL BE RESPONSIBLE FOR THE MAINTENANCE OF ALL LANDSCAPE IMPROVEMENTS SHOWN ON THE APPROVED PLANS, INCLUDING IN THE RIGHT-OF-WAY, UNLESS LONG-TERM MAINTENANCE OF SAID LANDSCAPING WILL BE THE RESPONSIBILITY OF ANOTHER ENTITY APPROVED BY THE DEVELOPMENT SERVICES DEPARTMENT. ALL REQUIRED LANDSCAPE SHALL BE MAINTAINED CONSISTENT WITH THE LANDSCAPE STANDARDS IN A DISEASE, WEED, AND LITTER FREE CONDITION AT ALL TIMES. SEVERE PRUNING OR "TOPPING" OF TREES IS NOT PERMITTED.

IF ANY REQUIRED LANDSCAPE (INCLUDING EXISTING OR NEW PLANTINGS, HARDSCAPE, LANDSCAPE FEATURES, ETC.) INDICATED ON THE APPROVED CONSTRUCTION DOCUMENTS IS DAMAGED OR REMOVED, THE OWNER/PERMITTEE SHALL REPAIR AND/OR REPLACE IN KIND AND EQUIVALENT SIZE PER THE APPROVED DOCUMENTS TO THE SATISFACTION OF THE DEVELOPMENT SERVICES DEPARTMENT WITHIN 30 DAYS OF DAMAGE OR CERTIFICATE OF OCCUPANCY.

## REVEGATION OF ADJACENT PARKLAND CONDITIONS

A REVEGETATION PLANTING PLAN WITH A 25-MONTH MAINTENANCE, SUCCESS CRITERIA PROGRAM AND TEMPORARY IRRIGATION ON ADJACENT PARKLAND WILL BE PROVIDED, TO INCLUDE THE FOLLOWING NOTES UNDER THE HEADING "REVEGETATION OF ADJACENT PARKLAND":

- PROVIDE A 120-DAY PLANT ESTABLISHMENT PERIOD AND 25-MONTH CONTRACTOR PROVIDED MAINTENANCE AND MONITORING PERIOD; LIST THE REVEGETATION SUCCESS CRITERIA AND INCLUDE A SCHEDULE FOR INSPECTION REPORTS. INSPECTION REPORTS SHALL BE SUBMITTED TO PAUL KILBURG, SENIOR PLANNER, PARKS AND RECREATION OPEN SPACE DIVISION, PHONE NUMBER 619-685-1327.
- A FINAL INSPECTION IS REQUIRED WITH ATTENDANCE AND APPROVAL OF THE PARKS AND RECREATION DEPARTMENT AND PUBLIC UTILITIES DEPARTMENT PRIOR TO ACCEPTANCE OF THE SITE.
- TEMPORARY IRRIGATION IS REQUIRED TO REESTABLISH VEGETATION IN DISTURBED AREAS. THE ABOVE GRADE SYSTEM MUST BE REMOVED AT THE END OF THE 25- MONTH CONTRACTOR PROVIDED MAINTENANCE PERIOD AND PRIOR TO PARKS AND RECREATION DEPARTMENT ACCEPTANCE PER THE CITY'S LANDSCAPE STANDARDS, SECTION 5.3.
- A MINIMUM OF 50 PERCENT OF THE TOTAL SLOPE AREA MUST BE PLANTED WITH DEEP ROOTING GROUND COVERS PER THE CITY'S LANDSCAPE STANDARDS, SECTION 4.2.
- PROPOSED PLANTING SHALL COMPLY WITH MUNI CODE SECTION 142.0411, REVEGETATION AND EROSION CONTROL. PLANTING SHALL INCLUDE 1 GALLON MINIMUM SIZE CONTAINER STOCK AT A RATE OF ONE PLANT/ 100 SQUARE FEET.
- CONTRACTOR MUST OBTAIN A RIGHT OF ENTRY PERMIT FROM THE PARKS AND RECREATION DEPT., ASSET MANAGEMENT DIVISION, SHANNON SCOGGINS (619-236-6894) PRIOR TO ENTERING CITY FEE-OWNED PARKLAND.

## PARK AND REC PERMIT CONDITIONS

The Owner/Permittee shall ensure that a right of-entry permit is obtained from the Park and Recreation Dept. prior to entering City fee-owned parkland. (New Issue)

The Owner/Permittee shall ensure that there are no temporary or permanent construction impacts to the adjacent City fee-owned open space. (New Issue)

The Owner/Permittee shall ensure that no invasives are planted adjacent to City fee-owned open spaces (New Issue)

The Owner/Permittee shall ensure that there is no overspray or irrigation runoff on adjacent City fee-owned property. (New Issue)

The Owner/Permittee shall ensure Parks and Recreation Department review and approval of grading plans prior to permit issuance. (New Issue)

Prior to issuance of any construction permits for grading, the Owner/Permittee shall submit complete landscape construction documents for the revegetation and hydro-seeding of all disturbed City fee-owned land for review and approval by the Parks and Recreation Department. All plans shall be substantial conformance to this permit (including Environmental Conditions) and Exhibit "A" on file in the Office of the Development Services Department. (New Issue)

All revegetation on City fee-owned Open Space shall have a two year maintenance and monitoring period prior to project approval and acceptance by Parks & Recreation Department. (New Issue)

The Owner/Permittee shall ensure that any tree damaged or determined to have died within a 5 year period as a result of impacts created by this project, shall be replaced with a with a tree of equal value as determined by the Park & Recreation Dept. (New Issue)

The Owner/Permittee shall schedule an inspection with the Park & Recreation Open Space Division and Public Utilities Department and the work shall be complete to the satisfaction of the City prior to turn over of sewer access road through Open Space to PUD. (New Issue)

AHLES
LANDSCAPE
ARCHITECTURE INC.

P.O. Box 1503
Rancho Santa Fe, California 92067
858.756.8963
ala@ahlesland.com

CA# 2538

LANDSCAPE DEVELOPMENT PLAN FOR:

ALL PEOPLES CHURCH

5551 College Avenue
San Diego
California

ALA PROJECT NO.: 1818

SHEET:

L-1

PREPARED BY:

NAME: AHLES LANDSCAPE ARCHITECTURE
PO BOX 150.
RANCHO SANTA FE, CA 92067

PHONE #: 858.756.8963

PROJECT ADDRESS:
5551 COLLEGE AVENUE

PROJECT NAME:
ALL PEOPLES CHURCH

SHEET TITLE:
LANDSCAPE DEVELOPMENT PLAN

| | |
|---|---|
| REVISION 14: | |
| REVISION 13: | |
| REVISION 12: | |
| REVISION 11: | |
| REVISION 10: | |
| REVISION 9: | 27 JUN 22 |
| REVISION 8: | 8 SEP 21 |
| REVISION 7: | 3 AUG 21 |
| REVISION 6: | 8 JUL 21 |
| REVISION 5: | 26 APR 21 |
| REVISION 4: | 15 FEB 21 |
| REVISION 3: | 28 JUL 20 |
| REVISION 2: | 20 MAR 20 |
| REVISION 1: | 3 JAN 20 |
| ORIGINAL DATE: | 30 APR 19 |
| SHEET 20 OF 25 | |
| DEP# | |

**ATTACHMENT 15**

AHLES
LANDSCAPE
ARCHITECTURE INC.

P.O. Box 1503
Rancho Santa Fe, California 92067
858.756.8963
ala@ahlesland.com

CA# 2538

LANDSCAPE DEVELOPMENT PLAN FOR:

ALL PEOPLES CHURCH

5551 College Avenue
San Diego
California

ALA PROJECT NO.: 1818

SHEET: L-2

## CITY OF SAN DIEGO AREA AND POINT CALCULATIONS

**STREET YARD**
**AREA**

| | | |
|---|---|---|
| TOTAL STREET YARD AREA | | 53,115 |
| REQUIRED LANDSCAPE AREA | 25% | 13,279 |
| PROVIDED LANDSCAPE AREA | | 38,718 |
| **POINTS** | | |
| REQUIRED POINTS | @ .05 | 2656 |
| REQUIRED TREE POINTS | @ 100% | 2656 |
| PROVIDED TREE POINTS | | 2,810 |

**REMAINING YARD**
**AREA**

| | | |
|---|---|---|
| TOTAL YARD AREA | | 16,794 |
| REQUIRED LANDSCAPE AREA | 30% | 5038 |
| PROVIDED LANDSCAPE AREA | | 14,887 |
| REQUIRED LANDSCAPE POINTS | @ .05 | 840 |
| PROVIDED LANDSCAPE POINTS (TREES ONLY) | | 480 |
| PROVIDED LANDSCAPE POINTS (ALL PLANTS) | | 1380 |

**STREET TREES- COLLEGE AVENUE**
**QUANTITY**

| | | |
|---|---|---|
| REQUIRED | 405 FT. @ 1/30 | 30 |
| PROVIDED | | 31 |

**COMMERICAL / RESIDENTIAL ADJACENT BUFFER**
**QUANTITY**

| | | |
|---|---|---|
| 5 FT BUFFER AREA | | 6,455 |
| TREE SCREENING POINT REQUIRED | @ .05 | 323 |
| PROVIDED LANDSCAPE POINTS (TREES ONLY) | | 360 |

5 X 8 FT.
ROOT
ZONE

ROOT ZONE NOTE:
AT THE UPPER PARKING LEVEL OF PARKING STRUCTURE- THE MINIMUM DIMENSION AND ROOT ZONE AREA MAY BE REDUCED WITH THE USE OF STRUCTURAL SOIL OR WHERE THE COMBINATION OF SOIL CONDITIONS, ROOT ZONE AREA, ADJACENT IMPROVEMENTS, AND SELECTED TREE SPECIES CAN BE DEMONSTRATED TO PROVIDE CONDITIONS FOR HEALTHY TREE GROWTH THAT WILL NOT DAMAGE ADJACENT IMPROVMENTS.

PREPARED BY:
NAME: AHLES LANDSCAPE ARCHITECTURE
PO BOX 1150.
RANCHO SANTA FE, CA 92067
PHONE #: 858.756.8963

PROJECT ADDRESS:
5551 COLLEGE AVENUE

PROJECT NAME:
ALL PEOPLES CHURCH

SHEET TITLE:
LANDSCAPE DEVELOPMENT PLAN

| | |
|---|---|
| REVISION 14: | |
| REVISION 13: | |
| REVISION 12: | |
| REVISION 11: | |
| REVISION 10: | |
| REVISION 9: | 27 JUN 22 |
| REVISION 8: | 8 SEP 21 |
| REVISION 7: | 3 AUG 21 |
| REVISION 6: | 8 JUL 21 |
| REVISION 5: | 26 APR 21 |
| REVISION 4: | 15 FEB 21 |
| REVISION 3: | 28 JUL 20 |
| REVISION 2: | 20 MAR 20 |
| REVISION 1: | 3 JAN 20 |
| ORIGINAL DATE: | 30 APR 19 |
| SHEET 21 OF 25 | |
| DEP# | |







**ATTACHMENT 15**

# PLANT LEGEND

## TREES

| SYMBOL / PLANT FUNCTION / BOTANICAL NAME | COMMON NAME | PLANT FORM / QUANTITY | PERCENTAGE | AT SIZE |
|---|---|---|---|---|
| CANOPY STREET TREE- 35 x 20' +/-HEIGHT X WIDTH | | FORM- MEDIUM UPRIGHT VASE | | |
| TRISTANIA CONFERTA | BOX TREE | 31 | 100% | 24" BOX |
| HYMENSPORUM FLAVUM | SWEETSHADE | | | |
| LOPHOSTEMON CONFERTUS | | | | |
| CANOPY PARKING LOT TREE- 25 x 30' +/-HEIGHT X WIDTH | | FORM- MEDIUM UPRIGHT VASE | | |
| PODOCARPUS GRACILOR | YEW PINE | 17 | 100% | 48" BOX |
| ARBUTUS X 'MARINA' | MARINA STRAWBERRY | | | |
| MEDIUM CANOPY PARKING LOT TREE- 25 x 20' +/-HEIGHT X WIDTH | | FORM- MEDIUM UPRIGHT VASE | | |
| OLEA 'WILSONII' | OLIVE | 15 | 100% | 48" BOX |
| ARBUTUS X 'MARINA' | MARINA STRAWBERRY | 6 | | 36" BOX ON PARKING GARAGE |
| MEDIUM CANOPY PARKING LOT TREE- 25 x 20' +/-HEIGHT X WIDTH IN RAISED PLANTER | | FORM- MEDIUM UPRIGHT VASE | | |
| LAURUS 'SARATOGA' | HYBRID LAUREL | 11 | | 48" BOX IN STREET YARD |
| OLEA 'WILSONII' | OLIVE | 4 | | 36" BOX |
| ARBUTUS X 'MARINA' | MARINA STRAWBERRY | 3 | | |
| SPECIMEN TREE- 40 x 40' +/-HEIGHT X WIDTH | | FORM- LARGE SPREADING BROADLEAF | | |
| QUERCUS AGRIFOLIA | COAST LIVE OAK | 2 | | 60" BOX IN STREET YARD |
| CINNAMONIUM CAMPHORA | CAMPHOR TREE | 2 | | 48" BOX |
| FICUS RUBIGNOSIA | RUSTY LEAF FIG | | | |
| SLOPE TREE- 25 x 25' +/- HEIGHT X WIDTH | | FORM- SMALL UPRIGHT VASE | | |
| RHUS LANCEA | AFRICAN SUMAC | 62 | | 24" BOX |
| QUERCUS AGRIFOLIA | COAST LIVE OAK | | | |
| LOPHOSTEMON CONFERTUS | BOX TREE | | | |
| PLAZA PALM TREE- 25 x 25' +/- HEIGHT X WIDTH | | FORM- CANOPY PALM | | |
| PHOENIX CANARIENSIS | DATE PALM | 14 | 100% | 15-20 FT BTH |
| ARECASTRUM ROMANOFFIANUM | QUEEN PALM | | | |

## GROUND COVERS

| FUNCTION / BOTANICAL NAME | COMMON NAME | SPACING | PERCENTAGE | AT SIZE |
|---|---|---|---|---|
| FUNCTION: ACCENT GROUND COVER +/- 1 FT. TALL X WIDTH | | FORM- SPREADING GROUND COVER | | |
| ALOE SAPONERIA | SOAP ALOE | 18 IN. O.C. | 100% | FLATS |
| SEDUM ALBUM | STONE CROP | | | |
| SEDUM SPURIUM 'BURGANDY CARPET' | SEDUM | | | |
| SENECIO MANDRALISCAE | 'BLUE CHALK STICKS' | | | |
| FUNCTION: SLOPE GROUND COVER +/- 1 FT. TALL X WIDTH | | FORM- SPREADING GROUND COVER | | |
| ROSMARINUS PROSTRATUS | ROSEMARY | 24 IN. O.C. | 100% | FLATS |
| BACCHARIS PIEGON POINT | COYOTE BUSH | | | |
| FUNCTION: BIO SWALE VEGETATION +/- 1 FT. TALL X WIDTH | | FORM- SPREADING GROUND COVER | | |
| CAREX PRAEGRACILIS | CAMISSO SEDGE | 12 IN. O.C. | 100% | 4 IN. POTS |

## EXISTING VEGETATION

EXISTING TO REMAIN

## NON LIVING COVERS

| | |
|---|---|
| BARK MULCH | 3 IN. DEPTH |
| DECOMPOSED GRANITE | 2 IN. DEPTH |

## SHRUBS

| FUNCTION / BOTANICAL NAME | COMMON NAME | QUANTITY | PERCENTAGE | SIZE |
|---|---|---|---|---|
| FUNCTION: SUCCULENT ACCENT PLANTS- 2 FT. TALL X WIDTH | FORM- ACCENT SUCCULENT | | | |
| AGAVE 'BLUE GLOW' | AGAVE | 60 | 100% | 1 GALLON |
| AEONIUM 'ZWARTKOP' | AEONIUM | | | |
| BULBINE BULBOSA | BULBINE LILY | | | |
| CRASSULA ARBORESCENS | SILVER DOLLAR PLANT | 14 | 100% | 1 GALLON |
| KALANCHOE THYRSIFLORA | PADDLE PLANT | | | |
| FUNCTION: SUCCULENT ACCENT PLANTS- 4-6 FT. TALL X WIDTH | FORM- ACCENT SUCCULENT | | | |
| AGAVE ATTENUATA | AGAVE | 25 | 100% | 5 GALLON |
| HESPERALOE PARVIFOLIA | RED YUCCA | | | |
| FUNCTION: NATURALIZED SLOPE PLANTS- 2-4 FT. TALL X WIDTH | FORM- MEDIUM SHRUB | | | |
| ENCELIA CALIFORNICA | CAL. ENCELIA | 140 | 100% | 1 GALLON |
| MUHLENBERGIA RIGENS | DEER GRASS | | | |
| FUNCTION: NATURALIZED SLOPE PLANTS- 6-10 FT. TALL X WIDTH | FORM- LARGE SHRUB | | | |
| HETEROMELES ARBUTIFOLIA | TOYON | 100 | 100% | 1 GALLON |
| RHUS INTEGRIFOLIA | LEMONADE BERRY | | | |
| FUNCTION: SCREENING PLANTS- 6-10 FT. TALL X WIDTH | FORM- LARGE SHRUB | | | |
| PRUNUS CAROLINIANA 'COMPACTA' | CAROLINA LAUREL | 160 | 100% | 15 GALLON |
| THEVETIA PERIVIANA | YELLOW OLEANDER | | | |
| PYRACANTHA 'SANTA CRUZ' | FIRE THORN | | | |
| FUNCTION: MEDIUM ROUNDED SHRUB 3-6 FT. TALL X 3-6 FT. WIDTH | FORM- MEDIUM SCREENING SHRUB | | | |
| CISTUS X PURPUREUS | ROCKROSE | 120 | 100% | 5 GALLON |
| PHOLMIS ITALICA | JERUSALEM SAGE | | | |
| FUNCTION: MEDIUM ROUNDED SHRUB 2-4 FT. TALL X 2-4 FT. WIDTH | FORM- FOUNDATION SHRUB | | | |
| ROSMARIUS 'TUSCAN BLUE' | ROSEMARY | 100 | 100% | 5 GALLON |
| BOUGAINVILLEA 'LA JOLLA' | BOUGAINVILLEA | | | |
| FUNCTION: VINE 2-4 FT. TALL X 6-8 FT. WIDTH | FORM- CASCADING VINE | | | |
| BOUGAINVILLEA 'LA JOLLA' | BOUGAINVILLEA | 22 | 100% | 5 GALLON |
| PARTHENOCISSUS QUINQUEFOLIA | CREEPER | 56 | 100% | 5 GALLON |

ADDITIONAL SHRUBS NOT SHOWN BUT ANTICIPATED FOR USE WITH FINAL PLANS
(OTHER SPECIES OF SIMILAR CHARACTER AND WATER USE MAY BE UTILIZED

| FUNCTION / BOTANICAL NAME | COMMON NAME | QUANTITY | PERCENTAGE | SIZE |
|---|---|---|---|---|
| FUNCTION: VERTICAL PLANTS- 4 FT.+TALL X 4 FT. WIDTH | FORM- VERTICAL | | | |
| CHONDROPETALUM TECTORUM | CAPE RUSH | | 100% | 5 GALLON |
| ELYMUS ARENARIUS | SAND RYEGRASS | | | |
| CORDYLINE AUSTRALIS 'RED STAR' | DRACAENA | | | |
| FUNCTION: GRASS LIKE PLANTS 2-4 FT. TALL X 2-4 FT. WIDTH | FORM- ACCENT GRASS | | | |
| DIANELLA 'CASSA BLUE' | FLAX LILY | | 100% | 5 GALLON |
| DIANELLA T. 'VARIGATA' | FLAX LILY | | | |
| HELICTOTRICHON SEMPREVIRENS | BLUE OAT GRASS | | | |
| FUNCTION: MEDIUM ROUNDED SHRUB 2-4 FT. TALL X 2-4 FT. WIDTH | FORM- FOUNDATION SHRUB | | | |
| MYTRTUS 'COMPACTA VARIEGATA' | MYRTLE | | 100% | 5 GALLON |
| PITTOSPORUM SPECIES | MOCKORANGE | | | |
| RHAPHEIOPSIS SPECIES | INDIAN HAWTHORNE | | | |
| FUNCTION: VINE 4-6 FT. TALL X 4-6 FT. WIDTH | FORM- VINE | | | |
| HARDENBERGIA VIOLACEA | LILAC VINE | 12 | 100% | 5 GALLON |
| BOUGAINVILLEA | BOUGAINVILLEA | | | |

AHLES
LANDSCAPE
ARCHITECTURE INC.
P.O. Box 1503
Rancho Santa Fe, California 92067
858.756.8963
ala@ahlesland.com

CA# 2538

LANDSCAPE DEVELOPMENT PLAN FOR:

ALL PEOPLES CHURCH

5551 College Avenue
San Diego
California

ALA PROJECT NO.: 1818

SHEET:

L-5

PREPARED BY:
NAME: AHLES LANDSCAPE ARCHITECTURE
PO BOX 150.
RANCHO SANTA FE, CA 92067
PHONE #: 858.756.8963

PROJECT ADDRESS:
5551 COLLEGE AVENUE

PROJECT NAME:
ALL PEOPLES CHURCH

SHEET TITLE:
LANDSCAPE DEVELOPMENT PLAN

| | |
|---|---|
| REVISION 14: | |
| REVISION 13: | |
| REVISION 12: | |
| REVISION 11: | |
| REVISION 10: | |
| REVISION 9: | 27 JUN 22 |
| REVISION 8: | 8 SEP 21 |
| REVISION 7: | 3 AUG 21 |
| REVISION 6: | 8 JUL 21 |
| REVISION 5: | 26 APR 21 |
| REVISION 4: | 15 FEB 21 |
| REVISION 3: | 28 JUL 20 |
| REVISION 2: | 20 MAR 20 |
| REVISION 1: | 3 JAN 20 |
| ORIGINAL DATE: | 30 APR 19 |
| SHEET 24 | OF 25 |
| DEP# | |



**ATTACHMENT 15**



REVEGATION OF ADJACENT PARKLAND CONDITIONS

AHLES
LANDSCAPE
ARCHITECTURE INC.

P.O. Box 1503
Rancho Santa Fe, California 92067
858.756.8963
ale@ahlesland.com

CA# 2538

LANDSCAPE
DEVELOPMENT PLAN
FOR:

ALL PEOPLES
CHURCH

5551 College Avenue
San Diego
California

ALA PROJECT NO.:

HYDROZONE MAP

SHEET:

L-6